UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 22-800099-CR-AMC

UNITED STATES OF AMERICA,

Plaintiff,

vs.

DANIEL ELIE BOUAZIZ,

Defendant.
_____________________________________/

**DEFENDANT'S OBJECTIONS AND FACTUAL CLARIFICATIONS TO THE DRAFT PRESENTENCE INVESTIGATION REPORT**

The Defendant, **DANIEL ELIE BOUAZIZ**, by and through his undersigned counsel and pursuant to Fed. R. Crim. P. 32, respectfully submits the following legal objections and factual clarifications to the Draft Presentence Investigation Report ("PSR" or "Report).

**Introduction**

Mr. Bouaziz objects to the PSR loss computation which adds intended loss to varying conversations with the undercover agent (UCE) wherein multiple pieces of art were discussed, but the agreement was never completed between the Defendant and the UCE. Defendant also objects to the finding of the PSR that there were 10 or more victims. Regarding the total loss the Defendant should be held accountable for, the government agreed in the plea agreement: **"That the relevant amount of actual, probable or intended loss** under Section 2B1.1(b)(1) of the Sentencing Guidelines resulting from the offense committed in this case is **more than $550,000 and less than $1,500,000."** [emphasis added]. In the instant case, the parties, who are in the best position to know the facts of the case, agreed to recommend a specific loss amount. Part of the reason for this joint

recommendation was due to the fact that the UCE and his corresponding conversations with the Defendant, and the amounts of money varyingly discussed overrepresented Bouaziz' conduct, when compared in quantitative dollar amounts from other normal sales tracking the nature and circumstances of the offense laid out in the PSR for what are delineated as Victims 1 – 12 (Paragraphs 50-106). Although sentencing entrapment is not recognized by the 11th Circuit Court of Appeals, facts like those detailed in the section of the PSR relating to the UCE's negotiations with Bouaziz reflect a clear attempt by law enforcement to artificially pump up sentencing numbers that they knew to be construed as relevant conduct.

The PSR compiled in this matter finds that the base offense level is 6 (Paragraph 126). Thereafter, the PSR computes a 20-level increase based on a loss amount of $22,200,750 (Paragraph 126)[1], a two-level increase for ten or more victims (Paragraph 126). There is then a three-level reduction for acceptance of responsibility (Paragraph 126) resulting in a total offense level of 26 (Paragraph 135). The PSR computations above are incorrect as detailed below and Mr. Bouaziz objects. The total offense level should be 17 with a criminal history category of I for a sentencing guideline range of 24-30 months.

**Summary of the Argument Regarding the Correct Loss**

Presently, before the amendment mentioned in footnote 1, supra, the PSR calculates a loss of $22,200,750 finding this to be an ***intended loss***. This is an inaccurate calculation based on the guideline definition of intended loss and the case law applicable thereto. The sentencing guidelines define intended loss as the "pecuniary harm that the defendant ***purposely sought to inflict,***"

[1] Subsequently, USPO Frances Weisberg has communicated with the undersigned to advise that the total amount of intended loss will be updated to a total figure of $14,200,750 based upon knowledge that items of art discussed for possible sale between the Defendant and the UCE were, in fact, authentic pieces of art of considerable value. Defendant continues to object to these new figures for the reasons expressed herein.

U.S.S.G. §2B1.1 comment. (n. 3(A) (ii) (emphasis added), and the defendant's ***subjective intent is relevant*** to the intended loss inquiry. The facts of the case are clear. Bouaziz had two galleries on Worth Avenue with tens of millions of dollars of inventory. Despite this fact, Bouaziz was first and foremost, a collector of fine art. His sales over the past few years, as set forth in the PSR never represented sales amounts approaching anywhere near the numbers that were discussed between the UCE and Defendant. Sales rarely went above tens of thousands of dollars. There were a few that did rise above a few hundreds of thousands of dollars. As a vendor of fine art, Bouaziz was aware that no purchaser would ever agree to spend tens of millions of dollars without, first, having the items examined by an expert and appraised, not to mention agreeing to spend $22,000,000. The UCE made no such arrangements and no agreement was reached as to which pieces he may buy. Further, the UCE directed federal law enforcement officials to transmit, on or about December 13, 2021, two separate Bitcoin transactions totaling $576.60 and $326.95.[2] The Basquiat mentioned in the PSR was not even on display, but rather, kept in a back room that was not open to the public. Importantly, the Monet that was offered for sale was authenticated by a witness that the Government interviewed, and who had sold the painting to Bouaziz. He confirmed its authenticity. That witness also stated that today, "the painting could be resold for millions[3]." Bouaziz also verily believed that the O'Keefe was an authentic work of art, [4] and he believed the Keith Haring piece was equally valuable and authentic. Seven Keith Haring paintings were purchased by Bouaziz from a local collector. After the sale was completed, a demand letter (previously provided to the Government) was served on the Defendant seeking $1,000,000 per painting. This, along with his examination of

---

[2] This was based on a Bitcoin value of $46,707.016 at that time.
[3] PSR Paragraph 48.
[4] It was related to the undersigned by USPO Weisberg that the Head of Conservation for the Georgia O'Keefe Museum in New Mexico opined that if the O'Keefe was authentic (which he opined it was not from photos provided by the Government) it would have been worth between $3,000,000 and $5,000,000.

the piece, suggested to Bouaziz, in his expert capacity, that the work was authentic. In summary, Bouaziz' state of mind was that there were at lest three pieces of artwork being negotiated between the UCE and Defendant that were objectively authentic in the mind of Defendant.

Intended loss refers to the defendant's subjective expectation, not the risk of loss to which he may have exposed his victims," U*nited States v. Yeaman*, 194 F.3d 442, 457 (3rd Cir. 1999). It is commercially unreasonable to suggest that a purveyor of fine art would agree upon the sale of $22M worth of assets without a written contract or purchase order and without something more than two Bitcoin deposits totaling $903.55. Further, the case law confirms subjective intent as the touchtone of intended loss as distinct from a regime in which the defendant is presumed to intend the natural and probable consequences of his acts. *United States v. Confredo*, 528 F.3d 143, 152 (2nd Cir. 2008). Contrary to the conclusion reached in Paragraph 39 of the PSR, there was no total agreed upon price nor was there an understanding as to which pieces of art were to be transferred, and Defendant objects to this statement. Neither was there a purchase agreement entered into as alleged in Paragraph 39. Unlike every other transaction detailed in the PSR, no purchase agreement or invoice was ever created, signed or transferred by the Defendant. The UCE did not appear to be a ready, willing and able buyer as it was offered to him to have the items evaluated, and nothing was discussed in that regard. Again, the idea that someone would purchase $22M worth of art without due diligence is unreasonable. Further, as detailed in the PSR, Bouaziz told the UCE that, as was his store policy, "Anyway, five years from here we pay you 5% on top of your money if you don't want it. It's in our contract"[5] The Government will concede that at least two customers of Bouaziz came to him and wanted to return art that they had purchased from his gallery. These were Leon Oks

[5] PSR Paragraph 30.

and Lawrence Moens. Both individuals were paid back without questions by Bouaziz. Both men were paid what they had remitted, to wit: $290,000 and $120,000.00 respectively. **Both men were reimbursed for their purchases before Bouaziz knew that he was the target of law enforcement** (emphasis added). Bouaziz' first information that he was being examined by law enforcement was in December of 2021 when a search warrant was effectuated at his two galleries.

**The Clear Language of the Guidelines Preclude an "Intended Loss" Calculation**

> Intended loss is defined as "pecuniary harm that the defendant ***purposely sought to inflict.***" U.S.S.G. §2B1.1 comment. (n. 3(A) (ii) (emphasis added). The defendant's ***subjective intent is relevant*** to the intended loss inquiry. U.S.S.G. App. C, amend. 792 (effective Nov. 1, 2015) (emphasis added).

For the reasons expressed, supra, the conduct with the UCE did not fall within the definition of intended loss

**The Applicable Case Law Demonstrates there is no Intended Loss attributable to the UCE**

The case law is clear that for a loss to count as intended loss, the defendant must have subjectively desired to cause a loss or have a subjective expectation that a loss would result from his conduct and the fraud guideline, "has never endorsed sentencing based on the worst-case scenario potential loss." *United States v. Kopp,* 951 F. 2d 521, 529 (3rd Cir. 1991); *United States v. Diallo,* 710 F.3d 147, 151 (3rd Cir. 2013) (for the intended loss determination "we look to the defendant's subjective expectation, not the risk of loss to which he may have exposed his victims"). In the case of *United States v. Hill,* 42 F.3d 914, 919 (5th Cir. 1995) the Court's finding, although not binding on this Honorable Court, it may still be viewed as persuasive, looked at a situation like that framed

by Bouaziz' offer to all of his clientele that they could return any item without question within five years and have their money paid back, plus 5%. The Court stated: "When reviewing the calculation of an intended loss, we look to actual, not constructive, intent, and distinguish between cases in which the intended loss for stolen or fraudulently obtained property is the face value of that property and those in which the intended loss is zero because the defendant intends to repay the loan or replace the property. In Hill, the court focused on the intent of the defendant who despite false statements was intent on repaying the loan. Bouaziz had demonstrated it was his intention to make good on his representations to repay clients who were unsatisfied with their purchases. As outlined above, he did so in the total amount of $410,000.00 before he knew law enforcement was watching him. He also repaid other clientele, including Jennifer Stanton (Hayes) and Sean Hayes, paying them $95,000.00 after the search warrant was executed.[6] Donna Nero was paid $100,000 after the search warrant was executed. Joseph Shabani was paid $21,000 and fully reimbursed after the execution of the search warrant. Frank Seminara was paid $30,000 and fully reimbursed by the Defendant after the execution of the search warrant. Chris Angel was repaid $15,000 and was fully reimbursed. *United States v. Moss,* 34 F.4th 1176, 1190-92 (11th Cir. 2022) the court held that the intended loss means the pecuniary harm the defendant purposely sought to inflict. Here, we have the unusual situation of a defendant that was willing to repay any customer that was unsatisfied with their transaction. Unlike someone caught up in a Ponzi scheme, Bouaziz had access to significant personal resources that permitted him to do so, without relying on the continuation of criminal conduct to generate additional funds to pay off those individuals who were asking for their money to be returned. The Defendant, at the time of the Indictment, owned at least 10 pieces of real

---

[6] $38,750.00 is still due and will be paid in advance of sentencing.

property in Palm Beach County. All of these were carried in his individual name. He did not attempt to construct layers of entities to shield or obscure his assets. He had one primary business bank account, not multiple fraudulent entities to shield or obscure assets. He, unlike many accused of fraudulent activity, had the wherewithal to make good on his representations to his clients that their investment would be secured. His intention was demonstrated in advance of notice of a criminal investigation.

Bouaziz objects to the facts stated in Paragraph 40 to the extent that it represents that the Basquiat painting was displayed in the gallery. It was not. It was not for sale, and was being kept in a back room, not open to the public.

Defendant next objects to the inclusion of Leon Oaks (L.O.) as a victim in Paragraphs 68-72. Bouaziz reimbursed Mr. Oaks at a time prior to having any knowledge about law enforcement investigating him or his gallery. He entered into a commercial transaction with Oaks and provided a guarantee that Oaks would be refunded his money in the event he was dissatisfied. This is differentiable and not relevant conduct as the clientele had his money returned to him by the defendant based upon his own commercial policy of allowing for a refund within 5 years of purchase. Defendant is not claiming that those clientele who were reimbursed after the execution of the search warrant are not victims as defined by the law. U.S. Probation deems Oaks to be a victim, presumably under U.S.S.G. Sec. 1B1.3, Relevant Conduct which provides:

> (a) Chapters Two (Offense Conduct) and Three (Adjustments). Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:
> ...
> (3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions.

In reality, there was no harm committed on these individuals. They were allowed to avail themselves of a full refund of their funds, without lawyers or threats of either going to the police or threats of bringing legal action against Bouaziz. The Defendant took such action that was completely in contradiction to creating any harm towards this client and to client Moens, (see below).

Defendant next objects to the consideration of Joseph Shabani (J.S.) as a victim in Paragraphs 73-76, and specifically objects to the assertion in Paragraph 76 that the Collage for Interiors print was an unauthorized reproduction. Although Defendant paid back Shabani after the discovery of law enforcements investigation, the price paid was a commercially reasonable one. Reproductions are not unlawful, and are commonly traded in the art world.

Defendant next objects to the inclusion of Lawrence Moens (L.M.) as a victim in Paragraphs 77-81. Bouaziz reimbursed Mr. Moens at a time prior to having any knowledge about law enforcement investigating him or his gallery. He entered into a commercial transaction with Moens and provided a guarantee that Moens would be refunded his money in the event he was dissatisfied. This is differentiable and not relevant conduct as the clientele had his money returned to him by the defendant based upon his own commercial policy of allowing for a refund within 5 years of purchase.

With the removal of these identified "victims," Bouaziz would not be subject to the two-level increase under U.S.S.G. Sec. 2B1.1(b)(1)(K) for ten or more victims since the number of victims would be adjusted to nine, therefore, the PSR, Paragraph 126 dealing with the two-level increase under that section is objected to by the Defendant.

## CONCLUSION

As a result of the foregoing, the correct guideline range is a base offense level of 6. There is then a 14-level increase based on a loss greater than $550,000 but less than $1,500,000 and and a three-level reduction for acceptance of responsibility resulting in an adjusted level of 17 with a category I criminal history. Mr. Bouaziz' correct guidelines range is now 24-30 months independent of any future downward variance arguments.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 16, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and served to all parties of record.

HOWARD J. SCHUMACHER, P.A.
1 E. Broward Blvd., Suite 700
Ft. Lauderdale, FL 33301
(954) 356-0477
FL Bar No: 776335

BY: /S/ Howard J. Schumacher, Esq.
HOWARD J. SCHUMACHER, ESQ.