IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 22-80099-CR-CANNON

UNITED STATES OF AMERICA,

Plaintiff, MAY 30, 2023

vs.

FORT PIERCE, FLORIDA

DANIEL BOUAZIZ,

Defendant. PAGES 1 - 133

_________________________________/

# TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE AILEEN CANNON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF: SARAH SCHALL, AUSA
PETER LASERNA, AUSA
101 South US Highway One
Suite 3100
Fort Pierce, Florida 34950

FOR THE DEFENDANT: HOWARD SCHUMAKER, ESQ.
Law Offices of Howard J. Schumaker P.A.
Wells Fargo Tower
1 E. Broward Boulevard, Suite 700
Fort Lauderdale, Florida 33301

REPORTED BY: DIANE MILLER, RMR, CRR
Official Court Reporter
(772)467-2337
diane_miller@flsd.uscourts.gov

P-R-O-C-E-E-D-I-N-G-S

THE COURT: Thank you.

Everybody in the gallery may be seated.

Let's call the case.

THE COURTROOM DEPUTY: United States v. Daniel Bouaziz, case number 22-Criminal-80099.

Will parties please make your appearance starting with the Government.

MS. SCHALL: Good morning, Your Honor; Sarah Schall on behalf of the United States. Also present with me at counsel table is FBI Special Agent Marc Gervasi, and --

MR. LASERNA: And Assistant United States Attorney Peter Laserna; good morning, Your Honor.

THE COURT: Good morning, Ms. Schall and Mr. Laserna; and good morning, Agent Gervasi.

MR. SCHUMACHER: Good morning, Your Honor. May it please the Court, Howard Schumacher on behalf of the Defendant, Daniel Bouaziz, seated to my left.

THE COURT: Good morning, Mr. Schumacher; and good morning, Mr. Bouaziz.

Who is here for Probation?

PROBATION OFFICER: Good morning, Your Honor; Frances Weisberg on behalf of United States Probation.

THE COURT: Good morning, Ms. Weisberg.

All right. You may all be seated unless you are

addressing the Court.

We are here today for your sentencing hearing, Mr. Bouaziz. The purpose of today's proceeding is to determine a sentence that is reasonable, but not greater than necessary to serve the statutory purposes set forth in Title 18, United States Code Section 3553(a).

I have reviewed the full record in this case, which is voluminous, including a number of letters filed in support of the Defendant, objections to the PSI, a motion for a downward variance, along with responses to those documents by the Government.

There are also numerous attachments and photographs, along with newspaper clippings and other related materials that have been filed on the docket, and I have reviewed all of those materials.

At this point, Mr. Schumacher, what are the unresolved objections to the PSI?

MR. SCHUMACHER: Judge, as it relates to intended loss and also as it relates to the number of victims, your Honor, those remain the two items that left -- that are left for adjudication by the Court.

THE COURT: And just so I understand, on the number of victims, you believe it is nine and the Government believes it's 11?

MR. SCHUMACHER: I believe they think it is 12, Your

Honor.

THE COURT: Okay. Now, do you have any factual objections to the content of the PSI?

MR. SCHUMACHER: Only those that I have detailed in my objections, Your Honor, that had to deal with those particular --

THE COURT: So which particular factual paragraphs are you taking issue with?

MR. SCHUMACHER: If I can have a moment, Your Honor.

It would be pretty much in sum total of those things covering the UCE, Your Honor, which would have been paragraphs 21 through 49, Your Honor.

THE COURT: I did not read your objections to challenge that entire swath of factual paragraphs, it seemed more targeted to the --

MR. SCHUMACHER: It was the amount of loss, Your Honor, which really dovetails closer into paragraph 49, Your Honor.

THE COURT: So is the factual objection that you are lodging to the contents of paragraph 49?

MR. SCHUMACHER: Yes, Your Honor, because it details that there was an agreement between the undercover and Mr. Bouaziz for the purchase of an additional 22 million dollars worth of artwork, Your Honor.

THE COURT: Okay.

MR. SCHUMACHER: Also we would object to paragraph 39, since that also has to deal with the agreed upon price for the artwork being 22 million dollars.

I think we also objected to the Basquiat, Your Honor, that was on display in Mr. Bouaziz's gallery. The Basquiat was actually in a rear room, not on display. It happened to have attracted -- the undercover had asked for anything additional that Mr. Bouaziz had in his gallery, and he was then shown the Basquiat, Your Honor.

THE COURT: That particular issue about where the Basquiat was or wasn't, that was already clarified via the addendum.

MR. SCHUMACHER: Yes.

THE COURT: So I'm hearing two factual objections to the PSI, paragraphs 39 and 49, which I understand relate to the loss amount dispute, and you have two legal objections, one to the intended loss amount as calculated by Probation in the final PSI, and additionally to the number of victims with the Defense asserting nine total victims, all right.

Let me hear from the Government on their overview of what is left to resolve at this point.

MS. SCHALL: On behalf of the Government, we believe only the issues that Defense Counsel has raised as having concerns with.

The Government, as the Court would see in our plea

agreement, agreed to recommend a loss amount that was less than had the undercover sale been completed. So the loss amount the Government was agreeing to is $550,000 to 1.5 million dollars.

The Government believes that the factual information -- the factual information that is included in the presentence report is, in fact, accurate. The Defendant and the undercover had conversations regarding the sale of art, there was a price list that was provided, there was an exchange of bitcoin money, almost as if you were doing a PayPal, you would make a preliminary payment, so that way it would be set up, but the Government does recognize that the full agreement did not come to fruition. A search warrant was executed on the day that the parties were to meet, and so the sale was not effectuated.

Given that this matter was a plea, all of the other circumstances that the Government has considered and the fact that the 22 million dollars was not paid out in full to finalize that agreement, the parties agree to recommend the lower loss amount for the sentencing calculations.

THE COURT: Okay. On your victims, how many victims does the Government believe exist in this case?

MS. SCHALL: Eleven, Your Honor. We did concede in the most recent filing -- I shouldn't say that, not the most recent filing. In the Government's response to the Defendant's objections, I apologize, it was contained in docket entry 85.

THE COURT: Okay, so it is 9 versus 11. And the victims that are in dispute, are those victims four and five?

MS. SCHALL: They are, Your Honor, in the revised PSR on 88, and they would be referenced with the initials LM and LO, I believe those are the two individuals that Counsel is taking issue with.

The Government would submit that not only does the information contained in the PSR support them being identified as victims, but if the Court requests additional information or presentation of evidence, the Government filed, in anticipation of today's hearing, an exhibit list and we have Special Agent Gervasi available as well to testify.

THE COURT: All right. Now, are there any victims here present who wish to be heard?

MS. SCHALL: I don't believe so. Everyone has been given notice of this hearing and given the opportunity to be present. I know that some witnesses elected to submit letters in advance of the hearing, and those were submitted to Probation, but I do not have notice of anyone appearing.

May I just have one moment, just to confer with the audience?

THE COURT: Yes, you may.

(Discussion off the record between Government Counsel and members of the gallery.)

MS. SCHALL: No, Your Honor. Seeing no show of

hands, I can represent to the Court no one has -- who was directly a victim of Mr. Bouaziz has indicated their intent to be here for the --

MR. SCHUMACHER: And Judge, if I could just weigh in, I may have a little more realtime information on that particular issue.

I have been speaking to all of the victims that were listed, both in terms of in the PSI, as well as additional customers of Mr. Bouaziz, a smaller number, because they were contacted by law enforcement, because they were unsettled by the nature and circumstances of the allegations, they had requested Mr. Bouaziz to have their items returned in exchange for refunds.

I have been in contact with all of those folks over the last two weeks, Your Honor, with the exception of three with -- four of those victims, everybody else has already had checks from my trust account cut to them. The other four will have -- three of them will be paid in full by Wednesday of this week with funds that I have left remaining in my account, Your Honor.

THE COURT: Okay. Now, I just wanted to ascertain whether there was anybody here in the courtroom that wanted to be heard, and I'm hearing no.

MR. SCHUMACHER: They all indicated they were not intending to attend the sentencing hearing.

THE COURT: All right. Well, I have a lay of the land in terms of what is left to resolve at this sentencing hearing, so what does the Government propose in terms of any evidentiary presentation, starting first with the matter of victims?

MS. SCHALL: Your Honor, I am prepared to have Special Agent Gervasi testify on behalf of the Government. If the Court is requesting any additional information or factual presentation in addition to what is in the PSR.

THE COURT: Mr. Schumacher, your argument on the victims, is it basically that those victims, four and five, were already reimbursed; and therefore, they shouldn't be deemed victims for purposes of the victim enhancement, is that generally the thrust of your argument?

MR. SCHUMACHER: It is a little more pointed than that, Your Honor. It is they were not only paid back, but they were paid back in advance of Mr. Bouaziz being aware of any federal investigation prior to the execution of the search warrant in December of 2021, and based upon his ongoing policy with any of his customers, which was that if they didn't like the piece within the first five years, they could return it to him.

THE COURT: Can you get closer to the microphone? You can move the actual base closer to you.

MR. SCHUMACHER: Yes, ma'am.

10

THE COURT: Now, I understand that his reimbursement might have been before he became aware that he was being federally investigated, but do you disagree that under the guidelines, the Court is to measure the time the offense was discovered by when a victim or a government agency detects the offense, and so in this case, although ultimately victims four and five were reimbursed, they were reimbursed after each of those victims themselves detected suspected wrongdoing, and so under the language of that guideline commentary, why wouldn't they be deemed victims?

MR. SCHUMACHER: Well, Judge, I just -- I think that under the clear language of the guidelines, when they talk about intended loss, intended loss is defined as a pecuniary harm that the Defendant personally sought to inflict, and I'm quoting from comment n.3n(A).

THE COURT: But I'm talking about comment n.3(E).

MR. SCHUMACHER: Oh, 3(E).

THE COURT: Yes.

MR. SCHUMACHER: I'm sorry, I don't have that in front of me, Your Honor.

You were referring to credits against loss, Your Honor?

THE COURT: Yes, which I think does indicate and speak to the question whether these two victims are properly classified as victims because even though ultimately they were

reimbursed after they, themselves, figured out that something was not right doesn't all of a sudden make them not victims, and that's my concern with your interpretation, and my question is really targeted at that issue based on the commentary in note 3(E).

MR. SCHUMACHER: If I can just have one moment, Your Honor.

(Brief pause in the proceedings)

MR. SCHUMACHER: Judge, I can't in good faith say that that's not appropriate, Your Honor, because it did indicate that both of those individuals had come to Mr. Bouaziz for differing reasons.

THE COURT: All right. Well, given the language of the guidelines, in light of the fact that these victims detected the fraud and then later were reimbursed, I'm going to overrule the Defense objection to the number of victims and concur with Probation and the Government that there are, in this case, 11 victims properly counted as victims, notwithstanding the subsequent reimbursement made to them after the victims themselves detected wrongdoing.

And so having overruled the number of victims enhancement, that leaves for resolution the issue of loss. Now, I understand the parties have come to an agreement, and that is not unusual; but of course, Probation has an independent obligation to ascertain the veracity of any

recommendations, so the suggestion that there is some kind of disparity in Probation's treatment of this case vis-a-vis any other cases filed or addressing West Palm is something that I wanted to particularly make note of because it is incorrect and frankly offensive.

Probation works for the Court in the interest of justice to ascertain the truth of the figures in the PSI, and one of those, of course, is loss, and Probation is obliged to calculate the advisory guideline range correctly. So in service of that goal, they, of course, must look behind the recommendations made by the parties and I think has, in this case, done a very admirable job at trying to determine what the loss amount is.

So with that, I would like to actually know, in this case, why we aren't looking at a much higher loss figure given that there were discussions of concrete items, eight pieces of art in particular, some legitimate, some fraudulent as it turns out, and so while the 22 million dollar figure is clearly not appropriate, Mr. Schumacher, why isn't it not the case that the ultimate figure, which I believe is $12,740,000 in fraudulent artwork, why would that not qualify under the definition of intended loss, which in this case, would require, of course, proof that the Defendant purposefully sought to inflict that amount of harm given the discussions with the undercover about particular pieces of art, including at least three, which I

understand are not legitimate, a Banksy, a Basquiat, and a Georgia O'Keeffe?

That's my question for you, Mr. Schumacher.

MR. SCHUMACHER: Yes, Judge. If I could just back up for a moment and address one of the Court's comments, Your Honor.

Anything that I put in my recitals and in any of the submissions that I do, I make an attempt to be factually accurate, Your Honor. The fact that you found some of that objectionable, my apologies to the Court. That was not my intention, but that's -- it's my understanding that it is factually accurate; that there are judges in our circuit that direct Probation to follow the recommendation of the parties.

That's not something that I think about. I think -- I have had direct experience with it, and it is also after -- comes from speaking to members of Probation.

THE COURT: So you are basically saying that had Mr. Bouaziz been indicted and given a randomly selected judge in West Palm Beach, there would be no dispute as to the loss amount?

MR. SCHUMACHER: That's what I'm saying, Judge.

THE COURT: Okay. Well, that might be so, but let's not forget Probation has an obligation to calculate the guidelines correctly.

MR. SCHUMACHER: Yes, ma'am.

THE COURT: So let's do that, let's calculate the guidelines correctly and let's figure out what the loss amount in this case actually is.

MR. SCHUMACHER: Okay.

THE COURT: Because while I understand you may have negotiated a very agreeable loss amount to your client, I'm still obliged to calculate those guidelines correctly, so I would like information about the facts in this case.

It appears to me that the facts do indicate very clearly that the loss amount exceeds the one agreed to by the parties.

MR. SCHUMACHER: I beg to differ, Your Honor. I don't think that that's the facts because although there were multiple conversations between Mr. Bouaziz and the undercover about a number of different pieces of art, there is no realistic expectation that someone was going to deliver to Mr. Bouaziz 22 million dollars, whether it be in bitcoin or in any other tender, Your Honor, without first doing an examination of the works of art and having those works of art analyzed.

There was never any -- Mr. Bouaziz indicated that during the course of the UCE's conversations with him that he was free to have someone come in and do an examination of the pieces, but that was never something that the undercover ever took steps to do, Your Honor.

There was conversations about a multitude of these pieces, there were different numbers that were discussed for that, but the undercover came in and knew that at that point in time, the victims that they were aware of were buying pieces in the neighborhood of in the tens of thousands, Your Honor, and on a couple of instances, including the Gorensteins, several hundred thousand dollars.

But for a number to then come out, an eight-figure number for the purchase of this, this was artificially calculated by the undercover in order to try to bolster the idea that with intended loss, that we are going jump up to some outrageous figures. In terms of the nature and circumstances of the offense, it is an outlier from the manner in which businesses was conducted.

In every other instance, Judge, that the Government -- and these were all documents that were retrieved as part of the search warrant process, Mr. Bouaziz had a purchase order, he had a receipt, he had documentation of specifically what was to have been either delivered or picked up in his gallery.

None of those steps were ever taken in this particular case with the undercover, it never advanced to that level, Judge. The only thing the undercover received was the Lichtenstein that was delivered to an address by the gallery, Your Honor. That Lichtenstein was nowhere in this

neighborhood, it was, again, a mid five-figure number, Your Honor.

The intent of Mr. Bouaziz is relevant under 2B1.1, and 3(A)(ii), the substantive intent is relevant to the intended loss. Mr. Bouaziz never actually believed that the undercover was going to consummate this transaction. Who takes a 900 to a $1,000 deposit on a 22 million dollar collection of artwork and says, Okay, we have a deal with no paperwork at all, Judge? This was superfluous puffery talked about between him and with the undercover.

THE COURT: So the Defendant had the fraudulent artwork available for sale, though, the eight pieces that were discussed between the UC and the Defendant?

MR. SCHUMACHER: With the exception of the Basquiat, yes, Judge. That was not actually offered for sale, it was in a backroom. Mr. Bouaziz is an art collector, as well as a purveyor, and it just wasn't for sale, but the undercover was looking for additional sums of money and additional items that would again artificially raise that price up because no one -- no one believed that he was actually going to go through with this deal, Judge.

There was absolutely no suggestion that $900 advanced on a 22 million dollar collective purchase was ever going to come to fruition and that that person would do it without making definitive steps to ascertain the authenticity of any of

those items, Your Honor.

On top of that, Mr. Bouaziz says, like he does to all of his clients, on tape, "Anyway, five years from here, we pay you 5 percent on top of your money if you don't want it, it is in our contract."

THE COURT: But why doesn't that just cut against the Defendant? Doesn't it just operate -- you know, further the scheme?

In any event, my question, though, targeted to the intended loss definition says, "Intended loss means the pecuniary harm that the Defendant purposefully sought to inflict; and number two, includes pecuniary harm that would have been impossible or unlikely to occur; example, as in a Government sting operation or an insurance fraud in which the claim exceeded the insured value."

So even if what you say is correct, that this ultimate deal for 22 million dollars was unlikely to occur, why wouldn't it still be calculated properly as intended loss?

MR. SCHUMACHER: As we have tried to focus on in our objections, Your Honor, I think, again, what the case law talks about and what the guidelines talk about is his subjective intent. Here, I don't believe there is a clear demonstration of Mr. Bouaziz's intent to go forward with this particular transaction, Your Honor. Again, there is no written agreement; there is no purchase order; there is nothing that formalized

what the parties had been loosely talking about. This is over the course, by the way, of three visits by the undercover.

THE COURT: Okay. Ms. Schall, what Government evidence exists about the nature of the agreement between the undercover and the Defendant with respect to this much larger sale of I think eight total pieces for approximately 22 million dollars?

MS. SCHALL: Your Honor, the undercover had been in communications with Mr. Bouaziz both via text and via the phone to discuss the purchase of art.

There was some discussions, just to make it clear for the record, about pieces --

THE COURT: Can you bring the microphone closer and speak louder.

MS. SCHALL: Of course, I apologize.

There were text and phone communications with Mr. Bouaziz and the undercover leading up to the day of the execution of the search warrant, and just to direct everyone's attention, that would have been December 15th of 2021. Their communications were about pieces that the undercover would potentially be interested in. There was some reference to at least one piece of art, I recall something about a frog, I believe it was a Warhol frog that was not in the gallery, but was actually in another location.

Mr. Bouaziz had asked for -- for example, I recall

that the day of -- I think it was the day of the search or the day -- if I just may have one second, Your Honor, I just want to do my best to make sure that I have the dates factually correct, given the Court's inquiry.

So for example, on or about December 13th of 2011, the UC exchanged text messages and they communicated, for example, about the O'Keeffe. Thereafter, they discussed crypto wallets and how a transfer could be made, and the UC indicated he would send a deposit to Bouaziz's bitcoin, basically his public wallet address, and that's where you will see that Defense Counsel was referencing a bitcoin payment.

The Government does concede that it was not a large sum of money that was paid, but there was an initial, essentially like a little deposit to get that ball rolling, and then there was -- Bouaziz provided subsequently a price list that outlined the pieces that they had discussed about possibly purchasing.

Now, the Government cannot say definitively that it came from Mr. Bouaziz himself. It came from the gallery, believed to be an employee working on Mr. Bouaziz's behalf, and it included a description of those pieces as well as the cost associated with them. There had been discussion between the UCE and Mr. Bouaziz about the purchase price for those pieces collectively.

Thereafter, the UCE transferred additional funds,

again a small amount of money, via bitcoin to Mr. Bouaziz's currency exchange, and then they continued to -- they had text messages about -- the UCE sent a text message to Bouaziz offering 22 million dollars worth of bitcoin for the purchase of the items. And then there was the exchange where later that same day, the address was added and they were able to exchange the money.

But again, fast forward, they were going to have a meeting, but that meeting obviously -- the Government didn't intend to really have the meeting to have the sale effectuated because the search warrant was effectuated before the sale could go through.

THE COURT: Well, when the PSI writes that the UCE and Bouaziz entered into a purchase agreement, what evidence is there to show there was a purchase agreement?

I would like to see some of this documentation, these text messages that you say were exchanged where references to these particular items were discussed with potential dollar amounts. That's the sort of evidence that I think would be relevant to determining whether the intended loss is more along the lines of what Probation indicated versus what the parties have proposed in the plea agreement.

MS. SCHALL: Yes, Your Honor, of course. I have a copy I can show Defense Counsel, it's been previously provided and I'll hand it up to the Court. It's of the price list that

was provided, there is a redaction in the top left-hand corner, that's a reduction of the undercover's contact information.

May I approach, Your Honor?

THE COURT: You may.

All right, what have you presented the Court with?

MS. SCHALL: Your Honor, for the record, the Court is presented with a three page document, it is a price list. So this was the list of items that the UCE discussed with Mr. Bouaziz to purchase, and you will see that it includes the -- initially, there was a price of $22,290,000 and they negotiated it to then 22 million dollars flat for all of those items that were listed.

And the Court correctly notes that after the execution of the search warrant, law enforcement confirmed that three of those pieces that were included, the Basquiat, the O'Keeffe -- the Banksy, the O'Keeffe and the Basquiat were, in fact, fraudulent items that were for sale.

The Government also has a copy -- I apologize, Your Honor, because of the text messages, they were a little difficult to print, but I do have one excerpt of a text message with me in court, I can provide a copy. Everything was previously provided to Defense Counsel in discovery, a copy of the communications wherein they discussed the prices, as well as how to forward the monies.

So when we talk about a purchasing agreement, the

Government can represent in the interest of justice that the parties did discuss the purchase of these items. There was not a signed contract per se, as may be existent in other cases. There was not an exchange directly of cash, there was only -- again, that's the equivalent of currency, but it was the bitcoin being sent for those two mailings of the bitcoin as deposits, and then the parties were discussing meeting that day, the 15th, about the exchange of artwork.

I believe that there was a discussion about one of the pieces potentially being taken by hand, I believe the undercover intended to -- had discussed taking the Banksy, for example, from the gallery when he went to pick up the pieces.

THE COURT: So is there a written memorialization of the Defendant agreeing to make this sale for 22 million dollars?

MS. SCHALL: If I may, as an officer of the Court, I can provide the Court with a copy of a text message exchange.

THE COURT: Yes, I would like to see that.

MS. SCHALL: It is a one page document, if I may approach.

THE COURT: All right. So I'm looking at a text message exchange that is represented to be between the UCE and the Defendant in this case. The first communication is the UCE asking --

MS. SCHALL: That's correct, Your Honor, the green --

there is a communication in green, that would be the UCE, the undercover, and the response in the gray would be Mr. Bouaziz, Your Honor.

THE COURT: And then Mr. Bouaziz says, "Yes, let's do it at that number, the 22 million dollar number. I am giving you a really good price, maybe you could send a few bitcoin through Gemini to close the deal, I'm looking forward to seeing you soon."

All right. Mr. Schumacher, do you take issue with the sort of factual accuracy of these documents, and I'm referring to the price list on Danieli Fine Art letterhead, along with the text message chain as I have described it?

MR. SCHUMACHER: No, Judge. Those are the actual documents that were -- speaking about the price sheet, that was provided previously in discovery, Your Honor. And as far as the text messages, we concede that that was between the UCE and Mr. Bouaziz, Your Honor.

I remain steadfast that, again, in each of these other commercial transactions involving a far less significant number, there was, associated with each of those, a purchase order and a bill of lading or a sale receipt indicating a willingness to move forward with that.

Again, with these kind of numbers -- first of all, Mr. Bouaziz's gallery had never dealt with those kind of numbers before. Secondly, if they were going to be, in fact,

part of a commercial transaction, he knew that those -- that person would absolutely come in and insist on evaluations to be done, again, as to each of those pieces for authenticity. And again, the Monet was, in fact, authenticated and that's not contested by the Government.

THE COURT: Do you disagree, Mr. Schumacher, that those three items, the Banksy, the Basquiat and the O'Keeffe, that those three pieces of art represented to be worth $140,000 as to the Banksy, 12 million dollars as to Basquiat, and $600,000 as to the O'Keeffe, that those three are not actually legitimately priced?

MR. SCHUMACHER: I can't agree to that, Judge, because my client cannot agree to that. I don't want to get into a situation where my client is in danger of, you know, losing his acceptance of responsibility, but art, as we have talked about, is very subjective, Your Honor. Art galleries and art purveyors do, in fact, make mistakes, Your Honor, and whether or not those were authentic, I can tell you that Mr. Bouaziz believed them to be authentic.

THE COURT: Does the Government have any proof it can provide via testimony that those three pieces are actually fraudulent?

MS. SCHALL: Yes, Your Honor, and I believe that information is outlined in the PSR as well, and I can direct the Court's attention to the paragraphs that can be of

assistance.

THE COURT: All right, which paragraphs?

MS. SCHALL: Paragraph -- I'm sorry, I'm referring to docket entry 88, Your Honor, of the revised PSR.

For example, if we refer to the Basquiat, paragraphs 40 and 41 reference there was a Gallery Chalet stamp on the piece. A subject matter expert was consulted with in regards to this case and indicated that they were, in fact, not authentic pieces, that it was fake.

I would note for the Court's record that there were at least two Basquiats that were, in fact, in the gallery. The Government does concede they were in different locations, but they were in the gallery.

In regards to the Banksy, Your Honor, we refer to paragraphs 46 and paragraph 47. At a minimum, it shows, as the Court has presumably noticed, there was a pattern of practice in this case where the Defendant oftentimes would purchase pieces online at auction, not an auction like Sotheby's or Christie's, as many of the customers would assume when he uses the term auction, but an online auction similar to Ebay, where he would go online, purchase something for a nominal fee, something for 100, $200, for a nominal fee, and then resell that item at a much higher price, which in and of itself is not the crime.

The crime is when it was altered, so the information

that was on the website when he initially bought it off Live Auctioneers, for example, it may say one thing. For example, after, after Warhol, meaning not by Warhol, and then when he would sell it to a customer, he would not add that after part, he would say it was an original Warhol.

So I give that little background so that when we are looking at, for example, paragraphs 46 and 47, we are looking at the Banksy. The Banksy, we have evidence that he purchased an item that looked -- that appeared to be the same for $518 from Black River Auction, another auction site. And that it appeared to be identical in image and when we look at the information that was provided, there was no certificate with that or anything.

But then when we see, one, the provenance, meaning the history of the piece that was provided by Mr. Bouaziz to the undercover, when they talked about it was bought by a particular person, that it was from Piccadilly Circus, we know that not to be true and accurate. That was false because the provenance is false because it was presumably purchased from Black River Auction.

Then paragraph 48, Your Honor, it's combined within a paragraph that references the Monet, so it may not have been -- may not have stood out, but right in the middle, it talks about the Georgia O'Keeffe, paragraph 48, and the FBI consulted with representatives from the Georgia O'Keeffe museum in New Mexico,

they reviewed the purported O'Keeffe painting that the Defendant had spoken about selling to the undercover, and they indicated that there were inconsistencies with the work and it was determined to be a forgery with no value.

So based on the information as its presented within the PSR, the Government would submit that we are able to establish that these were not authentic pieces that the Defendant was discussing with the undercover, and that the pattern of practice was similar to some of the other victims in this case, and if the Court would like additional information, FBI Special Agent Gervasi is here to testify, Your Honor.

THE COURT: All right. Mr. Schumacher, previously, you lodged factual objections to paragraph 39 and 49. Those paragraphs are different than the paragraphs relied on by the Government to establish the fraudulent nature of the three items we have just been talking about, meaning the Banksy, the Basquiat and the Georgia O'Keeffe.

I want to determine if you have any factual objections to the paragraphs relied on by the Government for this last topic of discussion?

MR. SCHUMACHER: I do, Judge, and again, what I try not to do at a sentencing hearing is to mire myself in minutiae for the Court. I like to try to focus on the bigger picture because I don't want to alienate the Court by trying to suggest that everything is being challenged, but in this particular

instance, the way the Government has made this case, in large part by coming in and saying, Okay, we found these items, let's talk about the Banksy, let's start with the Banksy.

Do we dispute the fact that Mr. Bouaziz had purchased the Banksy through this particular online auction; no, we don't dispute that, the receipts are there. But what the Government is unable to do is specify -- and in fairness to Counsel, she has tried to qualify it by saying, We think that this is the case.

The truth is that unless there is something specifically discerning about a particular item coming through, it is a best guess as to whether or not these items belong to the one that came from the online auction or if, in fact, this Banksy was, in fact, suggestive of authenticity because it was coming from this large art collector, Hans Schemke, that Mr. Bouaziz had purchased a number of items before.

And the problem is, unless there is a differentiable -- that if it suggests that it is 101 out of 150, that would be -- that would be exact, right, but we don't have that in this particular case, Judge. At least as it relates to that Banksy, I don't think that there is anything that was specifically discerning about it.

Also, as it relates to --

THE COURT: So your argument is that the Banksy that was discussed as part of the 22 million dollar deal might not

be the same Banksy listed in paragraph 47?

MR. SCHUMACHER: That's correct, that's correct.

What I'm also saying, Judge, is that my client is an accepted expert in a couple of different artists, and we are not saying that it involves either Banksy or Basquiat, although he is writing a book right now on Basquiat that he has just finished, but he is not recognized as an expert in O'Keeffe or anything like that, but based upon his eye, his collecting art over the last 50 years, he believed the brush strokes, et cetera, to be authentic.

I believe -- and Counsel for the Government can tell me if I'm wrong -- these people are making these assertions based upon photos, not an in personam evaluation.

Is that right?

MS. SCHALL: If counsel was asking for clarification, for example, the O'Keeffe was brought to the O'Keeffe Museum to be evaluated by the representatives.

MR. SCHUMACHER: Okay. And I think that the issue that the conservator or the expert that they are claiming looked at it suggested that there were wet brush strokes, meaning that -- I don't know the exact process of that, but they said O'Keeffe never painted with wet brush strokes, and Mr. Bouaziz disagrees with that.

So again, these are people that are experts only because they are helping in a particular estate. We don't know

what their -- I don't know what their expertise is, Judge. I know what my client's expertise is and in this particular case, and those three particular items he believed to be authentic items, Your Honor.

Again, based upon an intended -- the intended pecuniary loss, my client didn't feel that that was, in fact, going to be a loss for that particular undercover, Judge, because he believed in their authenticity.

Obviously, there is no question about the Monet, there is no question that the Monet is worth probably around 10 million dollars, Judge, at least as far as what my client is concerned with, Your Honor.

THE COURT: All right. I would like to hear from the Agent on these three pieces, the Banksy, the Basquiat and the O'Keeffe. I want to hear what evidence the Government has to show those items are not legitimate, and I'm referring to the three that were part of a 22 million dollar deal between the UCE and Mr. Bouaziz, even if that deal didn't ultimately result in final paperwork.

MS. SCHALL: The Government would now call to the stand FBI Special Agent Marc Gervasi.

THE COURT: Let's swear the Agent in.

MARC GERVASI, GOVERNMENT WITNESS, SWORN

THE COURTROOM DEPUTY: Sit down and state your name, spelling your last name for the record.

THE WITNESS: Yes, ma'am.

My name is Marc Gervasi, last name -- I'm sorry, first name Marc, M-A-R-C, last name is G-E-R-V-A-S-I.

THE COURT: Please continue.

MS. SCHALL: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SCHALL:

Q Sir, where are you employed?

A I am an agent with FBI out of Miami Division, West Palm Beach resident agency.

Q How long have you been an agent with the FBI?

A An agent, since 2004.

Q And during the course of your time as an FBI agent, what types of cases or investigations have you handled?

A A wide range of different violations from the national security side to currently, I work on a white collar crime squad.

We handle a multitude of different investment scams, frauds and swindles; and also within that squad, I have a specialized certification -- FBI certification in fraud related to art.

Q And as a specialist in this area, are you part of a team for the FBI?

A That's correct. I'm part of -- one of approximately 25 agents throughout the country on the art crime team.

Q And you said you received certification for this, is that correct, sir?
A Correct, an FBI certification.
Q And what, if anything, have you had to do or classes have you had to take in order to receive that certification?
A There is one week annual training, and then there is training throughout the year, oftentimes virtual training. And then a lot of it, of course, is on-the-job training and monthly team calls.
Q And do you consult with your fellow art crime agents in regards to their cases or investigations that they are handling around the country?
A Almost all of the time, yes.
Q So are you familiar -- I'm assuming so, since you have been sitting in the courtroom with us today, but are you familiar with the investigation into Mr. Daniel Elie Bouaziz, the Defendant in this case?
A Yes, I'm the primary case agent on this matter.
Q What does that mean, to be the primary case agent?
A Essentially, I'm the lead case agent. So basically, it's always a team project, but for simplicity, I am the person working the case.
Q Did agents from the art crime team assist you with this investigation?
A Definitely, multiple agents assisted with this case,

including many on the art crime team.
Q Did there come a point in time when search warrants were executed in regards to this investigation?
A That's correct, December 15th and 16th, 2021.
Q And now the Court had asked you to just -- for us to focus our attention on three pieces of art that the Defendant had in his gallery and had spoken with the undercover about selling.
Do you recall that?
A I do.
Q So if we could, if we could go through each piece. In regards to the Basquiat, are you familiar with the Basquiat that's referenced here, the Basquiat that Mr. Bouaziz had discussed selling to the undercover?
A Correct.
Q How are you familiar with that piece, sir?
A We are aware that he was trying to -- that he had a price list for those pieces, there were two of them that I recall seeing -- or I'm sorry, I recall seeing one. Then there was another one that I couldn't see that was in a closed room or separate room, but we had information that the prices for those were approximately 12 million and 25 million dollars.
Q And when you say you had an opportunity to see, where did you go to see these pieces?
A I, myself, conducted surveillance on one occasion in September 2021, I believe, in which I took various photographs

of the artwork on display so that I could provide some of those photographs to entities that were considered experts in those particular artists.

Q Were you, in fact, able to take photographs?

A Yes.

Q Did you share those photographs with anyone to consult about the pieces that you had photographed?

A That's correct.

Q And what, if anything, did you discover?

A All of the pieces were inauthentic and not by the hand of the artist.

Q And do you recall anything distinguishable? Were there any labels or anything, like that on the pieces that you are talking about, these Basquiats?

A There were some gallery labels on at least one of them, a gallery label on at least one of them.

Q Do you recall whether or not -- let me take it a step back.

First of all, when you said you had seen these pieces, were these at Mr. Bouaziz's galleries on Worth Avenue?

A Correct.

Q And the undercover in this case, are you familiar with the undercover?

A Yes, I am.

Q Okay. And do you work with that individual?

A I did.

Q And did that individual provide you with information regarding his communications with Mr. Bouaziz in time?
A Yes.
Q And do you know if the undercover had had discussions with Mr. Bouaziz about the Basquiat or Basquiats?
A Yes.
Q And what do you recall, to the best of your recollection, about their discussions?
A Starting with the day of the search, that would have been December 15th, 2021, I recently reviewed the concealed audio and video recording, and I remember a sales associate sitting with the undercover and Mr. Bouaziz sitting at his desk, and they spoke about the Basquiat that was being sold to the undercover and I remember the undercover saying, Oh, this is the closest I've actually been to it, it looks nice, which I believe he was referencing -- he was referencing the Basquiat.
And then the conversation was that Mr. Bouaziz said that was not for sale, but indicated it is for the undercover and the sales associate said something to the effect, Yes, it is just for you.
Q And during that conversation, was there any discussion about the provenance of the piece, if you recall?
A There was several comments, I believe at that meeting, and also at a previous meeting, perhaps in September of 2021, where Mr. Bouaziz claimed that the provenance was -- I want to say at

least on one of the Basquiats from a partner of his and I think there was a reference of some sort to Hans Schemke.

Q And do you recall anything about it being -- the provenance being the father of Basquiat?

MR. SCHUMACHER: Objection, leading.

THE COURT: Sustained.

BY MS. SCHALL:

Q Do you recall any other information regarding the provenance as you sit here in court today?

A He said that -- something to the fact that this is -- I know this is real, this is from the father of Basquiat, and he conveyed it was from the father of Basquiat is what I recall.

Q And this Basquiat that Mr. Bouaziz was discussing with the UCE for sale, was this one of the two Basquiats that you photographed?

A There was one that I photographed in the main room, and that was an image of a man with a sword, and then there was one in the backroom, which I did not see.

My understanding was that the one for sale was the one with the man and the sword. The reason why that was my understanding is because there were two previous prices given for the two Basquiats, one was 12 million and one was 25 million to a different individual. And since the sale price was 12 million dollars for this one, the one that was in the main office, that was what my understanding was.

Q Because the 12 million dollar piece was included in the price list for the undercover, is that correct?
A That's correct.
Q And your understanding was at a minimum, that those two pieces that were inside of the gallery, one on display and one perhaps in the backroom, were both confirmed by a subject matter expert not to be authentic pieces, is that right?
A That's correct. We consulted with a member that was previously part of the authentication committee for Basquiat.
Q Now, did you have an opportunity, during the course of the investigation, to review subpoena record returns for Live Auctioneers, an online auction company?
A Yes.
Q And do you know if Mr. Bouaziz, as a result of those records, in fact, made purchases through that online auction company?
A Correct.
Q And are we talking about one or two purchases or a number of purchases?
A An incredible amount of purchases, hundreds.
Q And do you know whether or not there were any -- whether or not there were any Live Auctioneers' invoices for Basquiats --
A Yes.
Q -- that he had purchased?
A There were.

Q And did any or at least one match the item that Mr. Bouaziz was in negotiations to sell to the undercover?
A Yes.
Q And would it be fair to say that the purchase price for that piece online by Mr. Bouaziz was about $495?
A Yes, several hundred dollars, correct.
Q And was this piece identical in image to the piece that he was selling the undercover?
A Yes.
Q Now, if I could, I think we can direct our attention to the second piece, the Banksy, are you familiar with the Banksy?
A I am.
Q How is it you are familiar with that piece, sir?
A I personally observed it, and we have looked -- we have analyzed it during our investigation.
Q Where did you observe it, sir?
A I observed it in, I believe, the smaller of the two galleries, 226A Worth Avenue, it was hanging on the wall by the entrance door.
Q And did you receive any information from Mr. Bouaziz about this piece?
A Yes, I interviewed him at the search. When we executed the search, we spoke for several minutes, maybe about 20 minutes roughly, and he had told me he bought the Stop Sign from Black River Auction, I believe he said he bought several Stop Signs

from Black River.
Q What is Black River?
A It is one of the many companies that sells artwork online.
Q And when we are talking about artwork, is it similar to Live Auctioneers, are these pieces that are all original pieces or are these some pieces that are reproductions that are being sold at Black River?
A Correct, reproductions.
Q So Live Auctioneers and Black River Auction are companies that are selling reproduction pieces?
A Correct.

MR. SCHUMACHER: Leading, foundation.

THE COURT: You can cross on this issue, Mr. Schumacher, overruled.

Let's continue.

BY MS. SCHALL:
Q Now, do you know whether or not the undercover had conversations with Mr. Bouaziz about the Banksy?
A Yes. I recall on the morning of the search, when I was preparing the undercover, as he was getting ready to go in the gallery, I asked him -- asked the undercover to ask Mr. Bouaziz to provide a provenance for the Stop Sign.

The undercover then requested that, I don't know if it was via phone or in person, but it was prior to him arriving at the gallery, and then during the search, we saw a

handwritten letter, which I believe was Mr. Bouaziz -- Mr. Bouaziz's handwriting, though we didn't have it analyzed, in which the provenance was listed as different than a Live Auctioneers purchase.

Q In what way, what did the provenance -- what did this handwritten letter refer to, anything in particular?

A Yes. It referred to, I believe, being from Hans Schemke, from Piccadilly Circus, which was, it's my understanding, in the United Kingdom.

There may have been some comments about how it was at a bar or at an establishment and bullet holes were shot through it, it is a famous Stop Sign, but there was no mention, of course, of it being purchased from Black River.

Q So what had been represented to the undercover was that it was an authentic piece, presumably from London, would that be correct?

A That's correct.

Q And just to be clear, prior to these -- to this discussion about the sale that was to have taken place on December 15th of 2021, the undercover had purchased and actually paid for another piece, is that correct?

A That's correct.

Q And that piece was determined to be an authentic piece or was that determined to also be a fraudulent piece?

A Also to be a fraudulent piece.

Q Now, lastly, if we could, let's turn our attention --

MS. SCHALL: I'm sorry. One second, please, Your Honor.

BY MS. SCHALL:

Q If we could turn our attention to the Georgia O'Keeffe that was referenced in the list of items for sale, do you recall that piece of art?

A Yes, I do.

Q And what, if anything, do you know about that piece, sir?

A I recall an identical piece being purchased by Mr. Bouaziz on Live Auctioneers again, and the description was after, after the artist.

Q And what does that mean, for those of us who may not be familiar with the art terminology?

A It essentially means not by the hand of the artist.

Q And the piece that Mr. Bouaziz was selling the undercover, did he indicate that it was an after piece or that it was an original piece by Mrs. O'Keeffe?

A He indicated it was a special piece by Mrs. O'Keeffe.

Q When you say special, what do you mean?

A Authentic, a good piece, original, high value; and I think the price tag he put on it was approximately $600,000.

Q And this piece that we are talking about, did you subsequently or members of the FBI have that piece examined by anyone from the O'Keeffe Museum?

A Yes. We shipped it from our Miami division evidence room to our office in Albuquerque and we transported it to the O'Keeffe Museum, and we had an individual at the O'Keeffe Museum spend some time going over it with us, two individuals.
Q And when they reviewed it with you, what, if anything, were their conclusions about the piece that you showed them?
A Without a doubt, inauthentic; there was no discussion that maybe this is it, or maybe this looks correct. It was more just like absolutely not by the artist.
Q If I could, I just have one item to clarify.
If a piece is sold online in the style of an artist, what does that mean?
A Generally, it's how -- it's in the style of the artist. Basically what it is saying is it's how the artist would paint it, for example.
Q But does that mean it was by the artist or meaning it is not -- for example, if --
A I understand what you are saying. I think if it was by the artist, it would say by the artist; but if it is in the style of, then it has stylistic components of how the artist would -- him or herself would paint something or draw something.
Q And could it have been possible that the O'Keeffe was described as that that was on Live Auctioneers, that it was in the style of the artist?
A Yes.

MS. SCHALL: I don't have any further questions for the witness at this time, Your Honor.

THE COURT: All right.

Mr. Schumacher.

MR. SCHUMACHER: Thank you, Judge.

CROSS-EXAMINATION

BY MR. SCHUMACHER:

Q Agent Gervasi, the search warrants that you and federal law enforcement executed in this case were done only at Mr. Bouaziz's two adjacent galleries, correct, on Worth Avenue?

A We had several search warrants. There was one on a storage facility, but there was nothing there, and we had digital search warrants as well.

Q Okay. What about his house, you never searched his house, correct?

A No, we did not.

Q Are you familiar with a commercial property that he has called The Castle, nicknamed The Castle?

A Yes.

Q You knew that he had a gallery there that was the predecessor to the ones that are on Worth Avenue, is that right?

A Are you suggesting The Castle was prior to the galleries on Worth Avenue?

Q Yes.

A I didn't know the time sequence of that. No, I thought The Castle was a later acquisition, after he already had the two galleries.
Q Do you know whether or not he ever had art in The Castle?
A Yes.
Q Okay. But again, you chose not -- you and other law enforcement officers, you being the main case agent, made a decision, We are not going to effectuate a search warrant in either his house or The Castle?
MS. SCHALL: Objection, Your Honor.
THE COURT: Overruled.
BY MR. SCHUMACHER:
Q Is that right?
A We felt like we did not have enough probable cause to go into his house because we did not know if he kept art there.
Q Well, do you know if he kept any art in either of those places?
A We do not believe that he kept any valuable art at The Castle.
Q And what do you base that on, sir?
A I personally saw The Castle and did not observe any art.
Q Okay. Did you see the photos that were attached to the sentencing memorandum, for instance, the social media photos of The Castle, when it was in -- when it was being used as an art gallery?

A No --
Q Okay.
A -- I did not see those photos.
Q Okay. So you don't know whether or not any of these items that were purchased -- you said that there was hundreds of items, right, purchased by Mr. Bouaziz on Live Auctioneer?
A That's correct.
Q How many of them were in his home?
A I have no idea.
Q How many of them were in The Castle?
A I do not know, I did not see any in The Castle.
Q Again, you were never inside The Castle, is that right?
A I was in The Castle, yes.
Q When was that, sir?
A That was perhaps the day of or prior -- week of the search, prior to when we were trying to determine if had we enough resources to see everything in The Castle.
Q How did you gain access to a building that you didn't have a search warrant for?
A There was a bay open, and I think we actually did have a search warrant for it, but we chose not to execute it and there was an individual there that showed me around.
Q Showed you around under the guise of a search warrant?
MS. SCHALL: Objection, Your Honor.
THE COURT: What's the objection?

MS. SCHALL: There actually was a search warrant for the location, there was nothing in the gallery.

THE COURT: What is the relevance? We are trying to determine loss amount of these three items of art.

MR. SCHUMACHER: Judge, I want to know what steps this Agent made to assure that the items that were ordered from Live Auctioneer weren't somewhere else, and not the items that he is now claiming were sold to the undercover. That's what I'm trying to get at, Your Honor.

THE COURT: I'm not sure how that ties in specifically to the Banksy, the Basquiat and the O'Keeffe.

MR. SCHUMACHER: Could I ask a few follow-up questions on that?

THE COURT: Yes.

BY MR. SCHUMACHER:

Q Agent, as it related to the Banksy that was ultimately going to be sold to the UC, was there anything distinguishable about that particular Banksy?

A Distinguishable in which meaning?

Q In your experience, was there are a number of Banksy reproductions being offered online?

A Yes.

Q Okay. So what allows you to say that the one that was purchased from the Black River Auction is the same one that he was offering to the UC, what was it that allowed you to do

that, sir?

A Sure. One is Mr. Bouaziz said that he bought the Stop Sign from Black River, so that was the first indication; and then we saw a purchase for that Stop Sign from Live Auctioneers for a couple hundred dollars --

Q Okay.

A -- from Mr. Bouaziz, and that purchase was -- appeared identical to what was being sold at the Worth Avenue gallery.

Q Presumably they all appear identical to an original, that's the whole idea behind a reproduction, correct?

A I think what you are suggesting is that perhaps Mr. Bouaziz had duplicates of everything that was in his gallery at a different location, if I'm understanding correctly.

Q I'm just asking you what steps you -- what steps you took that will now allow you to now come into court and say that the one purchased from Black River Auction was the very same one that was offered to the UC, that's what I'm asking, particularly when Mr. Bouaziz has given a provenance that it was given to him by or purchased from Hans Schemke, correct?

MS. SCHALL: Objection, Your Honor, asked and answered. The witness has indicated that the Defendant himself told him that this was purchased from Black River.

THE COURT: Overruled, you can answer the question.

BY MR. SCHUMACHER:

Q So just walk me through, Agent, what allows you to say that

the Banksy that was being -- going to be delivered to the UCE was the very same one that came from Black River Auction?

A Right. We compiled our investigative analysis and results by the fact that he purchased that from Live Auctioneers, an identical image; from the fact that he told me, during the interview, that he did; by the aggregate amount of what was going on at the gallery outside of the Banksy and the O'Keeffe; the large volume of Live Auctioneers purchases, all of this goes into making a probable cause ascertation to get the search warrants, et cetera.

Q Is it fair to say that you -- because of the closeness in the image to the Black River Auction to what was being offered, what Mr. Bouaziz purchased and what was being offered to the UCE, you speculated that it was the very same one, correct?

A If we didn't have all of these facts, aggregate facts, and then the Banksy Stop Sign didn't look like the Banksy Stop Sign he purchased, then we wouldn't have made this deduction.

Q Again, sir, the idea here is that reproductions have to look like the originals, isn't that right, sir? Isn't that how they get sold?

A Generally, a resemblance to the original is what a reproduction would be.

Q Did Mr. Bouaziz, during his statement to you, say to you that the provenance that he had articulated to the UCE was fake or false about the Banksy?

49

A We never got to that point in the conversation.
Q Okay. When you did your search warrant at his galleries, you found a number of copies of purchase orders from his other customers, correct?
A Correct.
Q In fact, for each of the victims, you were actually able to tie it together with a written purchase order, correct?
A I can't say all of the victims; but yes, generally, yes.
Q Okay. And in this particular instance with the UCE, the transaction had never gotten to the point of a purchase order, can we agree to that, in the same form and fashion as what you had seen from other clientele?
A Right. So I did listen to the recording involving this and to try to tell both sides of it, either the morning -- the week of your transaction, the undercover and Mr. Bouaziz definitely agreed on a price and they agreed on the artwork, that was clear. There is -- in my opinion, there is no doubt Mr. Bouaziz was taking money from the undercover on December 15th, in my opinion.
Mr. Bouaziz did ask for bitcoin or a virtual currency transaction prior to December 15th, and I believe the undercover said -- made up some excuse, because we were not going to give him 22 million dollars or anything substantial. Mr. Bouaziz asked for, I believe, a more substantial payment to finalize the deal, that was his words, to finalize the deal;

and then the intention was, on December 15th, for them to meet, which they did, for the transaction to be completed.

And during the conversation, the signal was given to me and the team to go in; and, of course, there was no -- there was no further exchange of any funds, there was no contract. We were not going to -- like I said, we were not going to give him 20 million dollars and then as we went in, of course, the undercover introduced us and we went over it at that time.

Q Okay. At any time on those tapes, did Mr. Bouaziz ever tell the undercover that they didn't have a deal?

A That they did not?

Q Yes.

A I don't recall him saying no deal, he was always trying to make a deal.

Q Did the undercover come back into his shop during the conduction of the search warrant?

A Yes.

Q And he told -- did you hear him say to the undercover, We never had a deal on these other pieces?

A I did not hear that, no, which I could have not been there. It could have been said, I just don't recall or was not a witness to that.

Q So in the case of the Basquiat, that was actually shown -- pictures were shown to somebody that represented themselves to be an expert.

A Correct.
Q Okay. So are these, like, really up close and personal pictures, is it just a picture from 10 feet away? I mean, can you explain how they are able to look at the detail on the photograph and make that determination rather than looking at it in person?
A Right. It was an image that we tried to make as clear as possible so that the authenticator could provide an accurate determination on the piece.

We have had, in the past, where we have sent images and the authenticator said, I need more on this, I need a more vivid picture, I need supporting documents, and that was not the case with any of the artworks.
Q Okay. For the Basquiat, the one we are talking about here, the 12 million dollar Basquiat, was there any kind of number sequence on that, was it a series?
A I don't recall.
Q Okay. Was there anything that -- was there anything that you were able to say that the item that was purchased on Live Auctioneer, the Basquiat, was one and the same?
A It was based on an image match.
Q Okay.
A And based on purchases made by Mr. Bouaziz.
Q By the way, when there is -- when you -- Ms. Schall asked you certain things, like when there is that language after the

artist or in the style of the artist, you understand those are meant to be reproductions, correct?
A Correct.
Q So a reproduction, you want it to look exactly like the original to the extent that it can be, correct?
A Sure.
Q So a photograph, you are looking at a photograph on Live Auctioneers and you are using that photograph and saying, I have this particular Basquiat in front of me now, and gee, they look like they are one and the same, right?
That's what you are saying your investigation showed you, right?
A That's part of it. That's not the only thing, but that's definitely part of it. Again, if it didn't match so closely, we wouldn't be making this assertion.
Q Again, any way of knowing if there is a Basquiat in Mr. Bouaziz's home or any other location that he controlled?
A No, I have never been to his house.
Q He is an art lover, would you agree with that?
A Yes.
Q Is it fair, in your estimation, to believe that he is going to have art in his home?
A Yes, sure.
Q Okay.
A We had no indication that there was fake artwork there, so

we did not have any probable cause to search his residence.
Q Okay. There is no expert for Banksy, is that correct?
A Kind of.
Q Nobody knows who Banksy is, correct?
A There is an entity called Pest Control, I believe, but, you know, I don't know their involvement with actually taking in Banksy works and providing assessment to the public.
Q Okay. You certainly didn't consult them in this case, correct?
A No.
Q Okay. So again --
A Well, to be fair, there was an agent that did try to reach out, but it's a little complicated, the dynamic, so we never moved forward with that, reaching out to going the next step.
Q Are you familiar with art houses like Christie's and Sotheby's?
A I am.
Q You are also familiar, in your investigation, that people make claims against those huge auction houses because they purchased inauthentic pieces, correct?
MS. SCHALL: Objection, Your Honor, beyond the scope of --
THE COURT: Sustained.
I have a question for the Agent.
So I think with the O'Keeffe, you mentioned the FBI

physically took the purported O'Keeffe to the O'Keeffe Museum in New Mexico; is that correct?

THE WITNESS: Yes, Your Honor.

THE COURT: And the representative from that museum determined pretty quickly, I think you said, that it was not authentic.

THE WITNESS: Yes, Your Honor.

THE COURT: With respect to the Basquiat, was that purported Basquiat ever physically examined by anybody with authority to speak about Basquiat authenticity?

THE WITNESS: Not in person, hands on, just a digital image.

THE COURT: Okay, thank you.

You may continue, Mr. Schumacher.

MR. SCHUMACHER: Thank you, Judge.

BY MR. SCHUMACHER:

Q Agent, as part of any of the conversation that you had with Mr. Bouaziz, did he ever tell you, I knew that the Basquiat was fake?

A No.

Q With respect to the Banksy, did Mr. Bouaziz ever tell you, It's an inauthentic piece, I just bought this one the other day on Black River Auction?

A No -- well, I mean, he did say he bought the Stop Sign on Black River Auction.

Q Okay, but not that particular one, you didn't ask him about that.

A I -- I would have to see the 302, but there was a Banksy behind -- there was a Stop Sign behind his desk, I believe, during the day of the search warrant when we were interviewing him, and so it was packaged and I tend to think that it was just mentioned more Banksy Stop Sign.

I don't know if I said, The one that you are selling to the undercover, was that -- did you buy that from Black River?

Q Okay. But you already answered my question that he never retracted or said, I lied about the provenance that I gave to the undercover about the Banksy?

A He never said that to me, no.

Q What about the O'Keeffe, did Mr. Bouaziz ever tell you one time that he knew the O'Keeffe was inauthentic?

A No, we had a very short conversation.

Q Have you ever been part of fielding a complaint from a purchaser of artwork from either Sotheby's or Christie's?

MS. SCHALL: Objection, Your Honor, relevance.

THE COURT: What is the relevance of this line of inquiry? Again, I'm focused here on the loss amount for these three pieces of art.

MR. SCHUMACHER: Again, Judge, just by way of proffer, if he says that he has, then he has a foundation upon

which to say, Do you have knowledge that these bigger auction houses have, in fact -- Judge, it's the elephant in the room.

I have already attached documentation to my sentencing memorandum. It's clear that this Agent would know that big auction houses get fooled, just like a smaller purveyor. That's all I'm trying to get into the record, Your Honor.

THE COURT: All right. You can ask two minutes worth of questions, then we are going to be wrapping up.

MR. SCHUMACHER: Yes, ma'am. Thank you.

BY MR. SCHUMACHER:

Q Agent, did you ever field any complaints or did you participate as a co-agent or in any other capacity with a complaint that somebody that walks into Christie's or Sotheby's, it ends up that they buy fake artwork?

A I don't recall ever working a case like that.

Q Okay. Any of your other 24 individuals on the art team ever do that?

A It's possible, but I don't recall a conversation. It's possible, but I don't recall a specific conversation about it.

MR. SCHUMACHER: Nothing additional, Your Honor. Thank you.

THE COURT: Any redirect?

MS. SCHALL: Very briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. SCHALL:

Q Did you have an opportunity to review, given the line of questioning by Defense Counsel, the Defendant's financial records?

A I did.

Q And in his financial records, did you see any transactions for art in the amount of 10, 20 million dollars?

A No. I think the most that I saw -- that most that I saw was an $18,000 purchase, which he had purchased on Live Auctioneers, which was a bit unusual because that was a lot for him.

And I remember from the video, the recorded video, that he had told the undercover that he had gotten that from Germany, waited all night, made those comments; but it was from -- the $18,000 purchase from Live Auctioneers was part of that package deal.

Q To the undercover?

A To the undercover.

Q And --

A I'm sorry. To answer your question, yes, I didn't see any of those high dollar acquisitions.

Q Because the Live Auctioneers' pieces that you historically saw were 100, 200, $300 items?

A That's correct.

MS. SCHALL: No further questions.

THE COURT: I have one more.

So just to recap, the Basquiat itself was not physically examined, I understand, to determine more conclusively perhaps whether it is authentic or not, so what evidence does the Government have to show that it's fraudulent, the one that was part of the deal to be sold by the UCE -- excuse me -- by Mr. Bouaziz to the UCE?

THE WITNESS: We had sent images -- several reasons.

We had sent images to a former member of either the Basquiat committee or authentication committee, somebody that knew Basquiat really well, obviously; and unequivocably, she had told us that these are not authentic, so that was one reason that led us to believe that they were counterfeit.

THE COURT: So it was a photograph taken of the purported Basquiat in the gallery --

THE WITNESS: That's correct.

THE COURT: -- seized during the search that was then sent to this individual with knowledge about Basquiat paintings?

THE WITNESS: That's correct.

THE COURT: Okay.

THE WITNESS: It was never physically handled, the piece was never physically handled by this contact, just a photograph.

THE COURT: What is your understanding of what this Basquiat person with knowledge indicated in response to reviewing that photograph?

THE WITNESS: What was conveyed to me, because it was a Los Angeles resident, our crime team member that had the contact, was that it was just simply, These are not real. I don't know if that LA agent had like a more full summary of it, but I think essentially it was just, These are not real.

THE COURT: Okay. And I think you were going to supplement your testimony with any additional evidence to support the Government's determination that the purported Basquiat is fraudulent beyond the transfer of this photograph for review by this Basquiat individual.

THE WITNESS: Right. So that was one piece of it; and then, similar to the pattern of a scheme, his acquisition of an identical piece from Live Auctioneers had a low price and that same piece was deemed fraudulent by the expert.

THE COURT: Okay.

THE WITNESS: So it was his acquisition on Live Auctioneers and then the subsequent determination by the expert.

THE COURT: Okay. All right.

Anything further from Mr. Schumacher?

MR. SCHUMACHER: Just one followup to that.

RECROSS-EXAMINATION

BY MR. SCHUMACHER:

Q Agent, when you saw these -- let's start with the Basquiat.

The Basquiat that was purchased on Live Auctioneers was just the actual piece of art itself, correct, the image?

A The item -- the image is what I saw on Live Auctioneers, right.

Q But what was displayed in the gallery was different, correct?

A The image on Live Auctioneers was identical in image to what was in the gallery.

Q Except for the fact that it was actually in a frame at that point in time, correct?

A I don't remember seeing a frame on Live Auctioneers or what the frame looked like. I do know that Mr. Bouaziz did frame artwork.

Q But again, the fact that there is a frame on the one that was in the gallery, you don't know if he put that on. Did anybody ever tell you, Oh, I put that frame on?

A I don't know if -- I know for another victim, the frame was identical; for this one, I don't know if it was framed when he bought it, I don't know.

Q Okay.

A So it is quite possible that Mr. Bouaziz just framed it himself.

Q It is also possible that it represents a completely different image than the one that was purchased on Live Auctioneers, correct, because it is not in the same condition?

MS. SCHALL: Objection as to the form of the question.

BY MR. SCHUMACHER:

Q One has a frame, one doesn't, that's all I'm trying to get you to say; isn't that right?

THE COURT: All right, I'll overrule the objection.

Please answer this question, and then I would like to wrap up this portion of the hearing.

THE WITNESS: Sure.

So generally, somebody can buy, we will say, fake artwork and put a nice frame on and that helps sell it.

Did Mr. Bouaziz do that here; I don't know.

In terms of what the frame -- framing was on the Live Auctioneers actual purchase, what they sent it to him in, I don't know. So yes, to answer your question, the frames could be different, but the image itself, we believed to be identical in image.

MR. SCHUMACHER: All right. Thank you.

Nothing further, Judge.

THE COURT: Okay. Actually, I have just one other thought.

I know you mentioned in your testimony that there was

no contract. I take it you mean there was no, I guess, final written agreement for the sale of these items, but I think you said there was clear discussion of the items and the price; is that correct?

THE WITNESS: Yes. The undercover was offered a price of $2,290,000; and our undercover said, Can we drop that to an even 2 million, and Mr. Bouaziz --

THE COURT: Do you mean 20 million?

THE WITNESS: I'm sorry, I'm sorry, yes. My apologies, yes, 20 million so the price was dropped $290,000 to 20 million dollars.

THE COURT: Okay.

THE WITNESS: And to answer your question, there was no written contract. There was no written contract, it was just a series of text messages in which they discussed this.

THE COURT: All right. Thank you, sir. You may return to counsel table.

THE WITNESS: Yes, Your Honor.

(Witness excused.)

THE COURT: We are going to take a ten minute break, and then I will rule on the loss objection and then proceed directly into the 3553 arguments on the variance motion.

Thank you.

(Recess was had at 11:09 a.m.; and the proceedings resumed at 11:24 a.m.)

THE COURT: Thank you, you may be seated.

All right. We are back, the Defendant is present, this is the sentencing hearing of Mr. Bouaziz.

On the subject of the disputed loss amount, the Court ultimately will sustain the Defense objection for the following reasons and recap: As the parties are aware, there was a plea agreement to recommend a loss amount of more than $550,000, but less than 1.5 million dollars. And in doing so, it appears the parties agreed not to count any aspect of the proposed 22 million dollar deal between the UCE and the Defendant for the purchase of eight defined pieces of art at a purchase price agreed to by the Defendant of 22 million dollars.

The Government takes the position that three of those pieces of art are fraudulent, specifically a Banksy, spray paint on metal sign valued at $140,000 purportedly, a Basquiat, untitled -- purported Basquiat, I should say, valued at 12 million dollars, and an O'Keeffe titled Camellia valued at $600,000 purportedly, for a total of $12,740,000 in additional intended loss beyond the 1.5 million dollars agreed to by the parties in the plea agreement.

Intended loss under the guidelines is pecuniary harm the Defendant purposefully sought to inflict and includes pecuniary harm that would have been impossible or unlikely to occur, for example, as in the case of a Government sting.

I think it is sufficiently clear to the Court, using

a preponderance standard, that Mr. Bouaziz agreed to the key terms of this deal with the UCE for purposes of inflicting pecuniary harm and that he intended to carryout that deal for those eight pieces. Even if additional paperwork would have been necessary to fully finalize the deal, there are written text message exchanges, along with testimony by the Agent, that formed the basis of a meeting of the minds with respect to the art involved, specifically those eight pieces, and the proposed price, ultimately 22 million dollars in total.

It is also clear to the Court that the pieces in this mixture of artwork were at least to some extent fraudulent, including the Georgia O'Keeffe, which was physically examined and determined to be fraudulent by somebody at the O'Keeffe Museum.

Nevertheless, the Government did not take the step of having the Basquiat, which is the most pricey piece in this set -- did not take the step of getting that physically examined and relied instead on a photograph and a somewhat tentative, at least as far as I can tell, determination on the Basquiat itself, and so without further corroboration on the ultimate status of the Basquiat, although frankly it seems to me like it is fraudulent, very much so consistent with the manner and means of the relevant scheme, I'm going to take the more conservative approach in this case in the absence of any clear testimony or paperwork from the Government that the

Basquiat is, in fact, fraudulent and accept the parties' proposal in the plea agreement to value the loss in this case at no more than 1.5 million dollars.

I will say that had the Government taken those additional steps to fully corroborate what I think is pretty clearly a fraudulent Basquiat, given the Defendant's possession of an identical image purchased on the Live Auction site, the Court's ruling very likely would have been different, but given the proof I have been presented with, that is the Court's ruling.

Which then leads the Court at this point to finally inquire, Mr. Schumacher, are there any other objections to the PSI at this point?

MR. SCHUMACHER: No, Your Honor, thank you.

THE COURT: Okay. Having sustained the loss objection, I think that takes us to an offense level of 20, criminal history category one, producing an advisory guideline range of 33 to 41 months imprisonment.

I previously overruled the number of victims enhancement, so Mr. Schumacher, is that correct, that at this point, given the Court's ruling, we are looking at a guideline range of 33 to 41 months imprisonment?

MR. SCHUMACHER: Yes, Your Honor.

THE COURT: Is that consistent with the Government's computation?

MS. SCHALL: It is, Your Honor.

THE COURT: Okay, all right. Then let me go ahead and fully, at this point, adopt the PSI in full, along with the calculations contained therein, with the exception of the loss amount that I have sustained as stated, ultimately producing an advisory guideline range of 33 to 41 months imprisonment, based upon a total offense level of 20, a criminal history category of one, recommended supervised release range of one to three years, a recommend fine range of $25,000 to $250,000 and a special assessment of $100.

Is that correct, Ms. Weisberg?

PROBATION OFFICER: Your Honor, the fine range changes to $15,000 to $150,000.

THE COURT: Okay, all right. Any objection to the calculation of the advisory guidelines from Mr. Schumacher at this point?

MR. SCHUMACHER: Judge, no, preserving my previous issue on the number of victims, but other than that, not as to the new calculation.

THE COURT: Anything from the Government?

MS. SCHALL: No, Your Honor, thank you.

THE COURT: All right. Having calculated the advisory guideline range, let's turn to argument on an appropriate sentence starting with the Government.

MS. SCHALL: Your Honor, the Government's

recommending a sentence at the low end of the guideline range. We would oppose the Defendant's application for a downward variance for the following reasons.

May I approach?

THE COURT: Yes.

MS. SCHALL: Thank you, Your Honor.

Your Honor, the Defendant, Mr. Bouaziz, painted a picture of himself that he wanted others to see and for them to believe, but in fact, what he presented to the world around him was someone who is not at all the person who was carrying out a fraud scheme inside of his two galleries.

The Defendant unquestionably is well known in the community. We have seen in the courtroom today that it is packed with people who are offering their support of him, which is a wonderful thing. There were, I believe, 40-something letters that were submitted on the Defendant's behalf, which is also commendable, but the problem is that you could be one person living one life that people see on the outside, when in fact, you are really living two, and really that's I think what we have here.

We have someone who had a very nice lifestyle, he had the means, he came from other countries, he has a -- he is an Israeli and a French citizen from Algeria, I believe he is 69 years of age. He came here on a visitor's visa and he did not have authorization to work.

Despite that, he opened these galleries, parks his Rolls Royce outside, he welcomes guests with a very fine watch on his arm, brings them into the gallery, tells them all about his experience overseas, speaking multiple languages, connection to the synagogue, and brings them in. He regals them with his knowledge of the art world.

And then unfortunately, what he did instead of always helping the community, as all of these letters said -- they said, Well, he helped, he was so generous, he did so much for the community, but it wasn't just generosity. Unfortunately, he was taking from some in order to help others and to fund his lifestyle.

And so for those reasons -- and I'll go through a little bit of the background in the case in just a moment -- the Government is recommending a low end sentence in accordance with the guidelines.

So this matter arose after the FBI had received reports about Mr. Bouaziz selling fraudulent art. As was their obligation, they conducted a thorough investigation and came to find out that, in fact, that's exactly what he was doing; that he, in many cases, was buying things online as we talked about during testimony earlier, Live Auctioneers, an online site. He would purchase pieces for a nominal amount of money. I mean, considerable money for many people, but in this high-end art world, where he has two galleries on Worth Avenue for which he

is paying $60,000 a month on one of the fanciest streets in the nation, he is selling the art that he buys online and as we see in the victimization that's outlined in the presentence report, he is then flipping it for hundreds of thousands of dollars more to make a profit, but he is misleading the customers.

Now, the Government is not standing before the Court to say that everything in Mr. Bouaziz's gallery was fake art or that he defrauded every single customer that came before him, not at all, that's not what we are saying.

We are saying is because he was leading almost like these two lives, he was displaying art, he was supporting local artists, there were people that would consign art, people who gave him art that they would like him to help sell because he was known in the community and believed to be someone more knowledgeable about the art world. They have artists who gave pieces of their work to have Mr. Bouaziz sell, but then we also had pieces that he was displaying and representing to be authentic pieces when they were not.

Now, the Defendant comes before this Court after having pled guilty. He pled guilty to laundering money, he deprived the victims, during the course of this scheme, in particular the victim identified as DM, in which, in his own factual proffer, he acknowledges the Government could have proven beyond a reasonable doubt that after misrepresenting the authenticity of Warhol works, he sold those pieces, induced the

purchaser, Ms. -- DM -- I apologize, Your Honor -- to make the purchase and then wired those monies.

So it's not a crime to sell art for a profit. It is almost like a used car dealer; you try to make the best buck, make as much money as you can. The problem is if you misrepresent something, if you lie about what you are selling, and that's what we have here.

As we know, in the presentence report, the Defendant and the parties now all recognize, because the Court has made the ruling, 11 victims. We have 11 victims who the Defendant defrauded during the course of his scheme.

During our investigation, we found over 348 pages of invoices from Live Auctioneers, one of the companies that Mr. Bouaziz was purchasing from.

Now, just to explain to the Court, what happens in Live Auctioneers, when the Government did the investigation, Live Auctioneers sends back subpoena returns, and it includes an invoice. If go through the invoice, you will see like a link for, let's say, a Warhol. You can click on essentially the piece that was purchased, outlined in the invoice, and in some invoices, it would just be maybe one or two pieces; some invoices included Warhols, Banksys and O'Keeffes, there would be a multitude of different pieces and you can click it on.

When you click it on, it opens the image of the piece that was purchased to the public for viewing, and so anyone --

yesterday before I prepared to come to court, I was able to still see these same images, and when you see the image, underneath it, it includes a description, and why is that important?

It is important because the description describes the piece, not just, you know, maybe it's 8 by 10, 12 by 14, something like that, but it describes it in a way someone who is interested in art, someone who is an expert in the art world will understand. A piece that's after, after Warhol, that means it's not by Warhol, it is someone who maybe has the likeness of Warhol, someone who was trying to copy the imaging or a reproduction. After, reproduction; in the style of, reproduction; attributed to, reproduction, terminology that Mr. Bouaziz, as someone who spent years studying, interested in art, owning and operating galleries would know, know when he purchased the pieces. He is purchasing from Live Auctioneers for $200, and it says after, it is not an authentic original piece.

Now, despite this, despite this knowledge in making these purchases, Mr. Bouaziz made false representations, false representations to buyers regarding the provenance and originality of the art he was selling. Now, again, the Government is not saying in every circumstance, but at least at a minimum, 11 victims that we're before the Court to discuss.

He provided buyers with invoices and documents that

included false provenance information. When we are talking about provenance, it is what is -- where is this picture from, where is this painting from? If you go into a gallery and you say, I see there is a Warhol on the wall, where is it from? Is it from Sotheby's, is it from Christie's, had it been in the home of a wealthy art collector, or had it been on Ebay.

And Mr. Bouaziz didn't tell his victims, Oh, I purchased it on Ebay or on an online website for auctions, he would say, I bought it at an auction, at an auction, at an auction.

And so the general public presumably what they are hearing is, Well, this is a gallery on Worth Avenue, a high-end place, presumably what he is selling is high-end art. When he is saying he got it from an auction house, he is getting it from a reputable art institution essentially, a place that is authenticating what he is selling to me because in addition, he is providing me with an appraisal and a certificate of authenticity that authenticates the work, that says it is appraised at $100,000 rather than $300, or that it has his notations, his certificate of authenticity as the certified appraisal, someone who is an art expert, it will say that on many of the papers that were submitted to the victims, and the Defendant would omit descriptors that were included with the items that he purchased to include after and reproduction.

He provided, again, for many of these buyers

certificates of authenticity with false assertions and with appraisals that he would know would not, in fact, be true values of the pieces that he had previously purchased online.

Additionally, Mr. Bouaziz had sold art to an undercover. There was a $25,000 sale of art to an undercover, there were discussions between the undercover and Mr. Bouaziz about a couple of pieces. Initially they were discussing a purchase of a Warhol Soup Can, a pretty famous piece, and he had described it as being topnotch, can't find it anywhere, there is no other, and my advice, I really give you a fantastic piece, you can only make money. Then they switched and it ended up being that the undercover purchased a Lichtenstein.

A number of victims in this case ended up purchasing similar works. This one was a Guggenheim print Mr. Bouaziz described as very difficult to find, very, very difficult to find; I guess you checked already, very difficult to find. We did good when I bought them, what an auction, this one.

Again, hearing that, the customers are thinking, well, auction, this must be a really great auction house that's providing me with this original Lichtenstein, and then it included an appraisal and a certificate of authenticity.

As we touched on moments before with the Court, there was a sale of the potential artwork to the undercover, and I won't go into too many details because that's been addressed by the Court, and then we lead to the victims.

So in this case, we have 11. Now, the Government is asking for a sentence at the low end of the guideline range because we believe that's what is fair and just in light of all of the circumstances and all of the factors to consider, and those factors to include the Defendant's age, the Defendant's health. We recognize that he does not have a criminal history, we recognize the Defendant is not -- there is no indication he is a violent man or that he has done anything during the course of this case before the Court, but we can't get away from the fact that there were 11 victims and that really needs to be what is balanced when we are determining what the appropriate sentence would be.

And so we look at his pattern of practice. So for example, victim one, referred to as JS and SH, they had a fine art claims adjuster confirm that the pieces they had purchased were not authentic, what they thought were Warhols were not Warhols; what they were told by Mr. Bouaziz were original pieces were not original pieces.

We have victim number two, identified as PD. That one, Mr. Bouaziz -- we have records to show a matching image was purchased from another auction house and the seller -- when the seller sold that piece, the same -- what appears to be the same piece that victim PD purchased, Mr. Bouaziz was told it was a reproduction. That piece was sold for $720. Subsequently the Government would submit, that same piece was

resold to the victim for $70,000.

Victim number three, DN, victim number three was looking at a collection of different pieces of art. Ultimately, that victim paid $200,000 essentially as a down payment toward the pieces, as the victim was making a determination as to what pieces to maintain. Investigation revealed that Mr. Bouaziz, again from a different auction house, had purchased a large number of Warhols matching the images, many which were sold to victim number three, but they were not originals, the ones that he had purchased from the auction house. They did not have a Warhol signature or edition numbers, whereas, again, the ones that were being sold to the victim as original pieces had these alterations.

Now, the Government cannot stand before the Court and say, Without a doubt we can prove that the Defendant made these changes. We cannot say that in all fairness, but what we can say is that it is a pattern of practice. We are seeing he's buying something online, reselling it at a higher cost and leaving out important variables about the authenticity of the pieces that he is reselling.

Victim number four, LO, again, the gentleman -- excuse me, victim LO purchased a number of pieces. Again, that was one where it had been identified, the Herring, as attributed; and therefore, not being a real Herring.

Victim number five referred to as LM purchased two

pieces, one, Hundertwasser was the artist and online an identical image was described as wall art and home decor, something that -- again, not minimizing or trivializing purchasing something at a Home Goods, for example, but a description you would expect for some piece that was in the open air market that anyone could have purchased, not an original authentic piece as was represented to the victim.

Victim number six identified as MM was purportedly sold a Botero, a sculpture, and this was what we would refer to as a like-kind exchange. That victim exchanged an $80,000 watch, the victim was a jeweler, for this Botero. What is interesting to note is that Mr. Bouaziz purchased an identical piece from Live Auctioneers for $1,375, and the description on Live Auctioneers indicated it was an after Botero sculpture.

Victim seven are identified and LG and HG, they purchased -- these are interesting victims, and I highlight them because they are a little different than some of the others. Some of the other victims walk in off the street, you know, because it was an art gallery on Worth Avenue, you might be on vacation, you might be there for lunch, you are going in to make a purchase.

These had met -- these particular victims had met Mr. Bouaziz through the synagogue and developed a friendship. The Court may be aware there was a letter that was submitted on their behalf to probation and is included in the PSR. They

purchased a number of pieces, most notably a piece that was -- that was purported to be a Murrow, and the Murrow, again, same image purchased on Live Auctioneers with the description as being attributed to Murrow. So these were friends, friends that he ripped off.

So again, when we talk about -- the Government, in anticipation of today's hearing, I read all of the letters. You know, again, it's great that Mr. Bouaziz has the support of so many people from the community, in particular within his synagogue and things of that nature, but we can't overlook the fact that there were people within that same community who were victimized by his actions.

Victim eight, JF, purchased a number -- was working to purchase a number of pieces of art, and put $40,000 down toward the collection. One of those pieces was a Warhol, a woman's shoe. It is also a pretty popular piece. This piece was -- again, you know, the victim understood that what was being purchased were original pieces. This same image was purchased as an after for $100 online.

Victim nine, FS, purchased a Lichtenstein; victim ten, JR, again a Lichtenstein and a Picasso; and victim 11, EH, was also looking to purchase a Lichtenstein and had actually -- in that case, had only paid a small amount of money before he canceled that purchase.

So considering all of that history, considering the

Defendant as a person, considering the losses that these victims sustained, the Government again reiterates our belief that a sentence at the low end of the guidelines as has been calculated by Probation and the parties and now agreed to by Defense Counsel would be appropriate.

We have considered the 3553 factors in making this recommendation, and of course, again, I just would like to reiterate to the Court, the Government did consider the Defendant's health and age when making this determination.

I would note that Defense Counsel has been working with me throughout this process to make efforts to have the victim's repaid. The Government recognizes that this is not something that happens in all of our cases.

He did something that -- it's obviously important to the Government to try to make the victims whole for their losses and also provide just punishment and deterrence for not just the Defendant, but anyone else who is interested in being similarly situated, anyone who is here in court today who may work on Worth Avenue and is considering trying to make a little side money, to cut a few corners, that there are consequences for their actions if they choose go that way.

I would note that -- and most notably, since the plea, Mr. Schumacher has been in touch with me. We have provided him with information for the victims so that he can facilitate repayment and I do believe his representations

earlier were correct. Again, I do not have copies of all of the checks or anything like that, but as an officer of the Court, he has represented that most everyone has been repaid. The victims referred to as LG and HG, obviously they are owed much more than many of the other victims and I believe that their repayment will be forthcoming. But again, I do not have receipts for all of them. Mr. Schumacher has made these representations, we have considered this. Our hope is that the Defendant continues to make restitution payments to the other people who have been victimized in this case.

There were also other individuals who had voiced concerns about Mr. Bouaziz or just wanted to return artwork and arrangements -- we are trying to work with the parties to do just that. So I anticipate there will probably be a separate restitution hearing that we will ultimately need to have, but I wanted to bring all of those issues to the Court's attention at this time as we make our arguments.

Thank you, Your Honor.

THE COURT: Mr. Schumacher.

MR. SCHUMACHER: Thank you, Judge.

Your Honor, with the Court's permission, I have got a couple of witnesses that need to get out of here, so if the Court will permit me to just call them first, and then I can do my allocution at that point.

THE COURT: That's fine.

MR. SCHUMACHER: Okay, great.

Rabbi, would you come forward, please.

THE COURT: Are you envisioning a formal examination or just a statement?

MR. SCHUMACHER: No, no.

Right here, Judge?

THE COURT: He can just stand next to you, and --

EXAMINATION

BY MR. SCHUMACHER:

Q Would you state your name for the record.

A Moshe Scheiner.

Q What is your occupation?

A Rabbi.

Q And what congregation?

A Palm Beach Synagogue.

Q How many people in that synagogue?

A About 600 members.

Q Are Mr. Bouaziz and his wife also congregates there?

A They attend services.

Q Can you tell me -- can you kind of just summarize for the Court the types of things that Mr. Bouaziz has done in terms of assisting -- both in terms of an organizational respect and also financially.

A Well, I have known Mr. Bouaziz for about 20 years now and he is one of those individuals who whenever he was called upon

to help, whether it is communal needs or individual needs, would always find a way to help, the type of person who would never say no to any request.

Q Did he ever volunteer the use of his galleries or anything like that for the synagogue?

A He would host events at his facility.

Q When you say host, what exactly do you mean by that? Would you pay for what was going on or would he donate that?

A Sometimes he would donate portions of it, not necessarily the entirety, but the use of his facility and sometimes donate as well.

Q Would you say your congregation is better for him being a part of it?

A He definitely contributed a great deal over the many years of his involvement.

Q Okay. I think you indicated in your letter that he also had volunteered the use of his home for certain --

A Not his home, his gallery.

Q Just the gallery, okay. And you also indicated that he did that as well for study groups, things like that.

A Yes, holiday parties, other situations, but also helped people in need in the community who needed financial assistance or otherwise.

Q Okay.

A There are a number of individuals who he consistently

helped.

Q You are talking about both financially and emotional support?

A Mostly financial.

MR. SCHUMACHER: Very good. Thank you very much, appreciate it.

THE COURT: Thank you, Rabbi.

MR. SCHUMACHER: Judge, I would call Diana Davis, please.

Ms. Davis.

EXAMINATION

BY MR. SCHUMACHER:

Q Would you state your name for the record, please.

A Diana Davis.

Q How do you know Mr. Bouaziz, Ms. Davis?

A I met Mr. Bouaziz when the charity, Movies Making a Difference, that I founded and am CEO of, that raises awareness of human trafficking and then gives back to survivers, was having a shop to stop trafficking on Worth Avenue for Christmas.

It was right as the pandemic was just coming to an end and the shops had had a really tough time, so we were helping out the shops and also giving back to survivors, when one of the restaurants that was supposed to culminate with the party at the end of it all decided that his business was

picking up, he didn't need us and canceled on us two days beforehand.

Q That was a restaurant?

A That was a restaurant and I had never met Mr. Bouaziz, but he heard about what had happened and he just stepped up and said, I can't believe that a business on Worth Avenue wouldn't want to help the rest, and not only a charity, and they were profiting from it to begin with from us, so he invited us to have it at his gallery and he hosted it and picked up the entire check for everybody --

Q Okay.

A -- on Worth Avenue.

Q So you didn't even know him before that?

A No, I had never met him. I walked in and I said, Could this possibly be true, because you have never met us and you didn't even know our charity.

Q Were you aware as to how he heard about your charity?

A We were known in the community and people, I guess, had -- you know, he had heard that we had been doing good things.

Q Again, just tell the Court a little bit about what you do as far as that charity.

A We make movies highlighting the injustice of human trafficking, child brides, child labor and then with all the proceeds from the movies, we go back to survivers, which we stopped counting at 200 quite a few years ago.

Q Since that introduction and relationship with Mr. Bouaziz, would you say you developed a friendship with him?
A I have not on a social level, just a respect level where we run in different groups, but he is -- through other charities, when I have told this story, they have said, Oh, I have a story, this is what he did when we were in trouble and there are just numerous of all the ways he has always been there to help.
Q Did he -- during the course of you guys talking together, did he relate to you his proudest moment?
A Yes, he did. That's when I realized what an amazing man, that he never seemed to tell anybody. He walked in when I was waiting for a friend in an establishment and he was waiting for someone and he complimented me on the good that I was doing for everything, and I said, Look, I'm not doing -- it is such a reward to me, I'm really -- if people would just realize how fabulous this was to be able to help other people.
And he said, I can relate perfectly to you because my proudest achievement was when I was in Scotland and I heard that a big company was coming to take over a village there and would put all of these farmers out of business, who had been there for generations and they had nowhere to go. And he said, I just couldn't stand by and see that happen, so I came in and took over and bought it and everybody was able to stay in place, and it's now been years and years, and I can go back

there and it's -- I have gotten to know the people. And he said, For all of my success in the art world and opera, everything else he did, he said, that's the one thing that I can -- in my life, knowing that I saved all of these families.

Q And again, like in your situation, he didn't even know these people beforehand.

A Didn't know the people at all, he just wanted -- so I said, We can really relate.

MR. SCHUMACHER: Thank you so much.

THE WITNESS: Thank you.

MR. SCHUMACHER: Judge, I'm not asking the Government if they want to cross.

Judge, I call Katya Hutton.

Good morning.

THE WITNESS: Good morning.

EXAMINATION

BY MR. SCHUMACHER:

Q Would you state your name, please.

A Katya Hutton.

Q How do you know Mr. Bouaziz, Ms. Hutton?

A Through his wife, Sophia.

Q Did Daniel ever participate with any organizations that you were raising money for?

A Yes, that's how we met him for the first time. We were hosting an event at our condo, and it was to raise money for

orphans of Ukraine, because I am from Ukraine and there is a lot of turmoil going on, and we tried to collect as much as we could. And Sophia came with Daniel the first time we met him and the auction wasn't doing so well, so at the end of the day, he realized that we are not collecting as much, so he decided to just buy everything. So he bought every item, even though they are irrelevant to him, and we made enough money, thanks to him, even though he has no connection to Ukraine.

Q How long ago was this?

A It was a few years ago.

Q Before what has happened here in this case, correct?

A Yes, before I didn't even know about the gallery or anything about them, but then he became friends with my late husband, we became their good friends and starting seeing each other often, and he was always very gracious, invited us to dinners, parties at the gallery, which were amazing.

Q There came a time when your husband passed away?

A He passed a little over a year ago.

THE COURT: If we could slow down a bit, ma'am, and get closer to the microphone, please. Don't move that though.

MR. SCHUMACHER: Sorry, Judge.

BY MR. SCHUMACHER:

Q And he was -- he died trying to save some people that were drowning, correct?

A Yes. He died on the inland, it was all over the news. He

was trying to save drowning children, I believe he saved nine, and then he got killed by a tugboat.
Q Did Daniel and Sophia help you through that?
A Yes, right away, they came to my house, helped me, retrieved my husband's belongings from the boat and his car and they were there every day since then for as long as I needed them with emotional support, Sophia would bring dinners and it was very tragic for me, very unexpected, and he was such a good guy and Daniel said, Anything you need, anything financial, he just tell me, so they are amazing friends and amazing people.
MR. SCHUMACHER: Thank you very much.
I think I just have one more witness.
THE COURT: Harris.
I'm sorry, I have two more, Judge, I'm sorry.
THE WITNESS: Good afternoon.
THE COURT: Good afternoon. Please tell me you're name, sir, and spell your last name and try not to talk over one another when you are giving your statement.
THE WITNESS: Thank you.
Good afternoon, my name is Philip Nicozisis; N like Nancy, I like igloo, C like cat, O like ostrich, Z like Zebra, I like igloo --
THE COURT REPORTER: You need to slow down.
THE WITNESS: N-I-C-O-Z, like zebra, I, S like Sam, I, S like Sam, Nicozisis. I have done that a few times in my

life.

EXAMINATION

BY MR. SCHUMACHER:

Q Mr. Nicozisis, tell us -- can you tell the Court how you know Mr. Bouaziz.

A Daniel and I initially became friends years ago socially, and as I've been being here this morning, it's more like we have become -- he has become more like an older brother to me.

Q And where did you meet him?

A So we are both members of Mar-a-Lago and then beyond that, we've become very good friends.

Q Okay. Have you had an opportunity to attend, you know, any kind of fundraisers that he has organized either at his gallery or his home?

A Many events at his gallery on Worth Avenue.

Q What about -- did he ever hold any of those at Mar-a-Lago.

A He might have, but I don't recall one offhand.

Q Okay. What can you tell the Court about Mr. Bouaziz and his generosity?

A Well, actually, I think the love for this man speaks for itself. For each one of us here, there are probably at least 100 more that would sing his praises.

I just -- if you will indulge me, and I'll be as quick as I can, four or five years ago, I was in a courtroom similar to this for another friend who was involved in a

federal case involving commercial real estate, and I thought to myself, Gosh, I wonder what it would be like -- ever since, I have been wondering what it would be to be a judge, and I think I would be pretty good at it, but I think the thing that would really bother me the most is if the Defendant came back before the judge again, that would really upset me. And so in that case, the Defendant, in a situation with millions of dollars, got four months of house arrest.

And so if somehow magically I could give a personal guarantee or offer my name or my honor as collateral that this man would never come back in a situation like this, that would be something I would pledge right away, but we don't live in a magical world, we live in the real world.

And Your Honor, with humility and respect, I submit to you that some form -- and I wrote this in the letter and maybe you recall. Some form of house arrest, I think, would -- you know, synthesizing both sides, synthesizing the life of this man and all of the factors, which I think even the Prosecution did a decent job of explaining, and these alleged infractions, I think synthesizing all of that, I think house arrest would be a very just thing.

And just looking at you, I can see you are person who cares and thinks seriously about things and tries to put it all together. And so I hope and I pray, and I think speak for everyone here, I hope and pray that you will do that and put it

all together and come up with something just.

Thank you very much.

MR. SCHUMACHER: Thank you, sir.

One final witness, Your Honor.

THE WITNESS: Good afternoon, Your Honor.

THE COURT: Good afternoon, sir.

THE WITNESS: My name is Harris Fried, F-R-I-E-D.

EXAMINATION

BY MR. SCHUMACHER:

Q And Mr. Fried, what did you do for a living, are you presently employed?

A I'm a recovering lawyer. At the moment, I'm not practicing, I'm a businessman.

Q Okay. How did you first meet Mr. Bouaziz?

A We met, I think originally, at the Palm Beach Synagogue, I have been a member for many years, I'm on the board, and I think Danny came along one day and there it was and we bound over our -- really I have to tell you our passion for Palm Beach Synagogue and for Rabbi Scheiner, but also most interesting, a passion for art.

I have been collecting since 1985 and Danny has been my mentor and I appreciate that, but those are the two ways that we have been bound together.

Q And I think just to highlight from your letter, you indicated that when you first met him at the synagogue, you

were working trying to help with fund raising or something of that nature.

A That's exactly right, Mr. Schumacher, and we were desperate. I wasn't really doing a very good job at holding an art auction, and it's about that time that I pulled Danny in and he basically took over, made the thing run right and we were actually very successful at the end of the day, and I've been grateful to him for that since then.

Q So many times when I was meeting with Mr. Bouaziz, you were meeting with us, is that right?

A That's correct.

Q Did you get an idea about the level of his remorse that he expressed to you about this case and his conduct and what had happened?

MS. SCHALL: Objection, Your Honor.

THE WITNESS: Pardon me?

Extraordinarily remorseful.

THE COURT: Overruled.

BY MR. SCHUMACHER:

Q Go ahead, sir.

A That's all right.

Yes, extraordinarily remorseful. He comes from a very, very prominent family, as I think the Court knows, his brothers and siblings are extraordinarily talented doctors, one of his brothers is an Israeli tech entrepreneur, a nephew of

his -- don't let me get off the track, but I think this is important to understand. A nephew of his is 27 years old and cofounded a company that's worth 10 billion dollars.

And I mean, it's just extraordinary, this man. I don't really understand how he got here, but seven languages, a world class tenor, this is not an ordinary fellow. And I mention that with all due respect, Your Honor, because he sees things differently perhaps than I do or perhaps others might, and if there are opportunities where you can arbitrage -- if you take his real estate transactions, for example, long story short, he bought a house in 2021 for a million, it's on the market now for 5. I think Mr. Bouaziz sees things, and perhaps that's how he ended up here, in a way different from other people, but at the end of the day, it doesn't necessarily have to be illegal.

THE COURT: All right, thank you.

MR. SCHUMACHER: Thank you.

THE COURT: Anything further, sir?

Any questions from the Government?

MR. SCHUMACHER: That's it, thank you.

THE COURT: Hold on one moment, sir. Since there was an objection, I want to make sure the Government has an opportunity to ask follow-up.

MS. SCHALL: Nothing further, Your Honor.

THE COURT: All right, thank you.

MR. SCHUMACHER: Judge, with your permission, if I can just get right into the allocution.

THE COURT: You may.

MR. SCHUMACHER: Just so you know, Mr. Bouaziz knows his right to self-elocute and he is not going to exercise that today.

Among other reasons, Judge, he has some bronchitis right now and it is kind of difficult for him to speak, but he gave a statement that he thoroughly gave thought to in the PSI, and I think the Court has already -- I'm sure that the Court has already read that and taken that into consideration as well.

You know, Judge, it's -- I have been doing this for 35 years, I can't remember an instance where I had a person who had people literally clamoring to come out of the shadows to speak on behalf of Mr. Bouaziz.

The fact that there was 40 letters, most of those letters detailed specific anecdotal stuff, it is not just, He is a really great guy, he's a generous guy. Yeah, there is some of that, Your Honor, but they are replete with instances where Mr. Bouaziz would essentially go above and beyond for perfect strangers, as we have already heard from Diana, and one a couple of occasions, for people that were financially down and out, for people that were recovering from alcoholism and had nowhere to stay; from a fighter that was retiring and had

no means to be able to assist or continue at least training, Mr. Bouaziz gave those things.

And again, it seems simple, but it's not simple because it actually characterizes a person's ethos, and his ethos is about giving back to people.

The terrible part about this case, Judge, is Mr. Bouaziz did not need 1.3 million by my calculations, the 1.3 million dollars that he made on victims one through 11. His lifestyle wouldn't have changed very much. He had real estate valued, at the time when everything was seized by the Government and has a lis pendens on it now, he had real estate that was worth somewhere between 15 and 20 million dollars.

Within in his gallery that was unfortunately just closed, he had probably another ten to 15 million worth of art, Judge, and some of these were enormous statutes, Judge, that were completely originals, and the Government knew they were originals and they knew they also couldn't move them, they were gigantic. But the Government also is holding presently an additional 15 -- I'm sorry, 150 to 200 pieces of art that also have a tremendous value.

And Judge, much has been made about purchases online, on the online auction. The point is Mr. Bouaziz has been amassing art for most of his adult life and he has been doing it very successfully. So the fact that there are, in fact, replicas that are purchased, you know, there is also a lot that

was amassed over years of collecting and purchasing from other artworks and other art auctions that weren't necessarily online.

Additionally, Judge, I'll point out that there is a number of artists who gave his works to sell in his gallery, and those are on consignment presently speaking. The Court was gracious enough to give us about what we asked for in terms of 90 days for sentencing from the change of plea, and Mr. Bouaziz didn't sit on his hands during that time period.

He has been raising money legally in order to repay victims. I dare say not only did Ms. Schall under-characterize it, I think she -- she is on point about, We don't see people getting paid back, and that is a demonstration of the fact that Mr. Bouaziz was intent on getting the victims their money and remains intent on that is a demonstration of the remorse that he feels.

Forget the embarrassment for just a second, Judge. I mean, his art galleries essentially made very little money after the raid. And again, you would say, That's his own fault because he was conducting illegal practices, and I would agree with you, but it is another facet of how this case has affected Mr. Bouaziz.

I pointed out in my sentencing memorandum that obviously he also knows that he is going to -- he knows he will be deported at some point in time, that this is a removable

offense, and all of these people here, all of these people that have come before you to say that he really deserves a second chance, they are going to lose their friend because he is not going to be here anymore. Can they see him, yes, but it is really a tragedy because if you can say that he got involved with for avarice --

THE COURT: Just in terms of the legal status, he has been here, I think at a minimum, since 2020 without authorization to work, is that correct?

MR. SCHUMACHER: He actually is presently under a work authorization, if I remember correctly, Judge.

THE COURT: Which was acquired subsequent --

MR. SCHUMACHER: Yes.

THE COURT: -- to the criminal conduct?

MR. SCHUMACHER: Yes, yes.

THE COURT: Thank you.

MR. SCHUMACHER: Subsequent to the criminal conduct, I think before his arrest, however, Judge, I think that's -- and Ms. Schall can correct me if I'm wrong.

MS. SCHALL: The Defendant's wife filed an application to modify his status and as that application was pending, it is the Government's understanding, through our consultation with immigration authorities, that they automatically issue a work authorization for an individual when that adjustment is being considered.

THE COURT: All right. Thank you.

MR. SCHUMACHER: But these same people, Judge -- I have got to just point out a couple of things, and actually I wanted to start with something somebody that is actually not here, a lady that we submitted a letter from, Mary McCourt. Ms. McCourt, I actually happened to speak to when she was on a riverboat on the Danube and she actually returned my call because she wanted to be here and she couldn't be.

What she talks about in her letter, Judge, is Mr. Bouaziz's -- she is the founder of the Freedom Team of Wounded Veterans through Achilles International, it is a charity available immediately to assist men and women who are injured in the line of duty in military action, Your Honor.

She talks about the number of times, and she actually specified it, she said, We had one huge event at Daniel's art gallery and two smaller events all for the purposes of raising money. She talks about -- her and other people also talked about the impassioned speech that Mr. Bouaziz gave during that time period, highlighting the fact that he really believes we should be giving to this particular organization because we are all benefiting from the sacrifices that they had made.

These were all private parties, Judge, all paid for exclusively by Mr. Bouaziz. She told me that there was also a fashion show, he paid to have a ramp done, all of the food, all of the drink, just, you know, an amazing contribution.

We also talk about -- you heard from Diana today, Judge, about the victims of human trafficking. Ms. Klawsnick (phonetic) also talked about the Christmas parties that Mr. Bouaziz had organized for disadvantaged people in the Northwood section, which is actually where his wife's coffee shop is. They hosted it, they bought Christmas gifts, free food, they gave I think a thousand gifts.

UNIDENTIFIED SPEAKER: More than a thousand.

MR. SCHUMACHER: More than a thousand gifts.

And then you talk about generationally, how Daniel has affected families. There is letters from the two George Buffs, the IV and the V. Obviously, the V is the son, he is coming up through college. He is looking to get into music production, Daniel has a music production studio at The Castle. He offers it free of charge to the young man to pursue his dream, his enthusiasm.

And then you talk to that very same son and besides thanking Daniel for that, he says, By the way, he went above and beyond, I had a grandfather that was dying of Parkinson's, and Daniel would just stop by, just voluntarily, because he had a connection with my grandfather.

Daniel was always looking for ways to improve people's existence, and in that case, as I said, that touched three generations within a particular family, all with no -- no benefit back. These weren't people that even ran in the same

social circles as Mr. Bouaziz.

They talked about Howard Patrick, a letter that he wrote, Judge. He is the head chef at Harold's. Again, that's Sophia's, his wife's coffee shop. He talked about a financial and emotional pain that he was going through and despite COVID being imposed and the coffee shop being negatively impressed with that, Daniel continued to keep him on as an employee.

And a host of musicians who came forward and said the same thing, This is a man who has generated so much interest in the arts, music, and it made a difference for people like them when things were going south with COVID, et cetera.

An international singer, Pat Dyer, talks about Daniel being free of prejudice. She said that there is no snobbiness in him. Despite the fact that he is a man of means, he would invite -- and you see this throughout the letters, he would ask people to the Polo Club that didn't benefit him socially at all just because he felt like they needed to be, you know, kind of treated well, and so he reached across all kinds of socioeconomic conditions.

And again, Ms. Dyer, that had been a friend of his, said, There is no -- there is no prejudice in him in spite of where he is at socially speaking. Honestly, Judge, when we were uploading photos from some of the social events and so forth from the galleries, I thought it might be a double-edged sword because it might create this elitism that I didn't want

to convey, but what I think it actually shows, Judge, is the energy that Mr. Bouaziz put into the island for certain, Palm Beach County, definitely, and all of its citizens.

Again, not to minimize -- I understand under 3553(a) the Court has to consider how this looks, what is the statement that has to be made and the seriousness of the offense, and clearly, these are very serious offenses, but if there is ever a person that I have ever seen that put himself secondarily, in contravention really to all of the conduct that Ms. Schall accurately reflected, it really is a dichotomy that's difficult to reconcile and I don't envy your job, Your Honor.

I think the other thing that is distinguishable about Daniel is that he elevates those that don't need it, but maybe they will benefit from it as far as just being exposed to a wider range of experiences. And what's always at the front of that; it is always Daniel contributing all of those things free.

And the Court might say, well -- or maybe the Government would say, Well, he is benefiting, too, because he is just making his galleries high publicity. You could probably look at it that way, Judge, but if you look at 40 people that tell you that he does it because he has a kind heart, the Jews would say, he is a mensch and he looks to get outside of his world to help people in that respect.

As I mentioned, Judge, Mr. Medgebow is a very close

friend and he also happens to be Mr. Bouaziz's personal lawyer, he is unavailable to get here today because of a prior engagement, but he details in his letter the story of the retired local boxer who had nowhere to go. Daniel let's him come right into his house.

THE COURT: I did read all the letters, Mr. Schumacher, so I'm happy to continue hearing your presentation, but I also don't want to facilitate duplication. I have read all of the letters, there are many, and as you say, a lot do contain specific anecdotes of Mr. Bouaziz's charitable works.

MR. SCHUMACHER: Yes, ma'am. I'll just step over to a very brief recap of a couple things I wanted to mention from my sentencing memo, Judge. Some of -- I'll try not to duplicate it, Judge.

But I think really what is important to look at here is that Mr. Bouaziz was doing business with a guarantee to all of his customers, and the guarantee was, If you don't like the artwork, you bring it back in five years. He said it to the undercover, he said it to the two individuals to begin with, Mr. Moens and -- I can't find his name right now. Mr. Moens and Mr. Oxe (phonetic), and I have it misspelled in my sentencing memorandum, I have it as Oaks, but it is actually Oxe.

But again, I know for purposes of the number of

victims and so forth, it doesn't matter, but Mr. Bouaziz, out of the total amount that was stipulated between the Government and us for the total amount of loss, Mr. Bouaziz repaid two of those people before he knew law enforcement was involved to the tune of $410,000. He did that without being threatened by lawyers, without demand letters, nothing, just because they came back and said, I don't like the piece, and maybe that doesn't mean anything.

You know, we have seen in a number of instances of other fraud cases a person does whatever he needs to, a ponzi schemer will just take money and give it back to somebody, but that's not what Mr. Bouaziz was doing, Judge. Mr. Bouaziz had significant assets, he never tried to obscure or hide those and he reached back into his pocket and said, No problem, I'm going to give you all of that back.

As we have mentioned, Judge, we have already told you about the steps he is taking to make sure everyone is repaid. Again, I think within 45 days of sentencing, the Gorensteins will be paid in full, with their entirety; the $200,000 forfeiture will be paid out of the proceeds from the sale of an upcoming -- The Castle that you have heard about.

We told the Government about that, we obviously need to apply to the Court for permission, once that gets closer to sale, but he has done everything he can to identify victims, with the help of the Government, to have me contact them, and

make them -- make them whole.

Again, Judge, I don't want to make too much of his medical history, but he has been laboring with significant heart problems, it is detailed in the PSI. We were trying to make arrangements for his doctor to either appear here today or testify by Zoom, but unfortunately, we weren't able to arrange that.

I think that's all I've got, Judge.

THE COURT: All right.

MR. SCHUMACHER: I would ask, Judge -- I would ask the Court to seriously consider a non-incarcerative sentence, Your Honor.

I know that's a far cry from where we are at under the guidelines, but I also -- like Philip, the last gentleman that testified before Mr. Fried, accurately said it, We are better in society with Mr. Bouaziz here than without him here.

In the alternative, Judge, if you believe there is a period of incarceration that is necessary, I would urge the Court to do a year and a day.

Thank you.

THE COURT: Thank you, Mr. Schumacher.

Mr. Bouaziz, you may address the Court, if you would like, but you are not required to make a statement.

THE DEFENDANT: No, Your Honor, thank you.

THE COURT: All right. Thank you.

Before I pronounce the sentence, I just want to inquire on the subject of forfeiture, where does forfeiture stand at this point?

MR. LASERNA: Good afternoon, Your Honor. I'm the forfeiture analyst in this case and I can address that.

There is a pending forfeiture motion with the Court, it was filed on May 2nd, 2023 under ECF number 76. It's a motion requesting a forfeiture money judgment of $200,000, that is the amount involved in the 1957 transaction that Mr. Bouaziz was convicted of.

The motion is unopposed and so I would ask Your Honor to enter the proposed order, which has been sent to chambers, and issue the order for a forfeiture money judgment of $200,000, Your Honor.

THE COURT: All right. Any objection, Mr. Schumacher, to entry of the $200,000 unopposed forfeiture motion?

MR. SCHUMACHER: No, Your Honor.

THE COURT: All right.

MR. SCHUMACHER: In terms of the plea agreement, we had agreed to that already, Judge.

THE COURT: All right. I'll grant that motion and enter a written order accordingly following this hearing.

Anything further, Mr. Laserna?

MR. LASERNA: Nothing further, I believe I already

sent the proposed order to your chambers. I can resend that if necessary, I don't know if that is necessary.

THE COURT: I don't believe that it is. If does become necessary, we will let you know, but for now, we have what we need and that motion will be granted.

MR. LASERNA: Thank you, Your Honor.

THE COURT: Now with respect to restitution, Ms. Schall, are you prepared today to arrive at a final sum, or would you like a hearing to be set within 90 days of today's date?

MS. SCHALL: I believe that the parties have reached a calculation as to what the final restitution will be, I think the issue is just repayment of that amount.

May I have just one moment to confer with Counsel?

MR. SCHUMACHER: Judge, if I can weigh in again, I think on behalf of Defense, we would like a restitution hearing to be set just because some of the victims that I'm dealing with right now are returning certain items.

THE COURT: Okay. We will go ahead and set a restitution hearing given the fluctuating and evolving nature of the sums involved and the need to arrive at a precise restitution figure after all of that due diligence has been completed, so we will set a date for that purpose.

As I noted at the outset, the record in this case is voluminous and I have considered it in its entirety, including

the many letters submitted on the Defendant's behalf, the multiple written filings and attachments, along with the testimony of the Agent today, and all of the arguments made both orally and in writing.

I have also considered the presentence report, which I previously adopted and which contains the advisory guidelines and the statutory factors set forth in Title 18, United States Code Section 3553(a).

It is the finding of the Court that the Defendant is able to pay restitution to be determined at a later date, as well as a fine.

Mr. Bouaziz, human nature is not a one dimensional thing, that's for sure, and I think this case is reflective of that principle. You are a highly educated man who ultimately capitalized upon his prominence and knowledge in the art field to victimize 11 individuals in this case by making material misrepresentations and omissions to them, people that believed and trusted your word; and nevertheless, you omitted key and fundamental facts about the origin of these pieces of art and ultimately lied to them for profit.

And it may be that you were motivated in part for non-pecuniary reasons, but at the end of the day, sir, there is no disputing the fact that you defrauded these individuals of large sums of money, including people who had become your close friends, and I will quote from one of the victim's letters.

"To help convince us to purchase pieces of art, Mr. Bouaziz would always guarantee that he would buy them back from us at any time. My wife and I would like to accept that offer and to return all of the pieces listed above."

Quoting from another portion of the same letter, "At no time did we question the authenticity or value of these purchases because Mr. Bouaziz portrayed himself to be a recognized authority of art and a friend to our family."

And so while I have no doubt, Mr. Bouaziz, that you have exhibited kindness and charity in your lifetime, and I think that's fully on display in this record, the fact remains that at some point, you decided to enter into this scheme to defraud unsuspecting customers purchasing art. You did so with knowledge, you did so not in an isolated instance, but on a recurrent basis, spanning approximately a year timeframe.

So ultimately, sir, I have to weigh all of these factors, including your personal circumstances, your lack of criminal history, your acceptance of responsibility and what I will acknowledge have been substantial efforts to repay these victims, and I think that is certainly worthy of consideration.

But there is also the matter of general deterrence, which is sending an appropriate message that criminal conduct of this nature won't be tolerated and will be met by sufficient punishment. There is also the need to promote respect for the law and to provide just punishment.

So having considered all of those factors and the voluminous sentencing record, it is the finding of the Court that a sentence of 27 months imprisonment, which represents a slight downward variance from the ultimate calculated range of 33 to 41 months imprisonment, is reasonable and appropriate and adequately takes into consideration the Defendant's actions to repay the victims, along with his acceptance of responsibility, his various good works in the community; but nevertheless, accounts for what is clear to the Court was a calculated scheme to defraud these victims from his high-end art galleries.

It is the judgment of the Court that the Defendant, Daniel Elie Bouaziz, is committed to the Bureau of Prisons to be imprisoned for 27 months as to count 17.

It is further ordered that pursuant to Title 18, United States Code Section 3664, subsection (d)(5), the victims' losses are not yet ascertainable; therefore, the Court shall set a date for the final determination of the victims' losses, not to exceed 90 days after sentencing.

Ms. Cassisi, when may we have the restitution hearing?

THE COURTROOM DEPUTY: August 16th at 1:30.

THE COURT: All right. We will have a final restitution hearing on August 16th, 2023 at 1:30 p.m. Once restitution is ordered, during the period of incarceration, payment shall be made as follows: One, if the Defendant earns

wages in a federal prison industry's job, the Defendant must pay 50 percent of wages earned towards the financial obligations imposed by this judgment in a criminal case.

Two, if the Defendant does not work in a UNICOR job, the Defendant must pay a minimum of $25 per quarter toward the financial obligations imposed in this order.

Upon release from incarceration, the Defendant shall pay restitution at the rate of 10 percent of monthly gross earnings until such time as the Court may alter that payment schedule in the interest of justice.

The U.S. Bureau of Prisons, U.S. Probation Office, and U.S. Attorney's Office shall monitor the payment of restitution and report to the Court any material change in the Defendant's ability to pay.

These payments don't preclude the Government from using any other anticipated or unexpected financial gains, assets or income of the Defendant to satisfy the restitution obligations.

The restitution shall be made payable to the Clerk of the United States Courts and forwarded to the 400 North Miami Avenue address. Restitution then will be forwarded by the clerk to the victims.

It is further ordered that the Defendant shall pay to the United States a total of $15,000 in the form of a fine. The fine is payable to the Clerk of United States Court and is

to be forwarded to the same 400 North Miami Avenue address, and the fine is payable immediately.

The U.S. Bureau of Prisons, U.S. Probation Office, and the U.S. Attorney's office are responsible for enforcement of the fine order.

Upon release from imprisonment, the Defendant shall be placed on supervised release for a term of three years. Within 72 hours of release, the Defendant shall report in person to the probation office in the district where released.

While on supervised release, the Defendant shall comply with the mandatory and standard conditions of supervised release, which include not committing any crimes, being prohibited from possessing a firearm or other dangerous device, not unlawfully possessing a controlled substance, and cooperating in the collection of DNA.

The Defendant also shall comply with the following special conditions: Cooperating with immigration during removal proceedings, financial disclosure requirement, no new debt restriction, permissible search and unpaid restitution fines or special assessments as noted in part F of the presentence report. And it is further ordered that the Defendant shall pay immediately to the United States a special assessment of $100.

The total sentence; therefore, is 27 months imprisonment, restitution to be determined at a final hearing

scheduled for the 16th of August at 1:30 p.m., a $15,000 fine and a $100 special assessment.

Now that sentence has been imposed, does the Defendant or his Counsel object to the Court's finding of fact or to the manner in which sentence was pronounced?

MR. SCHUMACHER: Judge, yes. We will renew our previous objection as to the number of victims, Judge, and I'll also -- since I haven't had an opportunity, there is a waiver of appeal in the plea agreement; however, I haven't had an opportunity to speak to my client, so let me just preserve in the way of saying I object to the subjective reasonableness of the sentence imposed, that it was greater than necessary to promote respect for the law and leave it at that, Your Honor.

We also have a recommendation, Your Honor, when the Court is ready for that --

THE COURT: All right.

MR. SCHUMACHER: -- for incarceration.

THE COURT: There is an appellate waiver that was agreed to, but I will nevertheless advise you, Mr. Bouaziz, you have the right to appeal the sentence imposed. Any notice of appeal must be filed within 14 days after the entry of the judgment. If you are unable to pay for the cost of an appeal, you may apply for leave to appeal in forma pauperis.

What are your recommendations, Mr. Schumacher?

MR. SCHUMACHER: We ask for a recommendation to FCI

Miami, the camp section, so as to keep him as close to family and friends as possible. Also, Judge, I'm going to ask for a 30 day surrender, Judge. Mr. Bouaziz has closed his gallery, he has approximately 20 pieces of art that are now on consignment, it involves a certain amount of his expertise in order to differentiate which ones those are. He has been -- he is under a 2 million dollar bond right now that's secured by properties that far exceed the 2 million, including his and his wife's home. He has had absolutely no violations while he has been on -- while he has been under pretrial release, so we would just ask for 30 days, Judge. It is also going to permit him to culminate those pending real estate transactions so as to be able to finish paying the Gorensteins, as well as the forfeiture amount, Your Honor.

THE COURT: All right. I will grant the recommendation to place Mr. Bouaziz in a facility as close to South Florida as possible. I will, however, deny your motion for a self-surrender date.

It is time now, sir, for you to serve your sentence. I do wish you well. You are now hereby remanded into the custody of the United States Marshals to begin serving your sentence immediately.

All right. The Court is in recess.

Anything further from the Government?

MS. SCHALL: Nothing further. I just would note one

thing, Your Honor. The Court mentioned having the restitution paid to the clerk and then disseminated to the victims, I believe Defense Counsel has been making efforts to have them paid directly, and the Government does not have opposition to that being done moving forward.

THE COURT: If you have a particular procedural request with respect to payment of restitution, you can bring those up at the restitution hearing.

Mr. Schumacher.

MR. SCHUMACHER: I was just going to say, I have been in contact not only with Ms. Schall relative to restitution, but with Ms. Weisberg as well, Your Honor. We felt it would be a quicker way for the victims to be paid back if I were remitting and doing a notice of filing as far as those checks and so forth that have already been presented.

THE COURT: Ms. Weisberg, any comments with respect to the payment of restitution?

PROBATION OFFICER: Your Honor, the wording is once restitution has been determined, then payments would be through the clerk of the court. Should payments be made and victims be paid in full, then the Government would just file a motion with the Court to cancel the restitution hearing and then restitution would not be an issue.

THE COURT: I think that all makes sense.

Mr. Schumacher, if you want to arrange for those

payments and document those payments so it is all clear in the record, then I think that methodology would be appropriate and if there is any outstanding restitution to be handled at the scheduled hearing, we can address it at that time.

MR. SCHUMACHER: Yes, ma'am.

THE COURT: Anything further from Probation?

PROBATION OFFICER: Just there are counts to be dismissed, Your Honor.

MS. SCHALL: Yes, Your Honor. At this time, the Government moves to dismiss all remaining counts in the indictment.

THE COURT: Those counts are dismissed.

Court is in recess.

(PROCEEDINGS ADJOURNED AT 12:41 P.M.)

**C-E-R-T-I-F-I-C-A-T-E**

I hereby certify that the foregoing is an accurate transcription and proceedings in the above-entitled matter.

***9/2/2023***
DATE

***/s/DIANE MILLER***
DIANE MILLER, RMR, CRR, CRC
Official Court Reporter
United States District Court
101 South U.S. Highway 1
Fort Pierce, FL 34950
772-467-2337

**BY MR. SCHUMACHER: [15]** 43/7 44/12 46/15 47/24 54/16 56/11 60/2 61/6 80/9 82/12 85/17 86/22 88/3 90/9 91/19
**BY MS. SCHALL: [5]** 31/7 36/7 39/16 41/4 57/2
**MR. LASERNA: [4]** 2/12 104/4 104/25 105/6
**MR. SCHUMACHER: [74]** 2/16 3/18 3/25 4/4 4/9 4/16 4/21 5/1 5/13 8/4 8/24 9/15 9/25 10/11 10/17 10/19 11/6 11/9 13/4 13/21 13/25 14/4 14/12 16/14 17/19 23/13 24/12 27/21 29/2 29/18 36/5 39/12 43/5 46/5 46/12 54/15 55/24 56/10 56/21 59/24 61/21 65/14 65/23 66/17 79/20 80/1 80/5 82/5 82/8 85/9 85/11 86/21 87/11 90/3 92/17 92/20 93/1 93/4 96/10 96/13 96/15 96/17 97/2 98/9 101/12 103/10 104/18 104/20 105/15 111/6 111/17 111/25 113/10 114/5
**MS. SCHALL: [40]** 2/9 5/22 6/22 7/3 7/15 7/25 9/6 18/8 18/15 20/23 21/6 22/16 22/19 22/25 24/23 25/3 29/15 30/20 31/5 41/2 43/1 44/10 45/24 46/1 47/20 53/21 55/20 56/24 58/1 61/4 66/1 66/21 66/25 67/6 91/15 92/24 96/20 105/11 112/25 114/9
**PROBATION OFFICER: [4]** 2/22 66/12 113/18 114/7
**THE COURT: [124]**
**THE COURTROOM DEPUTY: [3]** 2/5 30/24 108/21
**THE DEFENDANT: [1]** 103/24
**THE WITNESS: [24]** 31/1 54/3 54/7 54/11 58/9 58/17 58/21 58/23 59/4 59/14 59/19 61/12 62/5 62/9 62/13 62/18 85/10 85/15 87/15 87/19 87/24 90/5 90/7 91/16
**UNIDENTIFIED SPEAKER: [1]** 98/8

**$**

**$1,000 [1]** 16/7
**$1,375 [1]** 76/13
**$100 [4]** 66/10 77/19 110/23 111/2
**$100,000 [1]** 72/19
**$12,740,000 [2]** 12/20 63/18
**$140,000 [2]** 24/8 63/15
**$15,000 [3]** 66/13 109/24 111/1
**$150,000 [1]** 66/13
**$18,000 [2]** 57/10 57/16
**$2,290,000 [1]** 62/6
**$200 [2]** 25/22 71/17
**$200,000 [5]** 75/4 102/19 104/8 104/14 104/16
**$22,290,000 [1]** 21/10
**$25 [1]** 109/5
**$25,000 [2]** 66/9 73/5
**$250,000 [1]** 66/9
**$290,000 [1]** 62/10
**$300 [2]** 57/24 72/19
**$40,000 [1]** 77/14
**$410,000 [1]** 102/5
**$495 [1]** 38/5
**$518 [1]** 26/9
**$550,000 [2]** 6/3 63/7
**$60,000 [1]** 69/1
**$600,000 [3]** 24/10 41/22 63/18
**$70,000 [1]** 75/1
**$720 [1]** 74/24
**$80,000 [1]** 76/10
**$900 [1]** 16/22

**/**

**/s/DIANE [1]** 114/19

**1**

**1.3 million [2]** 94/7 94/8
**1.5 [2]** 6/3 63/8
**1.5 million [2]** 63/19 65/3
**10 [2]** 57/8 71/6
**10 billion [1]** 92/3
**10 feet [1]** 51/3
**10 million [1]** 30/11
**10 percent [1]** 109/8
**100 [3]** 25/22 57/24 88/22
**101 [3]** 1/15 28/18 114/21
**11 [11]** 3/24 7/1 11/18 70/10 70/10 71/24 74/1 74/10 77/21 94/8 106/16
**11:09 [1]** 62/24
**11:24 [1]** 62/25
**12 [5]** 3/25 24/9 37/1 51/15 71/6
**12 million [4]** 33/21 36/22 36/24 63/17
**12:41 [1]** 114/14
**133 [1]** 1/7
**13th [1]** 19/5
**14 [2]** 71/6 111/21
**15 [2]** 94/12 94/19
**15 million [1]** 94/14
**150 [2]** 28/19 94/19
**15th [8]** 18/19 22/8 33/4 35/10 40/19 49/19 49/21 50/1
**16th [4]** 33/4 108/21 108/23 111/1
**17 [1]** 108/13
**18 [3]** 3/5 106/7 108/14
**1957 [1]** 104/9
**1985 [1]** 90/21
**1:30 [2]** 108/21 108/23
**1:30 p.m [1]** 111/1

**2**

**2 million [1]** 112/8
**20 [5]** 38/23 65/16 66/7 80/24 112/4
**20 million [6]** 50/7 57/8 62/8 62/10 62/11 94/12
**200 [3]** 57/24 83/25 94/19
**2004 [1]** 31/12
**2011 [1]** 19/5
**2020 [1]** 96/8
**2021 [8]** 9/19 18/19 33/4 33/25 35/10 35/24 40/20 92/11
**2023 [4]** 1/4 104/7 108/23 114/19
**21 [1]** 4/12
**22 [14]** 12/18 16/7 16/23 17/17 18/6 20/4 21/11 22/14 23/5 28/25 30/17 49/23 63/12 64/9
**22 million [5]** 4/23 5/3 6/17 14/17 63/10
**22-80099-CR-CANNON [1]** 1/2
**22-Criminal-80099 [1]** 2/6
**226A [1]** 38/18
**2337 [2]** 1/25 114/22
**24 [1]** 56/17
**25 [1]** 31/24
**25 million [2]** 33/21 36/23
**27 [4]** 92/2 108/3 108/13 110/24
**2B1.1 [1]** 16/3
**2nd [1]** 104/7

**3**

**30 [3]** 1/4 112/3 112/11
**302 [1]** 55/3
**3100 [1]** 1/15
**33 [4]** 65/18 65/22 66/6 108/5
**33301 [1]** 1/20
**348 [1]** 70/12
**34950 [2]** 1/16 114/22
**35 [1]** 93/14
**3553 [5]** 3/6 62/22 78/6 100/4 106/8
**3664 [1]** 108/15
**39 [3]** 5/2 5/15 27/13

**4**

**40 [3]** 25/6 93/17 100/21
**40-something [1]** 67/15
**400 [2]** 109/20 110/1
**41 [5]** 25/6 65/18 65/22 66/6 108/5

**4**

**45 [1]** 102/18
**46 [2]** 25/15 26/7
**467-2337 [1]** 1/25
**47 [3]** 25/15 26/7 29/1
**48 [2]** 26/21 26/24
**49 [5]** 4/12 4/17 4/20 5/15 27/13

**5**

**5 percent [1]** 17/4
**50 [1]** 29/9
**50 percent [1]** 109/2

**6**

**600 [1]** 80/17
**69 [1]** 67/23

**7**

**700 [1]** 1/19
**72 [1]** 110/8
**76 [1]** 104/7
**772 [1]** 1/25
**772-467-2337 [1]** 114/22

**8**

**80099 [1]** 2/6
**85 [1]** 6/25
**88 [2]** 7/4 25/4

**9**

**9/2/2023 [1]** 114/19
**90 [3]** 95/8 105/9 108/18
**900 [1]** 16/7

**A**

**a.m [2]** 62/24 62/25
**ability [1]** 109/14
**about a [1]** 99/4
**above [4]** 93/21 98/18 107/4 114/18
**above-entitled [1]** 114/18
**absence [1]** 64/24
**absolutely [4]** 16/22 24/2 42/9 112/9
**accept [2]** 65/1 107/3
**acceptance [3]** 24/15 107/18 108/7
**accepted [1]** 29/4
**access [1]** 45/18
**accordance [1]** 68/15
**accordingly [1]** 104/23
**account [2]** 8/17 8/19
**accounts [1]** 108/9
**accuracy [1]** 23/10
**accurately [2]** 100/10 103/15
**achievement [1]** 84/19
**Achilles [1]** 97/11
**acknowledge [1]** 107/19
**acknowledges [1]** 69/23
**acquired [1]** 96/12
**acquisition [3]** 44/2 59/15 59/19
**acquisitions [1]** 57/22
**across [1]** 99/18
**action [1]** 97/13
**actions [3]** 77/12 78/21 108/6
**add [1]** 26/4
**added [1]** 20/6
**addendum [1]** 5/12
**addition [2]** 9/9 72/16
**address [9]** 13/5 15/24 19/10 20/6 103/22 104/5 109/21 110/1 114/4
**adequately [1]** 108/6
**adjacent [1]** 43/10
**ADJOURNED [1]** 114/14
**adjudication [1]** 3/21
**adjuster [1]** 74/15
**adjustment [1]** 96/25
**admirable [1]** 12/12
**adopt [1]** 66/3
**adopted [1]** 106/6
**adult [1]** 94/23
**advance [2]** 7/18 9/17
**advanced [2]** 15/22 16/22
**advice [1]** 73/10
**advisory [6]** 12/9 65/17 66/6 66/15 66/23 106/6
**afternoon [6]** 87/15 87/16 87/20 90/5 90/6 104/4
**age [3]** 67/24 74/5 78/9
**agency [2]** 10/5 31/10
**agent [30]** 2/11 2/15 7/11 9/7 27/11 30/14 30/21 30/22 31/9 31/11 31/12 31/13 32/18 32/19 32/20 43/8 44/7 46/6 46/16 47/25 53/12 53/24 54/17 56/4 56/12 56/13 59/7 60/3 64/6 106/3
**agents [4]** 31/25 32/10 32/23 32/25
**aggregate [2]** 48/6 48/15
**agreeable [1]** 14/6
**agreement [17]** 4/22 6/1 6/11 6/18 11/23 17/24 18/4 20/14 20/15 20/22 21/25 62/2 63/7 63/20 65/2 104/20 111/9
**AILEEN [1]** 1/10
**air [1]** 76/6
**Albuquerque [1]** 42/2
**alcoholism [1]** 93/24
**Algeria [1]** 67/23
**alienate [1]** 27/24
**allegations [1]** 8/11
**alleged [1]** 89/19
**allocution [2]** 79/24 93/2
**allow [1]** 47/15
**allowed [1]** 46/25
**allows [2]** 46/23 47/25
**almost [4]** 6/9 32/13 69/10 70/4
**alter [1]** 109/9
**alterations [1]** 75/13
**altered [1]** 25/25
**alternative [1]** 103/17
**although [4]** 10/6 14/13 29/5 64/21
**amassed [1]** 95/1
**amassing [1]** 94/23
**amazing [5]** 84/11 86/16 87/10 87/10 97/25
**AMERICA [1]** 1/3
**amount [29]** 4/16 5/16 5/17 6/1 6/2 6/19 12/13 12/24 13/20 14/2 14/6 14/10 20/1 37/20 46/4 48/6 55/22 57/8 63/4 63/7 66/5 68/23 77/23 102/2 102/3 104/9 105/13 112/5 112/14
**amounts [1]** 20/19
**analysis [1]** 48/3
**analyst [1]** 104/5
**analyzed [3]** 14/20 38/15 40/2
**anecdotal [1]** 93/18
**anecdotes [1]** 101/10
**Angeles [1]** 59/5
**annual [1]** 32/6
**answer [5]** 47/23 57/21 61/10 61/18 62/13
**anticipate [1]** 79/14
**anticipated [1]** 109/16
**anticipation [2]** 7/10 77/7
**anymore [1]** 96/4
**apologies [2]** 13/10 62/10
**apologize [4]** 6/25 18/15 21/18 70/1
**appeal [5]** 111/9 111/20 111/21 111/22 111/23
**appearance [1]** 2/7
**APPEARANCES [1]** 1/13
**appellate [1]** 111/18
**application [3]** 67/2 96/21 96/21
**apply [2]** 102/23 111/23
**appraisal [3]** 72/17 72/21 73/21
**appraisals [1]** 73/2
**appraised [1]** 72/19
**appreciate [2]** 82/6 90/22
**approach [4]** 21/3 22/20 64/24 67/4
**arbitrage [1]** 92/9
**area [1]** 31/22
**aren't [1]** 12/15
**argument [4]** 9/10 9/14 28/24 66/23
**arguments [3]** 62/22 79/17 106/3
**arm [1]** 68/3
**arose [1]** 68/17
**arrange [2]** 103/6 113/25
**arrangements [2]**

## A

**arrangements...** **[2]** 79/13 103/5
**arrest [4]** 89/8 89/16 89/21 96/18
**arrive [2]** 105/8 105/21
**arriving [1]** 39/24
**art [82]** 6/7 12/17 12/25 14/15 14/19 14/19 16/16 18/10 18/22 23/11 24/8 24/15 24/16 24/17 28/15 29/8 31/21 31/25 32/10 32/23 33/1 33/6 41/7 41/14 44/4 44/15 44/16 44/18 44/21 44/24 46/4 52/19 52/22 53/15 55/23 56/17 57/8 60/5 63/11 63/14 64/8 68/6 68/18 68/24 69/2 69/7 69/11 69/12 69/13 69/15 70/3 71/8 71/8 71/15 71/22 72/6 72/13 72/15 72/21 73/4 73/5 74/15 75/3 76/2 76/19 77/14 85/2 90/20 91/5 94/14 94/19 94/23 95/2 95/18 97/15 106/15 106/19 107/1 107/8 107/13 108/10 112/4
**articulated [1]** 48/24
**artificially [2]** 15/9 16/19
**artist [15]** 34/11 41/12 41/15 42/9 42/11 42/13 42/14 42/16 42/19 42/19 42/20 42/24 52/1 52/1 76/1
**artists [5]** 29/4 34/3 69/12 69/15 95/5
**arts [1]** 99/10
**artwork [19]** 4/24 5/3 12/21 16/8 16/12 22/8 34/1 39/3 39/4 49/16 52/25 55/19 56/15 60/16 61/14 64/11 73/23 79/12 101/19
**artworks [2]** 51/13 95/2
**ascertain [4]** 8/21 11/25 12/7 16/25
**ascertainable [1]** 108/16
**ascertation [1]** 48/9
**aspect [1]** 63/9
**asserting [1]** 5/19
**assertion [1]** 52/15
**assertions [2]** 29/12 73/1
**assessment [4]** 53/7 66/10 110/23 111/2
**assessments [1]** 110/20
**assets [2]** 102/13 109/17
**assist [3]** 32/23 94/1 97/12
**assistance [2]** 25/1 81/22
**Assistant [1]** 2/12
**assisted [1]** 32/25
**assisting [1]** 80/22
**associate [2]** 35/11 35/19
**associated [2]** 19/22 23/20
**assume [1]** 25/19
**assuming [1]** 32/14
**assure [1]** 46/6
**attached [2]** 44/22 56/3
**attachments [2]** 3/12 106/2
**attempt [1]** 13/8
**attend [3]** 8/25 80/19 88/12
**Attorney [1]** 2/12
**Attorney's [2]** 109/12 110/4
**attracted [1]** 5/7
**attributed [3]** 71/13 75/24 77/4
**auction [36]** 25/18 25/18 25/20 25/20 26/10 26/10 26/20 28/5 28/13 37/12 37/15 38/25 39/9 46/24 47/16 48/2 48/12 53/19 54/23 54/25 56/1 56/5 65/7 72/9 72/9 72/10 72/14 73/17 73/19 73/19 74/21 75/7 75/11 86/4 91/5 94/22
**Auctioneer [3]** 45/6 46/7 51/20
**Auctioneers [29]** 26/2 37/12 39/5 39/9 40/4 41/11 42/23 47/4 48/4 48/8 52/8 57/11 57/16 59/16 59/20 60/4 60/6 60/10 60/14 61/3 61/17 68/22 70/13 70/16 70/17 71/16 76/13 76/14 77/3
**Auctioneers' [2]** 37/22 57/23
**auctions [2]** 72/8 95/2
**audience [1]** 7/21
**audio [1]** 35/10
**August 16th [2]** 108/21 108/23
**AUSA [2]** 1/14 1/14
**authentic [17]** 24/18 24/19 25/9 27/7 29/10 30/3 37/7 40/15 40/23 41/21 54/6 58/5 58/13 69/18 71/17 74/16 76/7
**authenticated [1]** 24/4
**authenticates [1]** 72/18
**authenticating [1]** 72/16
**authentication [2]** 37/9 58/11
**authenticator [2]** 51/8 51/11
**authenticity [12]** 16/25 24/3 28/14 30/8 54/10 69/25 72/18 72/20 73/1 73/21 75/19 107/6
**authorities [1]** 96/23
**authority [2]** 54/10 107/8
**authorization [4]** 67/25 96/9 96/11 96/24
**automatically [1]** 96/24
**avarice [1]** 96/6
**Avenue [16]** 34/19 38/18 43/10 43/21 43/24 47/8 68/25 72/12 76/19 78/19 82/19 83/6 83/12 88/15 109/21 110/1
**awareness [1]** 82/17

## B

**background [2]** 26/6 68/14
**backroom [3]** 16/16 36/18 37/6
**balanced [1]** 74/11
**ball [1]** 19/14
**Banksy [38]** 13/1 21/16 22/11 24/7 24/9 25/14 26/8 26/8 27/16 28/3 28/3 28/5 28/14 28/21 28/24 29/1 29/5 30/14 38/11 38/11 39/18 46/11 46/16 46/18 46/20 48/1 48/7 48/16 48/16 48/25 53/2 53/4 53/7 54/21 55/3 55/7 55/13 63/14
**Banksys [1]** 70/22
**bar [1]** 40/11
**base [2]** 9/24 44/20
**basis [2]** 64/7 107/15
**Basquiat [54]** 5/4 5/5 5/9 5/11 13/1 16/14 21/15 21/16 24/7 24/9 25/5 27/17 29/5 29/6 30/14 33/11 33/11 33/12 35/5 35/13 35/16 36/4 36/11 36/12 36/13 37/9 46/11 50/23 51/14 51/15 51/20 52/9 52/16 54/8 54/9 54/10 54/18 58/3 58/11 58/12 58/16 58/19 59/2 59/12 59/13 60/3 60/4 63/15 63/16 64/16 64/20 64/21 65/1 65/6
**Basquiats [7]** 25/11 34/14 35/5 36/1 36/14 36/22 37/22
**bay [1]** 45/20
**Beach [6]** 13/19 31/10 80/15 90/15 90/19 100/3
**beforehand [2]** 83/2 85/6
**beg [1]** 14/12
**behind [4]** 12/10 47/10 55/4 55/4
**belief [1]** 78/2
**belong [1]** 28/12
**belongings [1]** 87/5
**benefit [3]** 98/25 99/16 100/14
**besides [1]** 98/17
**beyond [7]** 53/21 59/12 63/19 69/24 88/10 93/21 98/19
**bigger [2]** 27/23 56/1
**bill [1]** 23/21
**billion [1]** 92/3
**bitcoin [10]** 6/9 14/17 19/9 19/11

## B

**bitcoin... [6]** 20/1 20/4 22/6 22/6 23/6 49/20
**Black [17]** 26/10 26/20 38/24 39/1 39/2 39/7 39/9 40/13 46/24 47/3 47/16 47/22 48/2 48/12 54/23 54/25 55/9
**board [1]** 90/16
**boat [1]** 87/5
**bolster [1]** 15/10
**bond [1]** 112/7
**book [1]** 29/6
**Botero [3]** 76/9 76/11 76/14
**bother [1]** 89/5
**BOUAZIZ [140]**
**Bouaziz's [14]** 5/5 17/23 19/9 19/20 20/1 23/24 34/19 40/2 43/10 52/17 69/7 97/10 101/1 101/10
**Boulevard [1]** 1/19
**bound [2]** 90/17 90/23
**boxer [1]** 101/4
**brides [1]** 83/23
**brief [2]** 11/8 101/13
**bronchitis [1]** 93/7
**brother [1]** 88/8
**brothers [2]** 91/24 91/25
**Broward [1]** 1/19
**brush [3]** 29/9 29/20 29/22
**buck [1]** 70/4
**Buffs [1]** 98/12
**building [1]** 45/18
**bullet [1]** 40/11
**Bureau [3]** 108/12 109/11 110/3
**business [4]** 82/25 83/6 84/21 101/17
**businesses [1]** 15/14
**businessman [1]** 90/13
**buyers [3]** 71/21 71/25 72/25

## C

**C-E-R-T-I-F-I-C-A-T-E [1]** 114/15
**calculate [4]** 12/9 13/23 14/1 14/7
**calculated [7]** 5/17 15/10 17/18 66/22 78/4 108/4 108/9
**calculation [3]** 66/15 66/19 105/12
**calculations [3]** 6/19 66/4 94/7
**Camellia [1]** 63/17
**camp [1]** 112/1
**cancel [1]** 113/22
**canceled [2]** 77/24 83/1
**CANNON [2]** 1/2 1/10
**capacity [1]** 56/13
**capitalized [1]** 106/15
**car [2]** 70/4 87/5
**carrying [1]** 67/10
**carryout [1]** 64/3
**cash [1]** 22/4
**Cassisi [1]** 108/19
**Castle [16]** 43/18 43/18 43/23 44/2 44/4 44/9 44/19 44/21 44/24 45/10 45/11 45/12 45/13 45/17 98/14 102/21
**cat [1]** 87/21
**category [2]** 65/17 66/7
**CEO [1]** 82/17
**certificate [4]** 26/12 72/17 72/20 73/21
**certificates [1]** 73/13
**certification [5]** 31/20 31/20 32/1 32/3 32/5
**certified [1]** 72/20
**certify [1]** 114/16
**cetera [3]** 29/10 48/10 99/11
**chain [1]** 23/12
**Chalet [1]** 25/6
**challenge [1]** 4/14
**challenged [1]** 27/25
**chambers [2]** 104/12 105/1
**chance [1]** 96/3
**characterize [1]** 95/11
**characterizes [1]** 94/4
**charge [1]** 98/15
**charitable [1]** 101/10
**charities [1]** 84/4
**charity [7]** 82/16 83/7 83/16 83/17 83/21 97/12 107/10
**chef [1]** 99/3
**child [2]** 83/23 83/23
**children [1]** 87/1
**choose [1]** 78/21
**chose [2]** 44/6 45/21
**chose not [1]** 44/6
**Christie's [5]** 25/19 53/15 55/19 56/14 72/5
**Christmas [3]** 82/20 98/3 98/6
**circles [1]** 99/1
**circuit [1]** 13/12
**circumstance [1]** 71/23
**circumstances [5]** 6/16 8/11 15/12 74/4 107/17
**Circus [2]** 26/17 40/8
**citizen [1]** 67/23
**citizens [1]** 100/3
**claim [1]** 17/15
**claimed [1]** 35/25
**claiming [2]** 29/19 46/8
**claims [2]** 53/19 74/15
**clamoring [1]** 93/15
**clarification [1]** 29/15
**clarified [1]** 5/11
**clarify [1]** 42/10
**class [1]** 92/6
**classes [1]** 32/4
**classified [1]** 10/25
**clear [13]** 10/12 17/22 18/11 40/18 49/17 51/7 56/4 62/3 63/25 64/10 64/25 108/9 114/1
**clerk [5]** 109/19 109/22 109/25 113/2 113/20
**click [3]** 70/19 70/23 70/24
**client [7]** 14/6 24/13 24/14 29/3 30/6 30/11 111/10
**client's [1]** 30/2
**clientele [1]** 49/12
**clients [1]** 17/3
**clippings [1]** 3/13
**close [6]** 23/7 51/2 100/25 106/24 112/1 112/16
**closed [3]** 33/19 94/14 112/3
**closely [1]** 52/14
**closeness [1]** 48/11
**closer [6]** 4/17 9/23 9/24 18/13 86/20 102/23
**closest [1]** 35/15
**Club [1]** 99/16
**co [1]** 56/13
**co-agent [1]** 56/13
**Code [3]** 3/6 106/8 108/15
**coffee [3]** 98/5 99/4 99/6
**cofounded [1]** 92/3
**collar [1]** 31/16
**collateral [1]** 89/10
**collect [1]** 86/2
**collection [4]** 16/7 75/3 77/15 110/15
**collective [1]** 16/23
**collectively [1]** 19/24
**collector [3]** 16/16 28/15 72/6
**college [1]** 98/13
**combined [1]** 26/21
**commendable [1]** 67/17
**comment [2]** 10/15 10/16
**commentary [2]** 10/9 11/4
**comments [5]** 13/5 35/23 40/10 57/15 113/16
**commercial [4]** 23/19 24/1 43/17 89/1
**committed [1]** 108/12
**committee [3]** 37/9 58/11 58/11
**committing [1]** 110/12
**communal [1]** 81/1
**communicated [1]** 19/6
**communication [2]** 22/23 23/1
**communications [5]** 18/9 18/16 18/20 21/23 35/2
**community [9]** 67/13 68/8 68/10 69/14 77/9 77/11 81/22 83/18 108/8
**companies [3]**

## C

**companies... [3]** 39/3 39/9 70/13
**company [4]** 37/12 37/16 84/20 92/3
**compiled [1]** 48/3
**complaint [2]** 55/18 56/14
**complaints [1]** 56/12
**completed [3]** 6/2 50/2 105/23
**complicated [1]** 53/13
**complimented [1]** 84/14
**comply [2]** 110/11 110/16
**components [1]** 42/20
**computation [1]** 65/25
**concealed [1]** 35/10
**concede [4]** 6/22 19/12 23/16 25/12
**concern [1]** 11/3
**concerns [2]** 5/24 79/12
**conclusions [1]** 42/6
**conclusively [1]** 58/5
**concrete [1]** 12/16
**concur [1]** 11/17
**condition [1]** 61/3
**conditions [3]** 99/19 110/11 110/17
**condo [1]** 85/25
**conduct [5]** 91/13 96/14 96/17 100/9 107/22
**conducted [3]** 15/14 33/24 68/19
**conducting [1]** 95/20
**conduction [1]** 50/16
**confer [2]** 7/20 105/14
**confirm [1]** 74/15
**confirmed [2]** 21/14 37/6
**congregates [1]** 80/18
**congregation [2]** 80/14 81/12
**connection [3]** 68/5 86/8 98/21
**consequences [1]** 78/20
**conservative [1]** 64/24
**conservator [1]** 29/19
**considerable [1]** 68/24
**consideration [3]** 93/11 107/20 108/6
**consign [1]** 69/12
**consignment [2]** 95/6 112/5
**consistent [2]** 64/22 65/24
**consistently [1]** 81/25
**consult [3]** 32/10 34/6 53/8
**consultation [1]** 96/23
**consulted [3]** 25/7 26/24 37/8
**consummate [1]** 16/6
**contain [1]** 101/10
**contained [3]** 6/25 7/8 66/4
**contains [1]** 106/6
**content [1]** 4/3
**contents [1]** 4/20
**contested [1]** 24/5
**continued [2]** 20/2 99/7
**contract [6]** 17/5 22/3 50/5 62/1 62/14 62/14
**contravention [1]** 100/9
**contributed [1]** 81/14
**contributing [1]** 100/16
**contribution [1]** 97/25
**Control [1]** 53/5
**controlled [2]** 52/17 110/14
**convey [1]** 100/1
**conveyed [2]** 36/12 59/4
**convicted [1]** 104/10
**convince [1]** 107/1
**cooperating [2]** 110/15 110/17
**corner [1]** 21/1
**corners [1]** 78/20
**corroborate [1]** 65/5
**corroboration [1]** 64/20
**count [2]** 63/9 108/13
**counted [1]** 11/18
**counterfeit [1]** 58/14
**countries [1]** 67/22
**country [2]** 31/25 32/12
**counts [3]** 114/7 114/10 114/12
**County [1]** 100/3
**court [77]** 1/1 1/24 2/17 3/1 3/21 5/25 7/9 8/1 9/8 10/4 12/6 13/10 20/25 21/5 21/6 21/13 21/21 22/16 22/17 25/16 27/10 27/23 27/24 33/5 36/9 47/15 63/4 63/25 64/10 65/11 69/6 69/19 70/9 70/15 71/1 71/24 73/22 73/25 74/9 75/14 76/24 78/8 78/18 79/3 79/23 80/21 83/20 87/23 88/4 88/18 91/23 93/10 93/10 95/6 100/5 100/18 102/23 103/11 103/19 103/22 104/6 106/9 108/2 108/9 108/11 108/16 109/9 109/13 109/25 111/15 112/23 113/1 113/20 113/22 114/13 114/20 114/21
**Court's [10]** 13/5 19/4 24/25 25/10 65/8 65/9 65/21 79/16 79/21 111/4
**courtroom [4]** 8/22 32/15 67/13 88/24
**Courts [1]** 109/20
**covering [1]** 4/11
**COVID [2]** 99/5 99/11
**CR [1]** 1/2
**CRC [1]** 114/20
**create [1]** 99/25
**credits [1]** 10/21
**crime [9]** 25/24 25/25 31/16 31/25 32/10 32/23 33/1 59/5 70/3
**crimes [1]** 110/12
**criminal [9]** 2/6 65/17 66/7 74/6 96/14 96/17 107/18 107/22 109/3
**cross [3]** 39/13 43/6 85/12
**CROSS-EXAMINATION [1]** 43/6
**CRR [2]** 1/24 114/20
**cry [1]** 103/13
**crypto [1]** 19/7
**culminate [2]** 82/24 112/12
**currency [3]** 20/2 22/5 49/20
**custody [1]** 112/21
**customer [2]** 26/4 69/8
**customers [8]** 8/9 9/20 25/19 49/4 69/5 73/18 101/18 107/13
**cut [3]** 8/17 17/6 78/20

## D

**danger [1]** 24/14
**dangerous [1]** 110/13
**DANIEL [20]** 1/6 2/5 2/18 32/16 85/22 86/3 87/3 87/9 88/6 98/10 98/14 98/18 98/20 98/22 99/7 99/12 100/13 100/16 101/4 108/12
**Daniel's [1]** 97/15
**Danieli [1]** 23/11
**Danny [3]** 90/17 90/21 91/5
**Danube [1]** 97/7
**dare [1]** 95/11
**Davis [4]** 82/8 82/10 82/14 82/15
**dealer [1]** 70/4
**dealt [1]** 23/24
**debt [1]** 110/19
**December 13th [1]** 19/5
**December 15th [7]** 18/19 33/4 35/10 40/19 49/19 49/21 50/1
**decent [1]** 89/19
**decided [3]** 82/25 86/5 107/12
**decision [1]** 44/8
**decor [1]** 76/2
**deduction [1]** 48/17
**deemed [3]** 9/13 10/10 59/17
**Defendant [52]** 1/7 1/18 2/17 3/9 6/6 10/14 12/23 16/11 16/13 17/7 17/11 18/5 22/14 22/23 25/17 27/2 27/8 32/17 33/6 47/21 63/2 63/10

## D

**Defendant... [30]** 63/12 63/22 67/7 67/12 69/19 70/8 70/10 72/23 74/7 75/15 78/1 78/17 79/9 89/5 89/7 106/9 108/11 108/25 109/1 109/4 109/5 109/7 109/17 109/23 110/6 110/8 110/10 110/16 110/22 111/4
**Defendant's [12]** 6/24 57/4 65/6 67/2 67/16 74/5 74/5 78/9 96/20 106/1 108/6 109/14
**Defense [12]** 5/19 5/23 11/16 19/11 20/24 21/22 57/4 63/5 78/5 78/10 105/16 113/3
**defined [2]** 10/13 63/11
**definition [2]** 12/21 17/10
**definitive [1]** 16/25
**definitively [1]** 19/18
**defraud [2]** 107/13 108/10
**defrauded [3]** 69/8 70/11 106/23
**deliver [1]** 14/16
**delivered [3]** 15/19 15/24 48/1
**demand [1]** 102/6
**demonstration [3]** 17/22 95/13 95/15
**deny [1]** 112/17
**deported [1]** 95/25
**deposit [3]** 16/7 19/9 19/14
**deposits [1]** 22/7
**deprived [1]** 69/21
**description [7]** 19/21 41/11 71/3 71/5 76/5 76/13 77/3
**descriptors [1]** 72/23
**deserves [1]** 96/2
**desk [2]** 35/12 55/4
**desperate [1]** 91/4
**despite [5]** 68/1 71/19 71/19 99/5 99/14
**detail [1]** 51/4
**detailed [3]** 4/4 93/18 103/4
**details [3]** 4/21 73/24 101/3
**detected [3]** 10/8 11/15 11/20
**detects [1]** 10/5
**determination [8]** 51/5 51/9 59/11 59/20 64/19 75/6 78/9 108/17
**determined [8]** 27/4 40/23 40/24 54/5 64/13 106/10 110/25 113/19
**deterrence [2]** 78/16 107/21
**developed [2]** 76/23 84/2
**device [1]** 110/13
**Diana [4]** 82/8 82/14 93/22 98/1
**diane [4]** 1/24 1/25 114/19 114/20
**dichotomy [1]** 100/10
**died [2]** 86/23 86/25
**difference [2]** 82/17 99/10
**differentiable [1]** 28/18
**differentiate [1]** 112/6
**difficult [6]** 21/20 73/15 73/15 73/16 93/8 100/10
**digital [2]** 43/12 54/11
**diligence [1]** 105/22
**dimensional [1]** 106/12
**dinners [2]** 86/16 87/7
**direct [6]** 13/13 13/15 18/18 24/24 31/6 38/10
**disadvantaged [1]** 98/4
**disagree [2]** 10/3 24/6
**disagrees [1]** 29/23
**discerning [2]** 28/11 28/22
**disclosure [1]** 110/18
**discover [1]** 34/9
**discovered [1]** 10/5
**discovery [2]** 21/22 23/15
**discussion [8]** 7/23 19/22 22/9 27/20 35/21 40/18 42/7 62/3
**discussions [6]** 12/16 12/24 18/11 35/4 35/8 73/6
**dismiss [1]** 114/10
**dismissed [2]** 114/8 114/12
**disparity [1]** 12/2
**display [5]** 5/5 5/6 34/1 37/5 107/11
**displayed [1]** 60/8
**displaying [2]** 69/11 69/17
**dispute [5]** 5/16 7/2 13/19 28/4 28/6
**disputed [1]** 63/4
**disputing [1]** 106/23
**disseminated [1]** 113/2
**distinguishable [4]** 34/12 46/17 46/19 100/12
**district [5]** 1/1 1/1 1/11 110/9 114/21
**division [2]** 31/9 42/1
**DM [2]** 69/22 70/1
**DN [1]** 75/2
**DNA [1]** 110/15
**docket [3]** 3/14 6/25 25/4
**document [3]** 21/7 22/19 114/1
**documentation [3]** 15/18 20/16 56/3
**documents [6]** 3/10 15/16 23/10 23/14 51/12 71/25
**dollar [12]** 12/18 16/7 16/23 20/18 23/5 28/25 30/17 37/1 51/15 57/22 63/10 112/7
**dollars [32]** 4/24 5/3 6/3 6/17 14/17 15/7 17/17 18/7 20/4 21/11 22/15 24/9 30/11 33/21 36/24 38/6 47/5 49/23 50/7 57/8 62/11 63/8 63/12 63/17 63/19 64/9 65/3 69/4 89/7 92/3 94/8 94/12
**donate [3]** 81/8 81/9 81/10
**double [1]** 99/24
**double-edged [1]** 99/24
**doubt [5]** 42/7 49/17 69/24 75/15 107/9
**dovetails [1]** 4/17
**downward [3]** 3/10 67/2 108/4
**draw [1]** 42/21
**dream [1]** 98/16
**drink [1]** 97/25
**drop [1]** 62/6
**dropped [1]** 62/10
**drowning [2]** 86/24 87/1
**duplicate [1]** 101/15
**duplicates [1]** 47/12
**duplication [1]** 101/8
**duty [1]** 97/13
**Dyer [2]** 99/12 99/20
**dying [1]** 98/19
**dynamic [1]** 53/13

## E

**earned [1]** 109/2
**earnings [1]** 109/9
**earns [1]** 108/25
**Ebay [3]** 25/20 72/6 72/8
**ECF [1]** 104/7
**edged [1]** 99/24
**edition [1]** 75/11
**educated [1]** 106/14
**effect [1]** 35/19
**effectuate [1]** 44/8
**effectuated [3]** 6/14 20/10 20/11
**efforts [3]** 78/11 107/19 113/3
**EH [1]** 77/21
**eight [8]** 12/16 15/8 16/12 18/6 63/11 64/4 64/8 77/13
**eight-figure [1]** 15/8
**elected [1]** 7/17
**elephant [1]** 56/2
**elevates [1]** 100/13
**Eleven [1]** 6/22
**Elie [2]** 32/16 108/12
**elitism [1]** 99/25
**elocute [1]** 93/5
**embarrassment [1]** 95/17
**emotional [3]**

# E

**emotional... [3]** 82/2 87/7 99/5
**employee [2]** 19/20 99/7
**energy [1]** 100/2
**enforcement [6]** 8/10 21/14 43/9 44/7 102/4 110/4
**engagement [1]** 101/3
**enhancement [3]** 9/13 11/22 65/20
**enormous [1]** 94/15
**enter [3]** 104/12 104/23 107/12
**enthusiasm [1]** 98/16
**entirety [3]** 81/10 102/19 105/25
**entities [1]** 34/2
**entitled [1]** 114/18
**entity [1]** 53/5
**entrance [1]** 38/19
**entrepreneur [1]** 91/25
**entry [4]** 6/25 25/4 104/16 111/21
**envisioning [1]** 80/3
**envy [1]** 100/11
**equivalent [1]** 22/5
**ESQ [1]** 1/18
**essentially [9]** 19/14 32/20 41/15 59/8 70/19 72/15 75/4 93/21 95/18
**establish [2]** 27/7 27/15
**establishment [2]** 40/11 84/13
**estate [6]** 29/25 89/1 92/10 94/10 94/11 112/12
**estimation [1]** 52/21
**et [3]** 29/10 48/10 99/11
**et cetera [1]** 29/10
**ethos [2]** 94/4 94/5
**evaluated [1]** 29/17
**evaluation [1]** 29/13
**evaluations [1]** 24/2
**event [3]** 17/9 85/25 97/15
**events [4]** 81/6 88/15 97/16 99/23
**everybody [4]** 2/3 8/16 83/10 84/24
**everyone [4]** 7/15 79/3 89/25 102/17
**everyone's [1]** 18/18
**evidence [9]** 7/10 18/4 20/14 20/19 26/8 30/15 42/1 58/6 59/10
**evidentiary [1]** 9/4
**evolving [1]** 105/20
**examination [12]** 14/19 14/23 31/6 43/6 57/1 60/1 80/3 80/8 82/11 85/16 88/2 90/8
**examined [5]** 41/24 54/9 58/4 64/12 64/18
**exceed [2]** 108/18 112/8
**exceeded [1]** 17/15
**exceeds [1]** 14/10
**exception [3]** 8/15 16/14 66/4
**excerpt [1]** 21/20
**exchange [11]** 6/8 8/12 20/2 20/5 20/6 22/4 22/8 22/17 22/22 50/5 76/10
**exchanged [3]** 19/6 20/17 76/10
**exchanges [1]** 64/6
**exclusively [1]** 97/23
**excuse [3]** 49/22 58/8 75/22
**excused [1]** 62/19
**execute [1]** 45/21
**executed [4]** 6/12 33/3 38/22 43/9
**execution [3]** 9/18 18/18 21/14
**exercise [1]** 93/5
**exist [1]** 6/21
**existence [1]** 98/23
**existent [1]** 22/3
**exists [1]** 18/4
**expectation [1]** 14/16
**experience [3]** 13/15 46/20 68/4
**experiences [1]** 100/15
**expert [11]** 25/7 29/4 29/7 29/19 37/7 50/25 53/2 59/17 59/21 71/8 72/21
**expertise [3]** 30/1 30/2 112/5
**experts [2]** 29/24 34/2
**exposed [1]** 100/14
**expressed [1]** 91/13
**extent [2]** 52/5 64/11
**extraordinarily [3]** 91/17 91/22 91/24
**extraordinary [1]** 92/4
**eye [1]** 29/8

# F

**F-R-I-E-D [1]** 90/7
**fabulous [1]** 84/17
**facet [1]** 95/21
**facilitate [2]** 78/25 101/8
**facility [4]** 43/12 81/6 81/10 112/16
**fact [39]** 6/6 6/16 11/14 13/9 21/17 23/25 24/4 24/17 25/8 25/11 28/4 28/13 28/14 30/6 34/4 36/10 37/15 48/4 48/5 49/6 56/2 60/12 60/17 65/1 67/9 67/19 68/20 73/2 74/10 77/11 93/17 94/24 94/24 95/13 97/19 99/14 106/23 107/11 111/4
**factors [7]** 74/4 74/5 78/6 89/18 106/7 107/17 108/1
**facts [6]** 14/8 14/9 14/13 48/15 48/15 106/19
**factual [12]** 4/2 4/7 4/14 4/19 5/14 6/4 6/5 9/8 23/10 27/13 27/18 69/23
**factually [3]** 13/8 13/12 19/3
**fairness [2]** 28/7 75/16
**faith [1]** 11/9
**fake [7]** 25/9 48/24 52/25 54/19 56/15 61/13 69/7
**false [7]** 26/18 26/19 48/25 71/20 71/20 72/1 73/1
**families [2]** 85/4 98/11
**family [4]** 91/23 98/24 107/8 112/1
**famous [2]** 40/12 73/8
**fanciest [1]** 69/1
**fantastic [1]** 73/10
**Fargo [1]** 1/19
**farmers [1]** 84/21
**fashion [2]** 49/11 97/24
**fast [1]** 20/8
**father [3]** 36/4 36/11 36/12
**fault [1]** 95/19
**FBI [13]** 2/11 26/24 27/11 30/21 31/9 31/11 31/13 31/20 31/23 32/3 41/24 53/25 68/17
**FCI [1]** 111/25
**federal [4]** 9/18 43/8 89/1 109/1
**federally [1]** 10/3
**fee [2]** 25/21 25/22
**fellow [2]** 32/10 92/6
**field [2]** 56/12 106/15
**fielding [1]** 55/18
**fighter [1]** 93/25
**figure [7]** 12/15 12/18 12/20 14/2 15/8 16/1 105/22
**figures [2]** 12/7 15/12
**file [1]** 113/21
**filings [1]** 106/2
**final [9]** 5/18 30/19 62/1 90/4 105/8 105/12 108/17 108/22 110/25
**finalize [4]** 6/18 49/25 49/25 64/5
**finally [1]** 65/11
**financial [10]** 57/4 57/7 81/22 82/4 87/9 99/4 109/2 109/6 109/16 110/18
**financially [3]** 80/23 82/2 93/23
**finish [1]** 112/13
**finished [1]** 29/7
**firearm [1]** 110/13
**five-figure [1]** 16/1
**FL [1]** 114/22
**flat [1]** 21/11
**flipping [1]** 69/4
**FLORIDA [5]** 1/1 1/6 1/16 1/20 112/17
**flsd.uscourts.gov [1]** 1/25

## F

**fluctuating [1]** 105/20
**focus [3]** 17/19 27/23 33/5
**focused [1]** 55/22
**folks [1]** 8/14
**follow-up [2]** 46/12 92/23
**followup [1]** 59/24
**food [2]** 97/24 98/7
**fooled [1]** 56/5
**foregoing [1]** 114/16
**forfeiture [9]** 102/20 104/2 104/2 104/5 104/6 104/8 104/13 104/16 112/14
**forgery [1]** 27/4
**forget [2]** 13/23 95/17
**form [5]** 49/11 61/4 89/15 89/16 109/24
**forma [1]** 111/23
**formal [1]** 80/3
**formalized [1]** 17/25
**former [1]** 58/10
**FORT [4]** 1/6 1/16 1/20 114/22
**forthcoming [1]** 79/6
**forwarded [3]** 109/20 109/21 110/1
**foundation [2]** 39/12 55/25
**founded [1]** 82/17
**founder [1]** 97/10
**frame [10]** 60/12 60/14 60/15 60/15 60/17 60/19 60/20 61/7 61/14 61/16
**frames [1]** 61/18
**Frances [1]** 2/22
**frankly [2]** 12/5 64/21
**fraud [5]** 11/15 17/14 31/20 67/11 102/10
**frauds [1]** 31/19
**fraudulent [18]** 12/17 12/20 16/11 21/17 24/22 27/15 40/24 40/25 58/6 59/12 59/17 63/14 64/11 64/13 64/22 65/1 65/6 68/18
**free [5]** 14/23 98/6 98/15 99/13 100/17
**Freedom [1]** 97/10
**French [1]** 67/23
**Fried [3]** 90/7 90/10 103/15
**friend [6]** 84/13 88/25 96/3 99/20 101/1 107/8
**friends [9]** 77/4 77/4 86/13 86/14 87/10 88/6 88/11 106/25 112/2
**friendship [2]** 76/23 84/2
**frog [2]** 18/22 18/23
**front [3]** 10/20 52/9 100/15
**fruition [2]** 6/12 16/24
**FS [1]** 77/20
**fund [2]** 68/11 91/1
**fundamental [1]** 106/19
**fundraisers [1]** 88/13
**funds [3]** 8/19 19/25 50/5

## G

**G-E-R-V-A-S-I [1]** 31/3
**gain [1]** 45/18
**gains [1]** 109/16
**galleries [16]** 24/16 34/19 38/18 43/10 43/23 44/3 49/2 67/11 68/1 68/25 71/15 81/4 95/13 99/24 100/20 108/10
**gallery [45]** 2/3 5/5 5/8 7/24 15/20 15/24 18/23 19/19 22/12 23/24 25/6 25/11 25/13 33/7 34/15 34/16 37/5 39/21 39/25 43/20 44/25 46/2 47/8 47/12 48/7 58/16 60/8 60/11 60/18 68/3 69/7 72/3 72/12 76/19 81/18 81/19 83/9 86/12 86/16 88/13 88/15 94/13 95/5 97/16 112/3
**Gemini [1]** 23/7
**general [2]** 72/11 107/21
**generated [1]** 99/9
**generationally [1]** 98/10
**generations [2]** 84/22 98/24
**generosity [2]** 68/10 88/19
**generous [2]** 68/9 93/19
**gentleman [2]** 75/21 103/14
**George [1]** 98/11
**Georgia [6]** 13/2 26/24 26/25 27/17 41/5 64/12
**Germany [1]** 57/15
**Gervasi [9]** 2/11 2/15 7/12 9/7 27/11 30/21 30/23 31/2 43/8
**gets [1]** 102/23
**gifts [3]** 98/6 98/7 98/9
**gigantic [1]** 94/18
**gives [1]** 82/18
**goal [1]** 12/10
**Goods [1]** 76/4
**Gorensteins [3]** 15/6 102/18 112/13
**Gosh [1]** 89/2
**gotten [3]** 49/10 57/14 85/1
**government [74]** 2/8 3/11 3/23 5/20 5/22 5/25 6/3 6/4 6/11 6/16 6/21 7/7 7/10 7/23 9/3 9/7 10/5 11/17 15/16 17/14 18/3 19/12 19/18 20/9 21/18 22/1 24/5 24/20 25/12 27/6 27/15 27/19 28/1 28/6 29/11 30/15 30/20 30/23 58/6 63/13 63/24 64/15 64/25 65/4 66/20 66/24 68/15 69/6 69/23 70/16 71/23 74/1 74/25 75/14 77/6 78/2 78/8 78/12 78/15 85/11 92/19 92/22 94/11 94/16 94/18 100/19 102/2 102/22 102/25 109/15 112/24 113/4 113/21 114/10
**Government's [5]** 6/24 59/11 65/24 66/25 96/22
**gracious [2]** 86/15 95/7
**grandfather [2]** 98/19 98/21
**grant [2]** 104/22 112/15
**granted [1]** 105/5
**grateful [1]** 91/8
**gray [1]** 23/2
**great [5]** 73/19 77/8 80/1 81/14 93/19
**greater [2]** 3/4 111/12
**green [2]** 22/25 23/1
**gross [1]** 109/8
**groups [2]** 81/20 84/4
**guarantee [4]** 89/10 101/17 101/18 107/2
**guests [1]** 68/2
**Guggenheim [1]** 73/14
**guideline [8]** 10/9 12/9 65/17 65/21 66/6 66/23 67/1 74/2
**guidelines [13]** 10/4 10/12 11/14 13/24 14/2 14/7 17/21 63/21 66/15 68/16 78/3 103/14 106/6
**guilty [2]** 69/20 69/20

## H

**handle [1]** 31/18
**handled [4]** 31/14 58/23 58/24 114/3
**handling [1]** 32/11
**handwriting [1]** 40/2
**handwritten [2]** 40/1 40/6
**hanging [1]** 38/18
**Hans [4]** 28/15 36/2 40/7 47/19
**happy [1]** 101/7
**harm [7]** 10/14 12/24 17/11 17/12 63/21 63/23 64/3
**Harold's [1]** 99/3
**Harris [2]** 87/13 90/7
**health [2]** 74/6 78/9
**hearing [27]** 1/10 3/2 5/14 7/11 7/16 7/18 8/23 8/25 9/3 27/22 61/11 63/3 72/12 73/18 77/7 79/15 101/7 104/23 105/9 105/16 105/20 108/20 108/23 110/25 113/8 113/22 114/4
**heart [2]** 100/23 103/4
**hereby [2]** 112/20

# H

**hereby... [1]** 114/16
**Herring [2]** 75/23 75/24
**HG [2]** 76/15 79/4
**hide [1]** 102/13
**high-end [4]** 68/24 72/12 72/13 108/10
**higher [3]** 12/15 25/23 75/18
**highlight [2]** 76/16 90/24
**highlighting [2]** 83/22 97/19
**highly [1]** 106/14
**Highway [2]** 1/15 114/21
**historically [1]** 57/23
**history [7]** 26/15 65/17 66/7 74/6 77/25 103/3 107/18
**hold [2]** 88/16 92/21
**holding [2]** 91/4 94/18
**holiday [1]** 81/21
**home [10]** 45/8 52/17 52/22 72/6 76/2 76/4 81/17 81/18 88/14 112/9
**Honestly [1]** 99/22
**honor [108]** 2/9 2/13 2/16 2/22 3/20 4/1 4/5 4/9 4/11 4/12 4/17 4/18 4/21 4/24 5/4 5/9 6/22 7/3 7/25 8/15 8/20 9/6 9/16 10/20 10/22 11/7 11/10 13/6 13/9 14/12 14/18 14/25 15/5 15/25 16/2 17/1 17/20 17/24 18/8 19/2 20/23 21/3 21/6 21/19 22/25 23/3 23/15 23/17 24/16 24/17 24/23 25/4 25/14 26/21 27/11 30/4 30/12 31/5 41/3 43/2 44/10 45/24 46/9 47/20 53/21 54/3 54/7 55/20 56/7 56/21 56/24 62/18 65/14 65/23 66/1 66/12 66/21 66/25 67/6 67/7 70/1 79/18 79/21 89/10 89/14 90/4 90/5 91/15 92/7 92/24 93/20 97/13 100/11 103/12 103/24 104/4 104/11 104/14 104/18 105/6 111/13 111/14 112/14 113/1 113/12 113/18 114/8 114/9
**HONORABLE [1]** 1/10
**hope [3]** 79/8 89/24 89/25
**host [3]** 81/6 81/7 99/8
**hosted [2]** 83/9 98/6
**hosting [1]** 85/25
**hours [1]** 110/8
**house [16]** 43/14 43/14 44/9 44/15 52/18 72/14 73/19 74/21 75/8 75/11 87/4 89/8 89/16 89/20 92/11 101/5
**houses [4]** 53/15 53/19 56/2 56/5
**HOWARD [4]** 1/18 1/18 2/17 99/2
**huge [2]** 53/19 97/15
**human [4]** 82/18 83/22 98/2 106/12
**humility [1]** 89/14
**Hundertwasser [1]** 76/1
**hundred [3]** 15/7 38/6 47/5
**hundreds [3]** 37/23 45/5 69/4
**husband's [1]** 87/5
**Hutton [3]** 85/13 85/19 85/20

# I

**identical [13]** 26/11 38/7 41/10 47/8 47/9 48/5 59/16 60/10 60/21 61/19 65/7 76/2 76/12
**igloo [2]** 87/21 87/22
**ii [1]** 16/4
**illegal [2]** 92/15 95/20
**image [22]** 26/11 36/17 38/7 48/5 48/12 51/7 51/21 54/12 60/5 60/6 60/10 60/10 61/2 61/19 61/20 65/7 70/24 71/2 74/20 76/2 77/3 77/18
**images [5]** 51/10 58/9 58/10 71/2 75/9
**imaging [1]** 71/11
**immediately [4]** 97/12 110/2 110/22 112/22
**immigration [2]** 96/23 110/17
**impassioned [1]** 97/18
**imposed [6]** 99/6 109/3 109/6 111/3 111/12 111/20
**impossible [2]** 17/13 63/23
**impressed [1]** 99/6
**imprisoned [1]** 108/13
**imprisonment [7]** 65/18 65/22 66/6 108/3 108/5 110/6 110/25
**improve [1]** 98/22
**inauthentic [5]** 34/10 42/7 53/20 54/22 55/16
**incarceration [4]** 103/18 108/24 109/7 111/17
**incarcerative [1]** 103/11
**income [1]** 109/17
**inconsistencies [1]** 27/3
**incorrect [1]** 12/4
**incredible [1]** 37/20
**independent [1]** 11/25
**indication [3]** 47/3 52/25 74/7
**indicted [1]** 13/18
**indictment [1]** 114/11
**individual [9]** 34/24 35/1 36/23 42/3 45/22 58/19 59/13 81/1 96/24
**individuals [10]** 7/5 11/11 42/4 56/17 79/11 80/25 81/25 101/20 106/16 106/23
**induced [1]** 69/25
**indulge [1]** 88/23
**industry's [1]** 109/1
**inflict [4]** 10/14 12/23 17/12 63/22
**inflicting [1]** 64/2
**information [19]** 6/5 6/5 7/8 7/9 8/5 9/8 14/8 21/2 24/24 25/25 26/12 27/5 27/10 33/20 35/1 36/8 38/20 72/1 78/24
**infractions [1]** 89/20
**initial [1]** 19/13
**initially [4]** 21/10 26/1 73/7 88/6
**initials [1]** 7/4
**injured [1]** 97/13
**injustice [1]** 83/22
**inland [1]** 86/25
**inquire [2]** 65/12 104/2
**inquiry [2]** 19/4 55/22
**insist [1]** 24/2
**instance [6]** 15/15 28/1 44/23 49/9 93/14 107/14
**instances [3]** 15/6 93/20 102/9
**instead [2]** 64/18 68/7
**institution [1]** 72/15
**insurance [1]** 17/14
**insured [1]** 17/15
**intend [1]** 20/10
**intended [17]** 3/18 5/17 10/13 10/13 12/22 15/11 16/5 17/10 17/10 17/18 20/20 22/11 30/5 30/5 63/19 63/21 64/3
**intending [1]** 8/25
**intent [7]** 8/2 16/3 16/4 17/22 17/23 95/14 95/15
**intention [2]** 13/11 50/1
**interest [4]** 12/6 22/1 99/9 109/10
**interested [4]** 18/21 71/8 71/14 78/17
**international [2]** 97/11 99/12
**interpretation [1]** 11/3
**interview [1]** 48/6
**interviewed [1]** 38/22
**interviewing [1]** 55/5
**introduced [1]** 50/8
**introduction [1]** 84/1
**investigated [1]** 10/3
**investigation [12]** 9/18 32/16 32/24

## I

**investigation... [9]** 33/3 37/11 38/15 52/11 53/18 68/19 70/12 70/16 75/6
**investigations [2]** 31/14 32/11
**investigative [1]** 48/3
**investment [1]** 31/18
**invite [1]** 99/15
**invited [2]** 83/8 86/15
**invoice [3]** 70/18 70/18 70/20
**invoices [5]** 37/22 70/13 70/21 70/22 71/25
**involvement [2]** 53/6 81/15
**irrelevant [1]** 86/7
**island [1]** 100/2
**isolated [1]** 107/14
**Israeli [2]** 67/23 91/25
**issue [14]** 4/8 5/10 7/6 8/6 11/4 11/22 23/9 29/18 39/13 66/18 96/24 104/13 105/13 113/23
**issues [2]** 5/23 79/16
**item [8]** 25/23 26/9 28/11 38/1 42/10 51/19 60/6 86/6
**items [30]** 3/20 8/12 12/16 16/18 17/1 20/5 20/18 21/8 21/12 21/17 22/2 24/7 27/16 28/2 28/12 28/16 30/3 30/4 30/16 41/6 45/4 45/6 46/4 46/6 46/7 57/24 62/2 62/3 72/24 105/18
**IV [1]** 98/12

## J

**jeweler [1]** 76/11
**Jews [1]** 100/23
**JF [1]** 77/13
**job [7]** 12/12 32/8 89/19 91/4 100/11 109/1 109/4
**JR [1]** 77/21
**JS [1]** 74/14
**judge [72]** 1/11 3/18 8/4 10/11 11/9 13/4 13/18 13/21 15/15 15/23 16/9 16/15 16/21 23/13 24/12 27/21 28/20 29/3 30/1 30/7 30/11 43/5 46/5 54/15 55/24 56/2 61/22 66/17 79/20 80/6 82/8 85/11 85/13 86/21 87/14 89/3 89/6 93/1 93/7 93/13 94/6 94/15 94/15 94/21 95/4 95/17 96/11 96/18 97/2 97/9 97/22 98/2 99/3 99/22 100/1 100/21 100/25 101/14 101/15 102/12 102/16 103/2 103/8 103/10 103/17 104/21 105/15 111/6 111/7 112/2 112/3 112/11
**judges [1]** 13/12
**judgment [5]** 104/8 104/13 108/11 109/3 111/22
**jump [1]** 15/11
**justice [3]** 12/7 22/1 109/10

## K

**Katya [2]** 85/13 85/19
**key [2]** 64/1 106/18
**kindness [1]** 107/10
**kinds [1]** 99/18
**Kingdom [1]** 40/9
**Klawsnick [1]** 98/2
**knowing [2]** 52/16 85/4
**knowledgeable [1]** 69/15
**knows [5]** 53/4 91/23 93/4 95/24 95/24

## L

**LA [1]** 59/7
**label [1]** 34/16
**labels [2]** 34/13 34/15
**labor [1]** 83/23
**laboring [1]** 103/3
**lack [1]** 107/17
**lading [1]** 23/21
**lady [1]** 97/5
**Lago [2]** 88/10 88/16
**land [1]** 9/2
**language [4]** 10/9 10/12 11/13 51/25
**languages [2]** 68/4 92/5
**large [6]** 19/12 28/1 28/15 48/8 75/8 106/24
**larger [1]** 18/5
**LASERNA [4]** 1/14 2/13 2/14 104/24
**lastly [1]** 41/1
**late [1]** 86/13
**Lauderdale [1]** 1/20
**laundering [1]** 69/20
**law [9]** 1/18 8/10 17/20 21/14 43/8 44/6 102/4 107/25 111/13
**lay [1]** 9/1
**lead [2]** 32/20 73/25
**leading [4]** 18/17 36/5 39/12 69/10
**leads [1]** 65/11
**led [1]** 58/14
**left-hand [1]** 21/1
**legal [2]** 5/16 96/7
**legally [1]** 95/10
**legitimate [3]** 12/17 13/1 30/16
**legitimately [1]** 24/11
**letter [11]** 40/1 40/6 76/24 81/16 89/15 90/24 97/5 97/9 99/2 101/3 107/5
**letterhead [1]** 23/11
**letters [14]** 3/8 7/17 67/16 68/8 77/7 93/17 93/18 98/11 99/15 101/6 101/9 102/6 106/1 106/25
**LG [2]** 76/15 79/4
**Lichtenstein [7]** 15/24 15/25 73/12 73/20 77/20 77/21 77/22
**lied [2]** 55/12 106/20
**life [5]** 67/18 85/4 88/1 89/17 94/23
**lifestyle [3]** 67/21 68/12 94/9
**lifetime [1]** 107/10
**light [2]** 11/14 74/3
**like-kind [1]** 76/10
**likeness [1]** 71/11
**lines [1]** 20/21
**link [1]** 70/19
**lis [1]** 94/11
**list [10]** 6/8 7/11 19/15 20/25 21/7 21/8 23/11 33/17 37/2 41/6
**listen [1]** 49/13
**literally [1]** 93/15
**LM [2]** 7/4 75/25
**LO [3]** 7/5 75/21 75/22
**local [2]** 69/11 101/4
**location [4]** 18/24 46/2 47/13 52/17
**locations [1]** 25/12
**lodged [1]** 27/13
**lodging [1]** 4/20
**London [1]** 40/15
**loosely [1]** 18/1
**Los [1]** 59/5
**losing [1]** 24/15
**losses [4]** 78/1 78/16 108/16 108/18
**louder [1]** 18/14
**love [1]** 88/20
**lover [1]** 52/19
**lower [1]** 6/19
**lunch [1]** 76/20

## M

**M-A-R-C [1]** 31/3
**magical [1]** 89/13
**magically [1]** 89/9
**mailings [1]** 22/6
**main [3]** 36/16 36/25 44/7
**maintain [1]** 75/6
**man [12]** 36/17 36/20 74/8 84/11 88/20 89/11 89/18 92/4 98/15 99/9 99/14 106/14
**mandatory [1]** 110/11
**manner [3]** 15/13 64/23 111/5
**Mar [2]** 88/10 88/16
**Marc [5]** 2/11 30/21 30/23 31/2 31/3
**market [2]** 76/6 92/12
**Marshals [1]** 112/21
**Mary [1]** 97/5
**match [3]** 38/1 51/21 52/14
**matching [2]** 74/20 75/8
**material [2]** 106/16 109/13
**materials [2]** 3/13 3/15
**matter [9]** 6/15

## M

**matter... [8]** 9/4 25/7 32/18 37/7 68/17 102/1 107/21 114/18
**May 2nd [1]** 104/7
**McCourt [2]** 97/5 97/6
**measure [1]** 10/4
**Medgebow [1]** 100/25
**media [1]** 44/23
**medical [1]** 103/3
**meeting [9]** 20/9 20/9 20/10 22/7 35/23 35/24 64/7 91/9 91/10
**member [4]** 37/8 58/10 59/5 90/16
**members [5]** 7/24 13/16 41/24 80/17 88/10
**memo [1]** 101/14
**memorandum [4]** 44/23 56/4 95/23 101/23
**memorialization [1]** 22/13
**men [1]** 97/12
**mensch [1]** 100/23
**mentor [1]** 90/22
**message [7]** 20/3 21/20 22/17 22/22 23/12 64/6 107/22
**messages [6]** 19/6 20/3 20/17 21/19 23/16 62/15
**metal [1]** 63/15
**methodology [1]** 114/2
**Mexico [2]** 26/25 54/2
**Miami [5]** 31/9 42/1 109/20 110/1 112/1
**microphone [3]** 9/23 18/13 86/20
**mid [1]** 16/1
**middle [1]** 26/23
**military [1]** 97/13
**miller [4]** 1/24 1/25 114/19 114/20
**million [46]** 4/23 5/3 6/3 6/17 12/18 14/17 16/7 16/23 17/17 18/6 20/4 21/11 22/14 23/5 24/9 28/25 30/11 30/17 33/21 33/21 36/22 36/23 36/24 37/1 49/23 50/7 51/15 57/8 62/7 62/8 62/10 62/11 63/8 63/10 63/12 63/17 63/19 64/9 65/3 92/11 94/7 94/8 94/12 94/14 112/7 112/8
**millions [1]** 89/7
**minimize [1]** 100/4
**minimizing [1]** 76/3
**minimum [5]** 25/15 37/4 71/24 96/8 109/5
**minutiae [1]** 27/22
**mire [1]** 27/22
**misleading [1]** 69/5
**misrepresent [1]** 70/6
**misrepresentations [1]** 106/17
**misrepresenting [1]** 69/24
**misspelled [1]** 101/22
**mistakes [1]** 24/17
**mixture [1]** 64/11
**MM [1]** 76/8
**modify [1]** 96/21
**Moens [2]** 101/21 101/21
**moment [9]** 4/9 7/20 11/6 13/5 68/14 84/10 90/12 92/21 105/14
**moments [1]** 73/22
**Monet [4]** 24/4 26/23 30/9 30/10
**monies [2]** 21/24 70/2
**monitor [1]** 109/12
**month [1]** 69/1
**monthly [2]** 32/8 109/8
**months [8]** 65/18 65/22 66/6 89/8 108/3 108/5 108/13 110/24
**Moshe [1]** 80/11
**Mostly [1]** 82/4
**motion [10]** 3/9 62/22 104/6 104/8 104/11 104/17 104/22 105/5 112/17 113/21
**motivated [1]** 106/21
**movies [3]** 82/16 83/22 83/24
**Mr [6]** 2/14 5/5 29/23 90/10 102/12 103/15
**Mr. [174]**
**Mr. Bouaziz [130]**
**Mr. Bouaziz's [12]** 17/23 19/20 20/1 23/24 34/19 40/2 43/10 52/17 69/7 97/10 101/1 101/10
**Mr. Daniel [1]** 32/16
**Mr. Laserna [1]** 104/24
**Mr. Medgebow [1]** 100/25
**Mr. Moens [2]** 101/21 101/21
**Mr. Nicozisis [1]** 88/4
**Mr. Oxe [1]** 101/22
**Mr. Schumacher [25]** 2/19 3/16 9/10 12/19 13/3 23/9 24/6 27/12 39/14 43/4 54/14 59/23 65/12 65/20 66/15 78/23 79/7 79/19 91/3 101/7 103/21 104/16 111/24 113/9 113/25
**Mrs. [2]** 41/18 41/19
**Mrs. O'Keeffe [2]** 41/18 41/19
**Ms [9]** 2/14 18/3 51/24 70/1 95/11 96/19 97/6 100/9 113/11
**Ms. [11]** 2/24 66/11 82/10 82/15 85/20 98/2 99/20 105/8 108/19 113/12 113/16
**Ms. Cassisi [1]** 108/19
**Ms. Davis [2]** 82/10 82/15
**Ms. Dyer [1]** 99/20
**Ms. Hutton [1]** 85/20
**Ms. Klawsnick [1]** 98/2
**Ms. Schall [1]** 105/8
**Ms. Weisberg [4]** 2/24 66/11 113/12 113/16
**multiple [4]** 14/14 32/25 68/4 106/2
**multitude [3]** 15/1 31/18 70/23
**Murrow [3]** 77/2 77/2 77/4
**museum [8]** 26/25 29/16 41/25 42/3 42/4 54/1 54/4 64/14
**music [3]** 98/13 98/14 99/10
**musicians [1]** 99/8

## N

**N-I-C-O-Z [1]** 87/24
**n.3 [1]** 10/16
**n.3n [1]** 10/15
**Nancy [1]** 87/21
**nation [1]** 69/2
**national [1]** 31/15
**nature [9]** 8/11 15/12 18/4 27/15 77/10 91/2 105/20 106/12 107/23
**necessary [7]** 3/4 64/5 103/18 105/2 105/2 105/4 111/12
**negatively [1]** 99/6
**negotiated [2]** 14/6 21/11
**negotiations [1]** 38/2
**neighborhood [2]** 15/5 16/1
**nephew [2]** 91/25 92/2
**news [1]** 86/25
**newspaper [1]** 3/13
**nice [3]** 35/15 61/14 67/21
**nicknamed [1]** 43/18
**Nicozisis [3]** 87/20 87/25 88/4
**nine [4]** 3/23 5/19 77/20 87/1
**Nobody [1]** 53/4
**nominal [3]** 25/21 25/22 68/23
**non [2]** 103/11 106/22
**non-incarcerative [1]** 103/11
**non-pecuniary [1]** 106/22
**None [1]** 15/21
**North [2]** 109/20 110/1
**Northwood [1]** 98/5
**notably [2]** 77/1 78/22
**notations [1]** 72/20
**notice [4]** 7/16 7/19 111/20 113/14
**noticed [1]** 25/16

N

**notwithstanding [1]** 11/19
**nowhere [4]** 15/25 84/22 93/25 101/4
**number [43]** 2/6 3/8 3/19 3/22 5/18 8/9 11/16 11/21 14/15 15/8 15/9 16/1 17/12 23/5 23/5 23/20 28/16 37/18 46/20 49/3 51/15 65/19 66/18 73/13 74/19 75/2 75/2 75/8 75/9 75/21 75/22 75/25 76/8 77/1 77/13 77/14 81/25 95/5 97/14 101/25 102/9 104/7 111/7
**number three [3]** 75/2 75/2 75/9
**number two [1]** 74/19
**numbers [4]** 15/2 23/23 23/25 75/12
**numerous [2]** 3/12 84/7

O

**O'Keeffe [32]** 13/2 19/7 21/16 21/16 24/7 24/10 26/24 26/25 27/1 27/17 29/7 29/16 29/16 29/22 30/15 41/5 41/18 41/19 41/25 42/3 42/3 42/22 46/11 48/7 53/25 54/1 54/1 55/15 55/16 63/17 64/12 64/13
**O'Keeffes [1]** 70/22
**Oaks [1]** 101/23
**object [3]** 5/1 111/4 111/11
**objected [1]** 5/4
**objection [19]** 4/19 11/16 36/5 44/10 45/24 45/25 47/20 53/21 55/20 61/4 61/9 62/21 63/5 65/16 66/14 91/15 92/22 104/15 111/7
**objectionable [1]** 13/10
**objections [12]** 3/9 3/17 4/3 4/5 4/13 5/14 5/16 6/25 17/20 27/13 27/19 65/12
**obligation [3]** 11/25 13/23 68/19
**obligations [3]** 109/3 109/6 109/18
**obliged [2]** 12/8 14/7
**obscure [1]** 102/13
**observe [2]** 38/16 44/21
**observed [2]** 38/14 38/17
**occasion [1]** 33/24
**occasions [1]** 93/23
**occupation [1]** 80/12
**offense [7]** 10/4 10/6 15/13 65/16 66/7 96/1 100/6
**offenses [1]** 100/7
**offensive [1]** 12/5
**offer [2]** 89/10 107/4
**offering [3]** 20/4 46/25 67/14
**offers [1]** 98/15
**offhand [1]** 88/17
**office [7]** 36/25 42/2 109/11 109/12 110/3 110/4 110/9
**officer [2]** 22/16 79/2
**officers [1]** 44/7
**Offices [1]** 1/18
**Official [2]** 1/24 114/20
**oftentimes [2]** 25/17 32/7
**Oh [5]** 10/17 35/14 60/19 72/7 84/5
**older [1]** 88/8
**omissions [1]** 106/17
**omitted [1]** 106/18
**ongoing [1]** 9/19
**online [22]** 25/18 25/20 25/21 28/5 28/13 37/12 37/15 38/5 39/3 42/11 46/21 68/21 68/22 69/2 72/8 73/3 75/18 76/1 77/19 94/21 94/22 95/3
**open [2]** 45/20 76/6
**opera [1]** 85/2
**operate [1]** 17/7
**operating [1]** 71/15
**operation [1]** 17/14
**opinion [2]** 49/17 49/19
**opportunities [1]** 92/9
**opportunity [8]** 7/16 33/22 37/10 57/3 88/12 92/23 111/8 111/10
**oppose [1]** 67/2
**opposition [1]** 113/4
**orally [1]** 106/4
**order [16]** 15/10 15/18 17/25 23/21 32/5 49/7 49/10 68/11 95/10 104/12 104/13 104/23 105/1 109/6 110/5 112/6
**orders [1]** 49/3
**ordinary [1]** 92/6
**organization [1]** 97/20
**organizational [1]** 80/22
**organizations [1]** 85/22
**organized [2]** 88/13 98/4
**origin [1]** 106/19
**original [14]** 26/5 39/5 41/18 41/21 47/9 48/21 52/5 71/17 73/20 74/17 74/18 75/13 76/7 77/18
**originality [1]** 71/22
**originally [1]** 90/15
**originals [4]** 48/19 75/10 94/16 94/17
**orphans [1]** 86/1
**ostrich [1]** 87/21
**outlier [1]** 15/13
**outlined [4]** 19/16 24/24 69/3 70/20
**outrageous [1]** 15/12
**outset [1]** 105/24
**outstanding [1]** 114/3
**overlook [1]** 77/10
**overrule [2]** 11/16 61/9
**overruled [6]** 11/21 39/14 44/11 47/23 65/19 91/18
**overseas [1]** 68/4
**overview [1]** 5/20
**owed [1]** 79/4
**owning [1]** 71/15
**Oxe [2]** 101/22 101/24

P

**P-R-O-C-E-E-D-I-N-G-S [1]** 2/1
**P.A [1]** 1/18
**p.m [3]** 108/23 111/1 114/14
**package [1]** 57/17
**packaged [1]** 55/6
**packed [1]** 67/14
**page [2]** 21/7 22/19
**pages [2]** 1/7 70/12
**pain [1]** 99/5
**paint [3]** 42/14 42/21 63/15
**painted [2]** 29/22 67/7
**painting [2]** 27/1 72/3
**paintings [1]** 58/20
**Palm [7]** 12/3 13/19 31/9 80/15 90/15 90/18 100/2
**pandemic [1]** 82/21
**papers [1]** 72/22
**paperwork [4]** 16/8 30/19 64/4 64/25
**paragraph [10]** 4/17 4/20 5/1 25/3 25/15 26/21 26/22 26/24 27/13 29/1
**paragraphs [12]** 4/7 4/11 4/14 5/15 24/25 25/2 25/5 25/15 26/7 27/14 27/14 27/19
**Pardon [1]** 91/16
**Parkinson's [1]** 98/19
**parks [1]** 68/1
**part [19]** 15/17 24/1 26/4 28/2 28/25 30/17 31/22 31/24 37/9 52/13 52/14 54/17 55/18 57/16 58/7 81/13 94/6 106/21 110/20
**participate [2]** 56/13 85/22
**parties [22]** 2/7 6/13 6/18 11/23 12/11 13/13 14/11 18/1 20/21 22/2 22/7 63/6 63/9 63/20 70/9 78/4 79/13 81/21 86/16 97/22 98/3 105/11
**parties' [1]** 65/1
**partner [1]** 36/1

P

**party [1]** 82/25
**passed [2]** 86/17 86/18
**passion [2]** 90/18 90/20
**Pat [1]** 99/12
**Patrick [1]** 99/2
**pattern [5]** 25/16 27/9 59/15 74/13 75/17
**pauperis [1]** 111/23
**pause [1]** 11/8
**pay [10]** 17/3 81/8 106/10 109/2 109/5 109/8 109/14 109/23 110/22 111/22
**payable [3]** 109/19 109/25 110/2
**payment [9]** 6/10 19/11 49/24 75/5 108/25 109/9 109/12 113/7 113/17
**payments [6]** 79/9 109/15 113/19 113/20 114/1 114/1
**PayPal [1]** 6/9
**PD [2]** 74/19 74/23
**pecuniary [8]** 10/13 17/11 17/12 30/6 63/21 63/23 64/3 106/22
**pendens [1]** 94/11
**pending [3]** 96/22 104/6 112/12
**people [40]** 29/12 29/24 53/18 67/14 67/18 68/24 69/12 69/12 77/9 77/11 79/10 80/16 81/22 83/18 84/16 84/17 85/1 85/6 85/7 86/23 87/10 92/14 93/15 93/23 93/24 94/5 95/12 96/1 96/1 97/2 97/17 98/4 98/25 99/10 99/16 100/22 100/24 102/4 106/17 106/24
**people's [1]** 98/23
**perfect [1]** 93/22
**perfectly [1]** 84/18
**perhaps [8]** 35/24 37/6 45/15 47/11 58/5 92/8 92/8 92/12
**period [4]** 95/9 97/19 103/18 108/24
**permissible [1]** 110/19
**permission [3]** 79/21 93/1 102/23
**permit [2]** 79/23 112/11
**person [17]** 16/24 24/2 26/17 32/21 39/24 51/6 54/11 59/2 67/10 67/18 78/1 81/2 89/22 93/14 100/8 102/10 110/9
**person's [1]** 94/4
**personal [4]** 51/2 89/9 101/1 107/17
**personam [1]** 29/13
**Pest [1]** 53/5
**PETER [2]** 1/14 2/13
**Philip [2]** 87/20 103/14
**phone [3]** 18/9 18/16 39/24
**phonetic [2]** 98/3 101/22
**photograph [9]** 51/5 52/7 52/7 52/8 58/15 58/25 59/3 59/12 64/18
**photographed [3]** 34/7 36/15 36/16
**photographs [5]** 3/12 33/25 34/2 34/4 34/6
**photos [5]** 29/13 44/22 44/23 45/3 99/23
**Picasso [1]** 77/21
**Piccadilly [2]** 26/17 40/8
**pick [1]** 22/12
**picked [2]** 15/19 83/9
**picking [1]** 83/1
**picture [5]** 27/23 51/3 51/12 67/8 72/2
**pictures [2]** 50/24 51/3
**piece [58]** 9/21 18/22 25/7 26/15 33/10 33/15 35/22 37/1 38/5 38/7 38/7 38/11 38/13 38/21 40/15 40/21 40/23 40/23 40/24 40/25 41/7 41/9 41/10 41/16 41/17 41/18 41/19 41/21 41/23 41/24 42/6 42/11 51/9 54/22 58/24 59/14 59/16 59/17 60/5 64/16 70/20 70/24 71/6 71/9 71/18 73/8 73/11 74/22 74/23 74/24 74/25 76/5 76/7 76/13 77/1 77/16 77/16 102/7
**pieces [74]** 12/16 12/25 14/15 14/24 15/2 15/4 16/12 18/6 18/12 18/20 19/16 19/21 19/23 21/15 22/10 22/12 24/3 24/8 24/21 25/9 25/18 27/7 30/14 33/6 33/17 33/23 34/7 34/10 34/13 34/19 37/5 37/7 39/5 39/5 39/6 39/10 50/19 53/20 55/23 57/23 63/11 63/14 64/4 64/8 64/10 68/23 69/16 69/17 69/18 69/25 70/21 70/23 71/16 73/3 73/7 74/15 74/18 74/18 75/3 75/5 75/6 75/13 75/20 75/22 76/1 77/1 77/14 77/15 77/18 94/19 106/19 107/1 107/4 112/4
**PIERCE [3]** 1/6 1/16 114/22
**place [5]** 40/19 72/13 72/15 84/25 112/16
**Plaintiff [2]** 1/4 1/14
**plea [10]** 5/25 6/15 20/22 63/6 63/20 65/2 78/23 95/8 104/20 111/9
**pled [2]** 69/20 69/20
**pledge [1]** 89/12
**pocket [1]** 102/14
**point [20]** 3/16 5/21 15/3 33/2 49/1 49/10 60/13 65/11 65/13 65/21 66/3 66/16 79/24 94/22 95/4 95/12 95/25 97/3 104/3 107/12
**policy [1]** 9/19
**Polo [1]** 99/16
**ponzi [1]** 102/10
**popular [1]** 77/16
**portrayed [1]** 107/7
**position [1]** 63/13
**possessing [2]** 110/13 110/14
**possession [1]** 65/6
**potential [2]** 20/18 73/23
**potentially [2]** 18/21 22/10
**practice [4]** 25/16 27/9 74/13 75/17
**practices [1]** 95/20
**practicing [1]** 90/13
**praises [1]** 88/22
**pray [2]** 89/24 89/25
**precise [1]** 105/21
**preclude [1]** 109/15
**predecessor [1]** 43/21
**prejudice [2]** 99/13 99/21
**preliminary [1]** 6/10
**prepared [3]** 9/6 71/1 105/8
**preponderance [1]** 64/1
**present [4]** 2/10 7/14 7/17 63/2
**presentation [4]** 7/10 9/4 9/9 101/8
**presentence [5]** 6/6 69/3 70/8 106/5 110/21
**presently [4]** 90/11 94/18 95/6 96/10
**preserve [1]** 111/10
**preserving [1]** 66/17
**pretrial [1]** 112/10
**price [24]** 5/2 6/8 16/19 19/15 19/23 20/25 21/7 21/10 23/6 23/11 23/14 25/23 33/16 36/23 37/2 38/4 41/22 49/16 59/16 62/3 62/6 62/10 63/11 64/9
**priced [1]** 24/11
**prices [3]** 21/23 33/20 36/21
**pricey [1]** 64/16
**primary [2]** 32/18 32/19
**principle [1]** 106/14
**print [2]** 21/20 73/14
**prison [1]** 109/1
**Prisons [3]** 108/12 109/11

**P**

**Prisons... [1]** 110/3
**private [1]** 97/22
**probable [3]** 44/14 48/9 53/1
**probation [18]** 2/21 2/23 5/17 7/19 11/17 11/24 12/6 12/8 13/13 13/16 13/23 20/21 76/25 78/4 109/11 110/3 110/9 114/6
**Probation's [1]** 12/2
**problem [4]** 28/17 67/17 70/5 102/14
**problems [1]** 103/4
**procedural [1]** 113/6
**proceed [1]** 62/21
**proceeding [1]** 3/3
**proceedings [5]** 11/8 62/24 110/18 114/14 114/17
**proceeds [2]** 83/24 102/20
**process [3]** 15/17 29/21 78/11
**producing [2]** 65/17 66/5
**production [2]** 98/14 98/14
**proffer [2]** 55/25 69/23
**profit [3]** 69/5 70/3 106/20
**profiting [1]** 83/8
**prohibited [1]** 110/13
**project [1]** 32/21
**prominence [1]** 106/15
**prominent [1]** 91/23
**promote [2]** 107/24 111/13
**pronounce [1]** 104/1
**pronounced [1]** 111/5
**proof [3]** 12/23 24/20 65/9
**properly [3]** 10/24 11/18 17/18
**properties [1]** 112/8
**property [1]** 43/17
**proposal [1]** 65/2
**proposed [5]** 20/22 63/9 64/8 104/12 105/1
**Prosecution [1]** 89/19
**proudest [2]** 84/10 84/19
**prove [1]** 75/15
**proven [1]** 69/24
**provenance [15]** 26/14 26/19 35/22 35/25 36/3 36/9 39/22 40/3 40/5 47/18 48/24 55/12 71/21 72/1 72/2
**PSI [12]** 3/9 3/17 4/3 5/15 5/18 8/8 12/7 20/13 65/13 66/3 93/9 103/4
**PSR [7]** 7/3 7/8 9/9 24/24 25/4 27/6 76/25
**public [4]** 19/10 53/7 70/25 72/11
**publicity [1]** 100/20
**puffery [1]** 16/9
**pulled [1]** 91/5
**punishment [3]** 78/16 107/24 107/25
**purchase [35]** 4/23 15/9 15/18 16/23 17/25 18/10 19/23 20/4 20/14 20/15 21/9 22/2 23/20 25/17 25/21 38/4 40/4 47/4 47/7 49/3 49/7 49/10 57/10 57/16 61/17 63/11 63/11 68/23 70/2 73/8 76/21 77/14 77/22 77/23 107/1
**purchased [47]** 26/8 26/19 28/4 28/16 37/24 40/13 40/20 41/10 45/5 45/6 46/24 47/16 47/19 47/22 48/4 48/13 48/17 51/19 53/20 57/10 60/4 61/2 65/7 70/20 70/25 71/16 72/8 72/24 73/3 73/12 74/15 74/21 74/23 75/8 75/10 75/22 75/25 76/6 76/12 76/16 77/1 77/3 77/13 77/18 77/19 77/20 94/25
**purchaser [2]** 55/19 70/1
**purchases [9]** 37/15 37/18 37/19 37/20 48/8 51/23 71/20 94/21 107/7
**purchasing [8]** 19/17 21/25 70/14 71/16 73/13 76/4 95/1 107/13
**purported [7]** 27/1 54/1 54/9 58/16 59/11 63/16 77/2
**purportedly [3]** 63/15 63/18 76/8
**purposefully [3]** 12/23 17/11 63/22
**purposes [5]** 3/5 9/13 64/2 97/16 101/25
**pursuant [1]** 108/14
**pursue [1]** 98/15
**purveyor [2]** 16/17 56/6
**purveyors [1]** 24/17

**Q**

**qualify [2]** 12/21 28/8
**quarter [1]** 109/5
**question [15]** 10/24 11/3 13/3 17/9 30/9 30/10 47/23 53/24 55/11 57/21 61/5 61/10 61/18 62/13 107/6
**questioning [1]** 57/4
**questions [5]** 43/1 46/13 56/9 58/1 92/19
**quick [1]** 88/24
**quicker [1]** 113/13
**quickly [1]** 54/5
**quote [1]** 106/25
**quoting [2]** 10/15 107/5

**R**

**Rabbi [4]** 80/2 80/13 82/7 90/19
**raid [1]** 95/19
**raise [2]** 16/19 85/25
**raised [1]** 5/23
**raises [1]** 82/17
**raising [4]** 85/23 91/1 95/10 97/16
**ramp [1]** 97/24
**randomly [1]** 13/18
**range [13]** 12/9 31/15 65/18 65/22 66/6 66/8 66/9 66/12 66/23 67/1 74/2 100/15 108/4
**rate [1]** 109/8
**reach [1]** 53/12
**reached [3]** 99/18 102/14 105/11
**reaching [1]** 53/14
**ready [2]** 39/20 111/15
**realistic [1]** 14/16
**realize [1]** 84/16
**realized [2]** 84/11 86/5
**realtime [1]** 8/5
**rear [1]** 5/6
**reasonableness [1]** 111/11
**recap [3]** 58/3 63/6 101/13
**receipt [2]** 15/18 23/21
**receipts [2]** 28/6 79/7
**recent [2]** 6/23 6/24
**recently [1]** 35/10
**recess [3]** 62/24 112/23 114/13
**recitals [1]** 13/7
**recognize [4]** 6/11 70/9 74/6 74/7
**recognized [2]** 29/7 107/8
**recognizes [1]** 78/12
**recollection [1]** 35/7
**recommend [4]** 6/1 6/18 63/7 66/9
**recommendation [5]** 13/13 78/7 111/14 111/25 112/16
**recommendations [3]** 12/1 12/11 111/24
**recommended [1]** 66/8
**recommending [2]** 67/1 68/15
**reconcile [1]** 100/11
**record [14]** 3/7 7/23 18/12 21/6 25/10 30/25 37/11 56/6 80/10 82/13 105/24 107/11 108/2 114/2
**recorded [1]** 57/13
**recording [2]** 35/11 49/13
**records [4]** 37/15 57/5 57/7 74/20
**recovering [2]** 90/12 93/24
**RECROSS [1]** 60/1
**RECROSS-EXAMINATION [1]** 60/1
**recurrent [1]**

**R**

**recurrent... [1]** 107/15
**redaction [1]** 21/1
**redirect [2]** 56/23 57/1
**reduction [1]** 21/2
**reference [3]** 18/21 25/6 36/2
**referenced [3]** 7/4 33/12 41/6
**references [2]** 20/17 26/22
**referencing [3]** 19/11 35/16 35/16
**reflected [1]** 100/10
**reflective [1]** 106/13
**refunds [1]** 8/13
**regals [1]** 68/5
**reimbursed [5]** 9/12 10/7 10/7 11/1 11/15
**reimbursement [2]** 10/1 11/19
**reiterate [1]** 78/8
**reiterates [1]** 78/2
**relationship [1]** 84/1
**relative [1]** 113/11
**release [8]** 66/8 109/7 110/6 110/7 110/8 110/10 110/12 112/10
**released [1]** 110/9
**relevance [3]** 46/3 55/20 55/21
**relied [3]** 27/14 27/19 64/18
**remain [2]** 3/20 23/18
**remaining [2]** 8/19 114/10
**remains [2]** 95/15 107/11
**remanded [1]** 112/20
**remitting [1]** 113/14
**remorse [2]** 91/12 95/15
**remorseful [2]** 91/17 91/22
**removable [1]** 95/25
**removal [1]** 110/18
**renew [1]** 111/6
**repaid [4]** 78/12 79/3 102/3 102/17
**repay [3]** 95/10 107/19 108/7
**repayment [3]** 78/25 79/6 105/13
**replete [1]** 93/20
**replicas [1]** 94/25
**report [7]** 6/6 69/3 70/8 106/5 109/13 110/8 110/21
**Reporter [3]** 1/24 87/23 114/20
**reports [1]** 68/18
**representations [4]** 71/20 71/21 78/25 79/8
**representative [1]** 54/4
**representatives [2]** 26/25 29/17
**reproduction [10]** 39/10 47/10 48/22 52/4 71/12 71/12 71/13 71/13 72/24 74/24
**reproductions [5]** 39/6 39/8 46/21 48/18 52/2
**reputable [1]** 72/15
**request [2]** 81/3 113/7
**requested [2]** 8/12 39/23
**requests [1]** 7/9
**required [1]** 103/23
**requirement [1]** 110/18
**resell [1]** 25/22
**reselling [2]** 75/13 75/20
**resemblance [1]** 48/21
**resend [1]** 105/1
**residence [1]** 53/1
**resident [2]** 31/10 59/5
**resold [1]** 75/1
**resolution [1]** 11/22
**resolve [2]** 5/21 9/2
**resources [1]** 45/17
**response [3]** 6/24 23/2 59/2
**responses [1]** 3/10
**responsibility [3]** 24/15 107/18 108/7
**rest [1]** 83/7
**restaurant [2]** 83/3 83/4
**restaurants [1]** 82/24
**restitution [27]** 79/9 79/15 105/7 105/12 105/16 105/20 105/22 106/10 108/19 108/23 108/24 109/8 109/13 109/17 109/19 109/21 110/19 110/25 113/1 113/7 113/8 113/11 113/17 113/19 113/22 113/23 114/3
**restriction [1]** 110/19
**result [2]** 30/18 37/14
**results [1]** 48/3
**resumed [1]** 62/25
**retired [1]** 101/4
**retiring [1]** 93/25
**retracted [1]** 55/12
**retrieved [2]** 15/16 87/5
**return [4]** 9/21 62/17 79/12 107/4
**returns [2]** 37/11 70/17
**revealed [1]** 75/7
**review [3]** 37/11 57/3 59/13
**revised [2]** 7/3 25/4
**reward [1]** 84/16
**ripped [1]** 77/5
**River [17]** 26/10 26/20 38/25 39/1 39/2 39/7 39/9 40/13 46/24 47/3 47/16 47/22 48/2 48/12 54/23 54/25 55/10
**riverboat [1]** 97/7
**RMR [2]** 1/24 114/20
**rolling [1]** 19/14
**Rolls [1]** 68/2
**room [6]** 5/6 33/19 33/20 36/16 42/1 56/2
**Royce [1]** 68/2
**rule [1]** 62/21
**ruling [4]** 65/8 65/10 65/21 70/10

**S**

**sacrifices [1]** 97/21
**sale [23]** 6/2 6/7 6/13 16/12 16/15 16/17 18/6 20/10 20/11 21/17 22/14 23/21 35/18 36/14 36/19 36/23 40/19 41/6 62/2 73/5 73/23 102/20 102/24
**sales [2]** 35/11 35/19
**Sam [2]** 87/24 87/25
**SARAH [2]** 1/14 2/9
**satisfy [1]** 109/17
**save [2]** 86/23 87/1
**saved [2]** 85/4 87/1
**scams [1]** 31/18
**SCHALL [10]** 1/14 2/9 2/14 18/3 51/24 95/11 96/19 100/9 105/8 113/11
**schedule [1]** 109/10
**scheduled [2]** 111/1 114/4
**Scheiner [2]** 80/11 90/19
**scheme [8]** 17/8 59/15 64/23 67/11 69/21 70/11 107/12 108/9
**schemer [1]** 102/11
**Schemke [4]** 28/15 36/2 40/7 47/19
**Schumacher [26]** 2/17 2/19 3/16 9/10 12/19 13/3 23/9 24/6 27/12 39/14 43/4 54/14 59/23 65/12 65/20 66/15 78/23 79/7 79/19 91/3 101/7 103/21 104/16 111/24 113/9 113/25
**SCHUMAKER [2]** 1/18 1/18
**scope [1]** 53/21
**Scotland [1]** 84/19
**sculpture [2]** 76/9 76/14
**se [1]** 22/3
**search [29]** 6/12 9/18 15/17 18/18 19/1 20/11 21/14 33/2 35/9 38/22 38/23 39/19 39/25 43/8 43/11 43/13 44/8 45/15 45/19 45/21 45/23 46/1 48/9 49/2 50/16 53/1 55/5 58/18 110/19

**S**

**searched [1]** 43/14
**second [5]** 19/2 38/11 41/2 95/17 96/2
**secondarily [1]** 100/8
**section [5]** 3/6 98/5 106/8 108/15 112/1
**secured [1]** 112/7
**security [1]** 31/16
**sees [2]** 92/7 92/12
**seized [2]** 58/18 94/10
**selected [1]** 13/18
**self [2]** 93/5 112/18
**self-elocute [1]** 93/5
**self-surrender [1]** 112/18
**seller [2]** 74/21 74/22
**selling [13]** 27/2 33/7 33/13 38/8 39/10 41/16 55/8 68/18 69/2 70/6 71/22 72/13 72/16
**sense [1]** 113/24
**sentence [17]** 3/4 66/24 67/1 68/15 74/2 74/12 78/3 103/11 104/1 108/3 110/24 111/3 111/5 111/12 111/20 112/19 112/22
**September 2021 [1]** 33/25
**sequence [2]** 44/1 51/16
**series [2]** 51/16 62/15
**serious [1]** 100/7
**seriously [2]** 89/23 103/11
**seriousness [1]** 100/6
**serve [2]** 3/5 112/19
**service [1]** 12/10
**services [1]** 80/19
**serving [1]** 112/21
**seven [2]** 76/15 92/5
**SH [1]** 74/14
**shadows [1]** 93/15
**shall [11]** 108/17 108/25 109/7 109/12 109/19 109/23 110/6 110/8 110/10 110/16 110/22
**share [1]** 34/6
**shipped [1]** 42/1
**shoe [1]** 77/16
**shop [5]** 50/15 82/19 98/6 99/4 99/6
**shops [2]** 82/22 82/23
**short [2]** 55/17 92/11
**shot [1]** 40/11
**shown [3]** 5/8 50/23 50/24
**siblings [1]** 91/24
**side [2]** 31/16 78/20
**sides [2]** 49/14 89/17
**sign [11]** 38/24 39/22 40/12 47/2 47/4 48/16 48/16 54/24 55/4 55/7 63/15
**signal [1]** 50/3
**signature [1]** 75/11
**signed [1]** 22/3
**Signs [1]** 38/25
**simple [2]** 94/3 94/3
**simplicity [1]** 32/21
**sing [1]** 88/22
**singer [1]** 99/12
**single [1]** 69/8
**site [3]** 26/10 65/7 68/23
**situated [1]** 78/18
**situation [4]** 24/14 85/5 89/7 89/11
**situations [1]** 81/21
**slight [1]** 108/4
**slow [2]** 86/19 87/23
**small [2]** 20/1 77/23
**smaller [4]** 8/9 38/17 56/5 97/16
**snobbiness [1]** 99/13
**social [4]** 44/23 84/3 99/1 99/23
**socially [3]** 88/6 99/16 99/22
**society [1]** 103/16
**socioeconomic [1]** 99/19
**son [2]** 98/12 98/17
**soon [1]** 23/8
**Sophia [4]** 85/21 86/3 87/3 87/7
**Sophia's [1]** 99/4
**Sotheby's [5]** 25/18 53/16 55/19 56/15 72/5
**sought [4]** 10/14 12/23 17/11 63/22
**Soup [1]** 73/8
**south [4]** 1/15 99/11 112/17 114/21
**SOUTHERN [1]** 1/1
**spanning [1]** 107/15
**special [12]** 2/11 7/11 9/7 27/11 30/21 41/19 41/20 66/10 110/17 110/20 110/22 111/2
**specialist [1]** 31/22
**specialized [1]** 31/20
**specific [3]** 56/20 93/18 101/10
**specified [1]** 97/15
**specify [1]** 28/7
**speculated [1]** 48/14
**speech [1]** 97/18
**spell [1]** 87/17
**spelling [1]** 30/25
**spend [1]** 42/4
**spent [1]** 71/14
**spite [1]** 99/21
**spoke [2]** 35/13 38/23
**spoken [2]** 27/2 33/7
**spray [1]** 63/14
**squad [2]** 31/17 31/19
**stamp [1]** 25/6
**stand [5]** 30/21 75/14 80/7 84/23 104/3
**standard [2]** 64/1 110/11
**standing [1]** 69/6
**starting [5]** 2/7 9/4 35/9 66/24 86/14
**state [4]** 30/24 80/10 82/13 85/18
**stated [1]** 66/5
**statement [6]** 48/23 80/4 87/18 93/9 100/5 103/23
**STATES [16]** 1/1 1/3 1/11 2/5 2/10 2/12 2/23 3/6 106/7 108/15 109/20 109/24 109/25 110/22 112/21 114/21
**status [3]** 64/21 96/7 96/21
**statutes [1]** 94/15
**statutory [2]** 3/5 106/7
**stay [2]** 84/24 93/25
**steadfast [1]** 23/18
**step [5]** 34/17 53/14 64/15 64/17 101/12
**stepped [1]** 83/5
**steps [8]** 14/25 15/21 16/25 46/5 47/14 47/14 65/5 102/17
**sting [2]** 17/14 63/24
**stipulated [1]** 102/2
**stood [1]** 26/23
**stopped [1]** 83/25
**storage [1]** 43/11
**story [4]** 84/5 84/6 92/10 101/3
**strangers [1]** 93/22
**street [1]** 76/18
**streets [1]** 69/1
**strokes [3]** 29/9 29/20 29/22
**studio [1]** 98/14
**study [1]** 81/20
**style [6]** 42/11 42/13 42/19 42/24 52/1 71/12
**stylistic [1]** 42/20
**subjective [3]** 17/21 24/16 111/11
**submissions [1]** 13/8
**submit [5]** 7/7 7/17 27/6 74/25 89/14
**submitted [6]** 7/18 67/16 72/22 76/24 97/5 106/1
**subpoena [2]** 37/11 70/17
**subsection [1]** 108/15
**subsequent [4]** 11/19 59/20 96/12 96/17
**substance [1]** 110/14
**substantial [3]** 49/23 49/24 107/19
**substantive [1]** 16/4
**success [1]** 85/2

## S

successful [1] 91/7
successfully [1] 94/24
sudden [1] 11/2
sufficient [1] 107/23
sufficiently [1] 63/25
suggest [1] 27/24
suggested [1] 29/20
suggesting [2] 43/23 47/11
suggestion [2] 12/1 16/22
suggestive [1] 28/14
suggests [1] 28/18
Suite [2] 1/15 1/19
sum [3] 4/10 19/13 105/8
summarize [1] 80/20
summary [1] 59/7
sums [3] 16/18 105/21 106/24
superfluous [1] 16/9
supervised [4] 66/8 110/7 110/10 110/11
supplement [1] 59/10
support [7] 3/8 7/8 59/11 67/14 77/8 82/3 87/7
supporting [2] 51/12 69/11
surrender [2] 112/3 112/18
surveillance [1] 33/24
survivers [2] 82/18 83/24
survivors [1] 82/23
suspected [1] 10/8
sustain [1] 63/5
sustained [5] 36/6 53/23 65/15 66/5 78/2
swath [1] 4/14
swear [1] 30/22
swindles [1] 31/19
switched [1] 73/11
sword [3] 36/17 36/20 99/25
SWORN [1] 30/23
synagogue [9] 68/5 76/23 77/10 80/15 80/16 81/5 90/15 90/19 90/25
synthesizing [3] 89/17 89/17 89/20

## T

table [2] 2/11 62/17
tag [1] 41/22
talented [1] 91/24
tape [1] 17/3
tapes [1] 50/9
targeted [3] 4/15 11/4 17/9
team [10] 31/22 31/25 32/9 32/21 32/23 33/1 50/4 56/17 59/5 97/10
tech [1] 91/25
tend [1] 55/6
tender [1] 14/18
tenor [1] 92/6
tens [1] 15/5
tentative [1] 64/19
term [2] 25/20 110/7
terminology [2] 41/14 71/13
terms [11] 8/8 9/2 9/3 15/12 61/16 64/2 80/21 80/22 95/7 96/7 104/20
terrible [1] 94/6
testimony [7] 24/21 59/10 61/25 64/6 64/25 68/22 106/3
text [34] 18/9 18/16 19/6 20/2 20/3 20/17 21/19 21/20 22/17 22/21 23/12 23/16 62/15 64/6
thank [35] 2/2 31/5 43/5 54/13 54/15 56/10 56/22 61/21 62/16 62/23 63/1 65/14 66/21 67/6 79/18 79/20 82/5 82/7 85/9 85/10 87/11 87/19 90/2 90/3 92/16 92/17 92/20 92/25 96/16 97/1 103/20 103/21 103/24 103/25 105/6
thanking [1] 98/18
thanks [1] 86/7
Thereafter [2] 19/7 19/25
therein [1] 66/4
thinking [1] 73/18
thorough [1] 68/19
thoroughly [1] 93/9
thought [6] 44/1 61/24 74/16 89/1 93/9 99/24
thousand [4] 15/7 98/7 98/8 98/9
thousands [2] 15/5 69/4
threatened [1] 102/5
thrust [1] 9/14
tie [1] 49/7
ties [1] 46/10
time [29] 10/4 15/4 31/13 32/13 33/2 35/2 42/4 43/2 44/1 50/8 50/9 55/16 60/13 79/17 82/22 85/24 86/3 86/17 91/5 94/10 95/9 95/25 97/19 107/3 107/6 109/9 112/19 114/4 114/9
timeframe [1] 107/15
times [3] 87/25 91/9 97/14
Title [3] 3/5 106/7 108/14
titled [1] 63/17
today's [4] 3/3 7/11 77/7 105/9
tolerated [1] 107/23
topic [1] 27/20
topnotch [1] 73/9
total [10] 4/10 5/19 18/6 63/18 64/9 66/7 102/2 102/3 109/24 110/24
touch [1] 78/23
touched [2] 73/22 98/23
tough [1] 82/22
toward [3] 75/5 77/15 109/5
towards [1] 109/2
Tower [1] 1/19
track [1] 92/1
trafficking [4] 82/18 82/19 83/23 98/2
tragedy [1] 96/5
tragic [1] 87/8
transaction [8] 16/6 17/24 24/1 49/10 49/15 49/21 50/2 104/9
transactions [4] 23/19 57/7 92/10 112/12
TRANSCRIPT [1] 1/10
transcription [1] 114/17
transfer [2] 19/8 59/12
transferred [1] 19/25
transported [1] 42/2
treated [1] 99/18
treatment [1] 12/2
tremendous [1] 94/20
tries [1] 89/23
trivializing [1] 76/3
trouble [1] 84/6
trust [1] 8/17
trusted [1] 106/18
truth [2] 12/7 28/10
tugboat [1] 87/2
tune [1] 102/5
turmoil [1] 86/2

## U

U.S [7] 109/11 109/11 109/12 110/3 110/3 110/4 114/21
UC [6] 16/13 19/6 19/8 46/17 46/25 47/17
UCE [20] 4/11 19/23 19/25 20/3 20/13 21/8 22/22 22/23 23/1 23/16 30/18 36/14 48/1 48/14 48/24 49/9 58/7 58/8 63/10 64/2
UCE's [1] 14/22
Ukraine [3] 86/1 86/1 86/8
ultimate [4] 12/20 17/17 64/21 108/4
ultimately [12] 10/6 10/25 30/18 46/16 63/5 64/9 66/5 75/4 79/15 106/14 106/20 107/16
unable [2] 28/7 111/22
unavailable [1] 101/2
under-characterize [1] 95/11
undercover [65] 4/22 5/7 6/2 6/7 12/24 14/14 14/24 15/3 15/10 15/22 15/23 16/6 16/10 16/17 18/2 18/5 18/8 18/17 18/20

**U**

**undercover... [46]** 22/11 23/2 26/16 27/2 27/8 30/7 33/7 33/13 34/21 34/22 35/4 35/12 35/14 35/14 35/18 37/2 38/2 38/8 39/17 39/20 39/21 39/23 40/14 40/20 41/16 46/8 49/15 49/18 49/22 50/8 50/10 50/15 50/18 55/9 55/13 57/14 57/18 57/19 62/5 62/6 73/5 73/5 73/6 73/12 73/23 101/20
**undercover's [1]** 21/2
**underneath [1]** 71/3
**understanding [9]** 13/11 36/19 36/21 36/25 37/4 40/8 47/13 59/1 96/22
**unequivocably [1]** 58/12
**unexpected [2]** 87/8 109/16
**unfortunately [4]** 68/7 68/10 94/13 103/6
**UNICOR [1]** 109/4
**UNITED [17]** 1/1 1/3 1/11 2/5 2/10 2/12 2/23 3/5 40/9 106/7 108/15 109/20 109/24 109/25 110/22 112/21 114/21
**unlawfully [1]** 110/14
**unless [3]** 2/25 28/10 28/17
**unlikely [3]** 17/13 17/17 63/23
**unopposed [2]** 104/11 104/16
**unpaid [1]** 110/19
**unquestionably [1]** 67/12
**unresolved [1]** 3/17
**unsettled [1]** 8/10
**unsuspecting [1]** 107/13
**untitled [1]** 63/16
**unusual [2]** 11/24 57/11
**upcoming [1]** 102/21
**uploading [1]** 99/23
**upset [1]** 89/6
**urge [1]** 103/18
**us [22]** 1/15 32/15 33/5 41/13 42/4 50/8 58/13 58/14 65/16 83/1 83/1 83/8 83/8 83/15 86/15 88/4 88/21 91/10 95/7 102/3 107/1 107/3

**V**

**vacation [1]** 76/20
**valuable [1]** 44/18
**value [6]** 17/15 27/4 41/21 65/2 94/20 107/6
**valued [4]** 63/15 63/16 63/17 94/10
**values [1]** 73/3
**variables [1]** 75/19
**variance [4]** 3/10 62/22 67/3 108/4
**veracity [1]** 11/25
**versus [2]** 7/1 20/21
**Veterans [1]** 97/11
**via [6]** 5/11 18/9 18/9 20/1 24/21 39/24
**victim [28]** 8/2 9/13 10/5 60/20 69/22 74/14 74/19 74/23 75/1 75/2 75/2 75/4 75/5 75/9 75/13 75/21 75/22 75/25 76/7 76/8 76/10 76/11 76/15 77/13 77/17 77/20 77/20 77/21
**victim's [2]** 78/12 106/25
**victimization [1]** 69/3
**victimize [1]** 106/16
**victimized [2]** 77/12 79/10
**victims [66]** 3/19 3/23 5/18 5/19 6/20 6/20 7/2 7/2 7/9 7/13 8/7 8/16 9/5 9/11 9/11 9/13 10/6 10/8 10/10 10/24 10/25 11/2 11/14 11/16 11/18 11/18 11/20 11/21 15/4 27/9 49/6 49/8 65/19 66/18 69/21 70/10 70/10 71/24 72/7 72/22 73/13 73/25 74/10 76/16 76/18 76/22 78/2 78/15 78/24 79/4 79/5 94/8 95/11 95/14 98/2 102/1 102/24 105/17 107/20 108/7 108/10 109/22 111/7 113/2 113/13 113/20
**victims' [2]** 108/16 108/17
**video [3]** 35/11 57/13 57/13
**village [1]** 84/20
**violations [2]** 31/15 112/9
**violent [1]** 74/8
**virtual [2]** 32/7 49/20
**vis [2]** 12/2 12/2
**visa [1]** 67/24
**visitor's [1]** 67/24
**visits [1]** 18/2
**vivid [1]** 51/12
**voiced [1]** 79/11
**volume [1]** 48/8
**voluminous [3]** 3/8 105/25 108/2
**voluntarily [1]** 98/20
**volunteer [1]** 81/4
**volunteered [1]** 81/17
**vs [1]** 1/5

**W**

**wages [2]** 109/1 109/2
**waiver [2]** 111/8 111/18
**walk [2]** 47/25 76/18
**walked [2]** 83/14 84/12
**walks [1]** 56/14
**wall [3]** 38/18 72/4 76/2
**wallet [1]** 19/10
**wallets [1]** 19/8
**Warhol [13]** 18/23 26/3 26/3 26/5 69/25 70/19 71/9 71/10 71/11 72/4 73/8 75/11 77/15
**Warhols [4]** 70/22 74/16 74/17 75/8
**warrant [14]** 6/12 9/19 15/17 18/18 20/11 21/14 44/8 45/19 45/21 45/23 46/1 49/2 50/16 55/5
**warrants [5]** 33/2 43/8 43/11 43/13 48/10
**watch [2]** 68/2 76/11
**wealthy [1]** 72/6
**website [2]** 26/1 72/8
**Wednesday [1]** 8/18
**weigh [3]** 8/4 105/15 107/16
**Weisberg [5]** 2/23 2/24 66/11 113/12 113/16
**welcomes [1]** 68/2
**Wells [1]** 1/19
**West [3]** 12/3 13/19 31/9
**wet [2]** 29/20 29/22
**whenever [1]** 80/25
**whereas [1]** 75/12
**wherein [1]** 21/23
**white [1]** 31/16
**wide [1]** 31/15
**wider [1]** 100/15
**wife's [3]** 98/5 99/4 112/9
**willingness [1]** 23/22
**wired [1]** 70/2
**wish [2]** 7/14 112/20
**witnesses [2]** 7/17 79/22
**woman's [1]** 77/16
**women [1]** 97/12
**wonder [1]** 89/2
**wonderful [1]** 67/15
**wondering [1]** 89/3
**world [10]** 67/9 68/6 68/25 69/15 71/8 85/2 89/13 89/13 92/6 100/24
**worth [22]** 4/24 20/4 24/8 30/10 34/19 38/18 43/10 43/21 43/24 47/8 56/8 68/25 72/12 76/19 78/19 82/19 83/6 83/12 88/15 92/3 94/12 94/14
**worthy [1]** 107/20
**Wounded [1]** 97/11
**wrap [1]** 61/11
**wrapping [1]** 56/9
**wrongdoing [2]** 10/8 11/20

**Y**

**young [1]** 98/15

Case 9:22-cr-80099-AMC Document 111 Entered on FLSD Docket 09/11/2023 Page 133 of 133

**Z**

**Zoom [1]** 103/6